No. 21-35433

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ADMIRAL INSURANCE COMPANY,

Plaintiff - Appellee,

v.

DUAL TRUCKING INC., a Louisiana corporation; et al.

Defendants - Appellants.

On Appeal from the United States District Court
For the District of Montana, Great Falls
No. 4:20-cv-00053-BMM
Hon. Brian Morris

**APPELLANTS' EXCERPT OF RECORD
VOL. 1 OF 1**

LINDA M. DEOLA
MORRISON SHERWOOD WILSON
DEOLA, PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, Montana 59624-0557
Phone: (406) 442-3261
ldeola@mswdlaw.com

KD FEEBACK
TOOLE & FEEBACK, PLLC
P.O. Box 907
Lincoln, Montana 59639
Phone: (406) 362-4025
kdfeeback@gmail.com

*Counsel for Defendants-Appellants*

# INDEX

**Volume 1**                                                                    **ER Number**

Judgment in a Civil Case, filed 5/5/21 (Doc. 77) ....................................................4

Order Granting Motion for Partial Summary Judgment,
filed 5/5/21 (Doc. 76) ........................................................................ 5-29

Exhibit A - Affidavit of Todd J. Hutchinson, filed 3/25/21 (Doc. 67-1),
*(Response to Motion for Summary Judgment)* ................................................ 30-34

Exhibit B - April 17, 2013, Letter from DEQ to Knudsen filed 3/25/21 (Doc. 67-2),
*(Response to Motion for Summary Judgment)* .......................................................35

Exhibit 5 - DTI Lease, filed 2/2/21 (Doc. 58-5),
*(Foundational Declaration of Emma L. Mediak)* ............................................. 36-50

Exhibit 6 - Assignment of Lease, filed 2/2/21 (Doc. 58-6),
*(Foundational Declaration of Emma L. Mediak)* ............................................. 51-67

Exhibit 7 - DTM Lease Lot 1, filed 2/2/21 (Doc. 58-7),
*(Foundational Declaration of Emma L. Mediak)* ............................................. 68-78

Exhibit 8 - DTM Lease Lot 2, filed 2/2/21 (Doc. 58-8),
*(Foundational Declaration of Emma L. Mediak)* ............................................. 79-92

Exhibit 9 - DTM Lease Lot 3, filed 2/2/21 (Doc. 58-9),
*(Foundational Declaration of Emma L. Mediak)* ........................................... 93-103

Exhibit 11- September 17, 2012, Letter from DEQ filed 2/2/21 (Doc. 58-11),
*(Foundational Declaration of Emma L. Mediak* ........................................... 104-105

Exhibit 12 - Complaint filed 2/2/21 (Doc. 58-12),
*(Foundational Declaration of Emma L. Mediak)* ........................................... 106-149

Exhibit 14 - March 12, 2013, Letter from DEQ filed 2/2/21 (Doc. 58-14,
*(Foundational Declaration of Emma L. Mediak)* ........................................... 150-153

Exhibit 15 - March 13, 2013, Letter from DEQ filed 2/2/21 (Doc. 58-15),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 154-155

Exhibit 17 - March 13, 2013, Letter from DEQ filed 2/2/21 (Doc. 58-17),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 156-160

Exhibit 18 - March 20, 2013, Letter from DTT filed 2/2/21 (Doc. 58-18),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 161-162

Exhibit 20 - August 2, 2013, Letter from DEQ filed 2/2/21 (Doc. 58-20),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 163-166

Exhibit 39 – June 26, 2014, Letter from DEQ filed 2/2/21 (Doc. 58-39),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 167-168

Exhibit 40 - DEQ Complaint filed 2/2/21 (Doc. 58-40),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 169-177

Exhibit 41 - Third Amended Complaint filed 2/2/21 (Doc. 58-41),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 178-184

Exhibit 42 – Limited Site Investigation Report filed 2/2/21 (Doc. 58-42),
*(Foundational Declaration of Emma L. Mediak)* ........................................ 184-204

Exhibit 5, Insurance Policy filed 2/2/21 (Doc. 59-5),
*(Declaration of Renee Miller)* ........................................................ 205-248

Notice of Appeal filed 6/4/21 (Doc. 78) ................................................ 249-250

District Court Docket Sheet .............................................................. 251-262

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| ADMIRAL INSURANCE COMPANY, | Case No. CV-20-53 -GF-BMM |
| Plaintiff, | JUDGMENT IN A CIVIL CASE |
| vs. | |
| DUAL TRUCKING, INC. ET AL, | |
| Defendant. | |

**Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

 **X**   **Decision by Court.** This action came before the Court for bench trial, hearing, or determination on the record.  A decision has been rendered.

IT IS ORDERED AND ADJUDGED Admiral's Motion for Partial Summary Judgment is GRANTED.

Dated this 5th day of May, 2021.

TYLER P. GILMAN, CLERK

By: /s/ M. Stewart
M. Stewart, Deputy Clerk

**ER_4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| ADMIRAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>DUAL TRUCKING, INC., a Louisiana corporation, DUAL TRUCKING OF MONTANA, L.L.C., a Louisiana limited liability company, DUAL TRUCKING AND TRANSPORT, L.L.C., a Louisiana limited liability company, and ANTHONY J. ALFORD, a Louisiana resident,<br><br>Defendants. | **CV-20-53-GF-BMM**<br><br>**ORDER** |

## INTRODUCTION

Plaintiff in this case, Admiral Insurance Company ("Admiral"), has filed a Motion for Partial Summary Judgment. (Doc. 55). Defendants Dual Trucking and Transport, LLC ("DTT"), Dual Trucking of Montana, LLC ("DTM"), Dual Trucking, Inc. ("DTI") (collectively, the "Dual Entities"), and Anthony Alford ("Alford") oppose the Motion. (Doc. 67). This Order refers collectively to the Dual Entities and Alford as "Defendants" where appropriate.

Admiral seeks a partial summary judgment ruling that it has no duty to defend or indemnify Defendants under six insurance policies that Admiral issued to the Dual Entities over two years. (Doc. 56 at 5). Admiral's Amended Complaint (Doc. 48) and Motion for Partial Summary Judgment (Doc. 55) relate to two underlying Montana state district court lawsuits, Cause No. DV-15-15 (the "*Harmon* Action"), and Cause No. DV-14-67 (the "*Montana DEQ* Action"), each filed in Roosevelt County, Montana, and six Violation Letters sent from the Montana Department of Environmental Quality ("Montana DEQ") to Defendants.

## FACTUAL AND LEGAL BACKGROUND

DTT and DTM operate as Louisiana limited liability companies with their principal places of business in Houma, Louisiana. (Doc. 48 at 3). DTI operates as a Louisiana corporation with its principal place of business in Houma, Louisiana. *Id.* at 2. Alford, a resident of Terrebonne Parish, Louisiana, served as "[p]rincipal manager of DTM," (Doc. 58-1 at 4), "managing member" of DTT, (Doc. 31 at 5), and an officer of DTI, (Doc. 68 at 4), during the time frame relevant to this case.

DTI leased a tract of real property in Montana from Garth L. Harmon and Wagner Harmon (the "Harmons") in 2011. (Doc. 48 at 4–5). DTI assigned its right in the lease to DTM later that year. *Id.* DTM and the Harmons then terminated the original lease, and DTM leased three tracts of land from the Harmons. *Id.* at 5. The DTM-Harmon leases included the entire portion of the original DTI-Harmon lease.

*Id.* The three DTM-Harmon leases included a purchase option for DTM. *Id.* The three lease tracts collectively constitute the "Bainville Site." *Id.*

Montana DEQ sent a Warning Letter dated September 17, 2012, to Alford, as representative of the Dual Entities. (Doc. 48 at 5). The Warning Letter advised Defendants that Montana DEQ had received a complaint on July 26, 2012, alleging that oil field exploration and production waste ("Special Waste") had been placed on the Bainville Site without a Solid Waste Management Facility license. (Doc. 1-5). The Warning Letter further advised Defendants that, if these allegations were correct, Defendants were operating "in violation" of the Montana Solid Waste Management Act ("SWMA"), Mont. Code Ann. §§ 75–10–212, –221. *Id.* The Warning Letter required Defendants, within 15 days, to "hire an environmental consultant and develop a corrective action plan for cleaning up the Special Waste on the [Bainville Site]." *Id.* The Warning Letter directed that, within 30 days, "the Special Waste must be legally removed and properly disposed of," and, within 60 days, Defendants must provide to Montana DEQ a "cleanup report" completed by Defendants' "environmental consultant." *Id.*

Defendants dispute the significance of the Warning Letter. (Doc. 68 at 6). Defendants insist that the Warning Letter "merely reported an unsupported hearsay allegation barren of fact" and characterize the Warning Letter as "merely advisory." *Id.* Notably, the Warning Letter cautions that, in the event Defendants

fail to follow the letter's requirements, Montana DEQ stood "prepared to initiate a formal enforcement action that may include the assessment of penalties." (Doc. 1-5).

*The Insurance Policies*

DTT applied for, and Admiral issued, two Environmental Impairment Liability Policies ("EIL Policies") for coverage at the Bainville Site. (Doc. 48 at 11). The first listed a policy period from October 1, 2012, to October 1, 2013 ("2012–2013 EIL Policy"), and the second listed a policy period from October 1, 2013, to October 1, 2014 ("2013–2014 EIL Policy"). The EIL Policies list DTT as the named insured. (Doc. 48 at 6). EIL Policies are claims-made policies, designed to provide coverage for certain pollution conditions at a property that the named insured owns or controls. (Doc. 56 at 5). Admiral's EIL policy application asks multiple questions regarding whether DTT operated in compliance with applicable environmental laws and whether DTT knew of any conditions at the insured location that might lead to a claim under the EIL Policies. (Doc. 57 at 8). DTT failed to include its receipt of the September 17, 2012 Warning Letter from Montana DEQ in its 2012–2013 EIL Policy application. (Doc. 56 at 21).

Admiral also issued four Contractor Pollution Liability Policies ("CPL Policies"), two to DTI and two to DTT. (Doc. 57 at 11–14, 27–30). The CPL Policies named DTM as an additional insured. *Id.* The first two CPL Policies listed

a policy period of October 1, 2012, to October 1, 2013 ("2012–2013 CPL

Policies"). (Doc. 56 at 6). The second two CPL Policies listed a policy period of

October 1, 2013, to October 1, 2014 ("2013–2014 CPL Policies"). *Id.*

*The Six Violation Letters and Two State Court Cases*

Montana DEQ sent the following three Violation Letters in quick succession

to representatives of the Dual Entities, including Alford: (1) Violation Letter from

Mont. DEQ to DTT, *Solid Waste & Open Burning Complaint [CVID # 16354]*,

March 12, 2013 ("Violation Letter 1") (Doc. 58-14); (2) Violation Letter from

Monta. DEQ to DTT, *Violations of Solid Waste Mgmt. Act [CVID # 15855]*, March

13, 2013 ("Violation Letter 2") (Doc. 58-15); and (3) Violation Letter from Mont.

DEQ to DTT, *Liquid Invert Spill at CR 1009, Bainville, Roosevelt Cty., Mont.*

*[CVID # 16391]*, March 13, 2013 ("Violation Letter 3") (Doc. 58-17).

Violation Letter 1 referenced the September 17, 2012 Warning Letter, and

detailed allegations that the Dual Entities improperly were storing and disposing of

solid waste, dumping "Liquid Invert" and contaminated soil and water on the

ground, and burning Tyvek suits and trash at the Bainville Site. (Doc. 58-14).

Violation Letter 2 asserts that DTT had not performed the required items listed in

the September 17, 2012 Warning Letter related to the unlicensed Solid Waste

Management Facility that DTT was operating at the Bainville Site. (Doc. 58-15).

Violation Letter 3 advised DTT that DEQ had received a report of a leak from an

above-ground Poseidon Tank at the Bainville Site. (Doc. 58-17). Violation Letter 3

also advised that a spill of 1500 barrels of "Liquid Invert" qualified as an improper

disposal of solid waste and constituted a violation of the Montana SWMA. *Id.*

DTT responded to the first three Violation Letters with a single letter dated

March 20, 2013. (Doc. 58-18). Montana DEQ later received on June 10, 2013, an

application from DTT for a Solid Waste Management Facility license at the

Bainville Site. (Doc. 58-19).

Montana DEQ sent a fourth Violation Letter dated August 2, 2013, to DTT

related to the unlicensed Solid Waste Management Facility at the Bainville Site.

*See* Letter from Mont. DEQ to DTT, *Proposed Dual Trucking Treatment*

*Facility—Bainville, Mont., Site Inspection Report—Violation Letter*, August 2,

2013 ("Violation Letter 4"). (Docs. 58-20, 58-21). Violation Letter 4

acknowledges that DEQ had received DTT's application for a Solid Waste

Management Facility License on June 10, 2013. (Doc. 58-20). Violation Letter 4

also notes that DTT was engaged in the ongoing management of solid wastes at the

facility, an act that qualifies as operation of a Solid Waste Management Facility

without a license in violation of the SWMA. *Id.*

On September 25, 2013, the Harmons sent Alford and DTM a letter

("Breach of Contract Letter") asserting that DTM had breached the three lease

agreements at the Bainville site. (Doc. 58-22). The Breach of Contract Letter

alleged that the Dual Entities had "caused environmental impairment to the

Property" and had "used the property in a manner that has caused pollution of

waterways flowing through or underneath the property." *Id.*

DTT failed to attach any of the four Violation Letters or mention the

pollution referenced in the Breach of Contract Letter when it renewed its 2013–

2014 EIL Policy. (Doc. 57 at 24). The same proved true for the renewal of the

2013–2014 CPL Policies. (Doc. 57 at 28).  DTT again failed to attach nay of the

Violation Letters or mention the Breach of Contract Letter.

Montana DEQ sent a settlement offer to DTT on December 4, 2013, seeking

to address DTT's violations of the Montana SWMA. *See* Letter from Mont. DEQ

to DTT, *Proposed Administrative Order on Consent, Docket No. SW-13-01 (FID

2271)*, Dec. 4, 2013 ("DEQ AOC Settlement Offer"). (Doc. 58-23). In response to

the DEQ AOC Settlement Offer, DTT employed HydroSolutions, Inc., to prepare a

Site Characterization and Environmental Condition Report ("2013 Site Report").

(Doc. 57 at 31–32; Doc. 58-24). DTT submitted the 2013 Site Report to Montana

DEQ on December 13, 2013. (Doc. 57 at 31–32).

DTT admitted in the 2013 Site Report to three prior "suspected or known

release" events. *Id.* DTT described all three events as "Storm Water" related and as

a berm breach lasting for three hours. *Id.* DTT prepared a revised Site

Characterization and Environmental Condition Report in February 2014. *See* Site

Characterization & Envtl. Condition Rep. (Revised), February 2014 ("2014

Revised Site Report"). *Id.* DTT admits in the 2014 Revised Site Report that the

three previously disclosed release events occurred in July 2013. *Id.* Montana DEQ

and DTT then engaged in settlement negotiations, and sent back and forth

proposed redline changes to different settlement offers. *Id.*

Montana DEQ sent a fifth Violation Letter to the Dual Entities on April 22,

2014. *See* Letter from Mont. DEQ to Dual Entities, *Request to cease solid waste*

*mgmt. operations at DTM; Mont. DEQ enforcement action for violations of Mont.*

*SWMA [FID 2271]*, Apr. 22, 2014 ("Violation Letter 5"). (Doc. 58-29). Violation

Letter 5 stated that DTT illegally had managed solid wastes at the Bainville Site

without a Solid Waste Management Facility license since at least July 2012. (Doc.

58-29). Violation Letter 5 acknowledges that DTT had submitted an application for

a Solid Waste Management Facility license, but states that Montana DEQ had

found DTT's application to be deficient and DTT had not responded adequately to

the deficiency letter. *Id.* Montana DEQ advised that DTT's application had

expired. *Id.* Montana DEQ directed DTT to submit a new application for a Solid

Waste Management Facility license. *Id.*

DTI responded to Violation Letter 5 on April 25, 2014. *See* Letter from

Julius P. Hebert, Jr. to Mont. DEQ, *Violation letter to DTI dated Apr. 22, 2014*,

Apr. 25, 2014 ("DTI April 2014 Response Letter"). (Doc. 58-30). DTT separately

responded to Violation Letter 5 on April 30, 2014. *See* Letter from A. Joselyn to Mont. DEQ, *Dual Trucking: Your Apr. 22, 2014 Violation Letter*, Apr. 30, 2014 ("DTT April 2014 Response Letter"). (Doc. 58-31). DTT advised Montana DEQ in its letter that DTT had ceased operations at the Bainville Site. (Doc. 58-31).

Counsel and representatives of DTT met with Montana DEQ on May 6, 2014, to discuss the ongoing issues at the Bainville Site. (Doc. 58-34). Montana DEQ advised DTT that it believed the Dual Entities were responsible for water quality violations discovered in surface water samples taken from the Bainville Site. *Id.*

Defendants and the Harmons engaged in settlement negotiations regarding the environmental contamination at the Bainville Site and DTM's proposed purchase of the Bainville Site. (Doc. 58-35). The record reveals that the parties detailed a number of payment terms in an email chain dated May 20, 2014. *Id.* at 2. DTM later asserted that it owns the Bainville Site after paying a total of $729,000 for the property, equating to $25,000 per acre for the actual surveyed size of the property. (Doc. 58-4 at 4).

Montana DEQ sent a sixth Violation Letter to the Dual Entities on June 26, 2014, related to the unlicensed Solid Waste Management Facility at the Bainville Site. *See* Letter from Mont. DEQ to Dual Entities, *Violations of the Water Quality Act [FID #2271]*, June 26, 2014 ("Violation Letter 6"). (Doc. 58-39). Violation

Letter 6 references DTT's December 13, 2013 admission that DTT had three suspected or known waste or storm water released at the Bainville Site. *Id.*

DTT cancelled the 2013–2014 EIL Policy effective July 1, 2014, and received a partial reimbursement of its premium. (Doc. 59-8 at 50). The 2013–2014 EIL Policy entitles an insured to an automatic 30-day extended reporting period upon cancellation of the Policy. *Id.* at 24. The 2013–2014 EIL Policy states that the "Automatic Extended Reporting Period shall apply to *Claims* first made within the Automatic Extended Reporting Period but only with respect to *Pollution Conditions* that (a) are *Discovered* and reported during the Automatic Extended Reporting Period." *Id.* (emphasis in original). The EIL Policy defines the term "Discovered" to mean "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a *Pollution Condition.*" *Id.* at 13 (emphasis in original).

Admiral asserts that it had not received notice of any claims related to the Bainville Site on or before July 1, 2014. (Doc. 58-1 at 5; Doc. 60). The following day, on July 2, 2014, DTT provided Admiral with the first notice of any claims related to the Bainville Site. (Doc. 60; Doc. 60-1). The Notice of Claim filed by DTT indicates that the date of occurrence had been July 5, 2013. (Doc. 60-1). The Notice of Claim seeks coverage under the 2012–2013 EIL Policy that was in effect at the time of the July 5, 2013 occurrence. *Id.* DTT attached Violation Letter 6 to

its July 2, 2014 Notice of Claim. (Doc. 68 at 66). DTI provided Admiral with a

Notice of Claim on July 3, 2014, asserting the same claim as those stated in DTT's

Notice of Claim. (Doc. 68 at 66–67).

On November 25, 2014, Montana DEQ filed the *Montana DEQ* Action,

Cause No. DV-14-67, and included an application for an injunction against DTT

related to DTT's use of the Bainville Site as an unlicensed Solid Waste

Management Facility. (Doc. 68 at 67–68). Montana DEQ alleges that DTT

operated an unlicensed Solid Waste Management facility at the Bainville Site from

July 26, 2012, until April 30, 2014. *Id.* at 68. On June 23, 2015, the Harmons filed

a second amended complaint in the *Harmon* Action, Cause No. DV-15-15, against

Defendants. *Id.* at 69. The Harmons allege that Defendants have operated an

unlicensed Solid Waste Management Facility on the Bainville Site and have caused

or allowed pollutants to remain on the site, and to migrate off the site to

surrounding properties. *Id.* The Harmons point to the allegations in the *Montana*

*DEQ* Action, Cause No. DV-14-67, to support their contentions. *Id.* DTM filed a

counterclaim against the Harmons and has filed a separate quiet title action

alleging that DTM had a lease-to-own agreement for the entire Bainville Site and

that the Harmons had received full payment for the Bainville Site, but have refused

to transfer title to DTM. *Id.* at 69–70.

DTM hired Terracon Consultants, Inc. ("Terracon"), an environmental consulting firm, to conduct testing at the Bainville Site in response to the pollution allegations. *Id.* at 70. Terracon has concluded that no contamination migrated off of the leased Bainville Site onto neighboring property. *Id.*

## LEGAL STANDARDS

This case came before this Court upon a transfer from the United States District Court for the Eastern District of Louisiana. (Doc. 23). In cases where the defendants seek transfer, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). With respect to the applicable state law, a change of venue under 28 U.S.C. § 1404(a) generally should constitute "but a change of courtrooms." *Id.* The Eastern District of Louisiana determined that the transferee federal district court, in this case, the District of Montana, should apply Louisiana law in interpreting the insurance policies at issue. (Doc. 23 at 15–16).

As for Admiral's Motion for Partial Summary Judgment (Doc. 55), the Court shall grant summary judgment if the movant shows that there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the

outcome of the suit under the state substantive law are considered "material."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Admiral argues that it stands entitled to partial summary judgment on a

number of points. Defendants respond that Admiral fails to present a justiciable

claim, and insists that a number of material facts remain in dispute, thereby

rendering summary judgment improper in this case. This Order addresses each of

these arguments in turn.

## I.   Whether Admiral presents a justiciable claim.

Admiral seeks a declaration that it maintains no obligation to continue

paying Defendants' defense costs in the underlying state court cases, and that it

will not be obligated to indemnify Defendants. (Doc. 56). Defendants counter that

Admiral fails to present a justiciable claim. (Doc. 67 at 7–9).

Montana employs a three-part test for determinations on justiciability.

*Northfield Ins. Co. v. Mont. Ass'n of Ctys.*, 10 P.3d 813, 816 (Mont. 2000). A

justiciable controversy first requires that parties have existing and genuine rights or

interest, as opposed to merely theoretical rights. *Id.* Second, the controversy must

present issues that render the court's judgment operative, as distinguished from a

debate or argument invoking a purely political, administrative, philosophical, or

academic conclusion. *Id.* Lastly, the controversy must require a judicial

determination with the effect of a final judgment in law or equitable decree of the rights, status, or legal relationships of one or more of the real parties interest. Should the controversy lack those necessary features, the controversy still may prove justiciable where it involves issues "of such overriding public moment as to constitute the legal equivalent" of each factor. *Id.*

Defendants insist that Admiral "fails to establish any of these requirements." (Doc. 67 at 8). Defendants allege that unresolved related issues remain in the underlying state court actions that ultimately may affect whether Admiral owes a duty to indemnify Defendants. *Id.* at 9. Defendants contend that these unresolved related issues render premature any ruling by this Court on Admiral's indemnity obligations to Defendants. *Id.*

The Court disagrees that the issues of insurance coverage in the present declaratory judgment action rely upon the resolution of issues raised in the underlying *Montana DEQ* Action, Cause No. 14-67, or the *Harmon* Action, Cause No. 15-15. Admiral seeks a declaration that Defendants lost coverage under their six insurance policies for three separate reasons. Admiral first contends that Defendants' alleged material misstatements in their policy applications violated the terms of the Policies. (Doc. 55). Admiral next argues that Defendants' purported knowledge of pollution at the Bainville Site before the policy periods and extended reporting periods violated the Policies' terms. And finally, Admiral suggests that

the fact that Defendants rented, occupied, or controlled the Bainville Site precludes

coverage. The determinations that Admiral seeks may be made separate and apart

from the conclusion of the underlying cases.

## II.   Whether the Dual Entities' failure to provide notice of a claim during the policy period precludes coverage under the 2012–2013 EIL Policy.

Admiral first asserts that the Dual Entities failed to provide notice to

Admiral of any claim during the 2012–2013 EIL Policy period. (Doc. 56 at 5–6).

The Dual Entities first provided Admiral with notice of the pollution condition at

the Bainville Site on July 2, 2014. (Doc. 68 at 16). The July 2, 2014 Notice filed by

DTT listed the "date of occurrence" as July 5, 2013, which falls within the 2012–

2013 EIL Policy period. (Doc. 56 at 8). DTT sought coverage for the July 5, 2013

occurrence under the 2012–2013 EIL Policy. *Id.*

DTI provided Admiral with notice of the pollution condition at the Bainville

Site on July 3, 2014, the day after DTT had filed its notice. *Id.* DTI also sought

coverage under the 2012–2013 EIL Policy, and listed the "date of occurrence" as

July 5, 2013. *Id.* Admiral claims that no coverage exists under the 2013–2013 EIL

Policy because the Dual Entities failed to report any claim to Admiral during that

policy period. (Doc. 56 at 9).

Admiral describes the 2012–2013 EIL Policy as a "claims made" policy.

(Doc. 56 at 9; Doc. 68 at 16). The 2012–2013 EIL Policy "provides coverage for

certain pollution conditions only if the pollution condition was 'Discovered and

reported to [Admiral] during the Policy Period, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if any.'" (Doc. 68 at 16). In its Statement of Undisputed Facts, Admiral states that it "did not receive any notice of a claim related to the Bainville site during the October 1, 2012 to October 1, 2013 policy period." (Doc. 57 at 10). Defendants "dispute" Admiral's statement that it did not receive notice of a claim during the 2012–2013 EIL Policy period. (Doc. 68 at 16). Defendants cite the Declaration of Ronald Ronzello (Doc. 60), Vice President of Claims for Berkley Custom Insurance Managers, as support for their disputation of Admiral's statement. (Doc. 68 at 16).

Defendants' sole basis for disputing Admiral's statement was that "Admiral received notices of potential claims in July 2013 as admitted by Ronzello." *Id.* The Court has reviewed Ronzello's declaration. Ronzello's declaration clearly states that Admiral "did not receive any notice of a claim related" to DTT's facility at the Bainville Site during the October 1, 2012 to October 1, 2013 EIL Policy period. (Doc. 60 at 2). Ronzello goes on to state that the first notice of claim that Admiral received was filed by DTT on July 2, 2014. *Id.* Contrary to Defendants' assertion, Ronzello's statement supports Admiral's claim that the Dual Entities failed to report any claim to Admiral during the 2012–2013 EIL Policy period. (Doc. 56 at 9).

An insurance policy serves as a contract between the insured and insurer, with the effect of law between them. *Gorman v. City of Opelousas*, 148 So.3d 888, 892 (La. 2014). A court's role in interpreting an insurance contract involves ascertaining the common intent of the insured and the insurer as reflected by the policy's words. *Id.* Where the words of an insurance contract stand clear and explicit, courts must enforce the contract as written and make no further interpretation of the parties' intent. *Id.*

Louisiana law provides that a "claims made" policy limiting coverage to those claims "made and reported during the policy period" delineates the scope of coverage bargained for by the insurer. *Hood v. Cotter*, 5 So.3d 819, 829 (La. 2008). "The purpose of a reporting requirement in a claims-made policy is to define the scope of coverage purchased by the insured by providing a certain date after which an insurer knows it is no longer liable under the policy." *Gorman*, 148 So.3d at 893. Under a claims-made policy, "the risk of a claim incurred but not made, as well as a claim made but not reported," shifts to the insured. *Id.* The insurer can "close its books" on that policy once the policy period and reporting period expire. *Id.*

The unambiguous policy terms here provide that coverage under the 2012–2013 EIL Policy exists only if Defendants' claim was discovered *and* reported within the applicable policy period. *See Gorman*, 1487 So.3d at 893. Defendants

17

have failed to put forth any evidence showing that a material dispute of fact arises from Admiral's assertion that it received no notice of any claim related to the Bainville Site during the 2012–2013 EIL Policy period. Defendants further fail to dispute that this failure to receive notice eliminates coverage under the terms of the 2012–2013 EIL Policy. The Court concludes that Admiral is entitled to summary judgment that no coverage exists under the 2012–2013 EIL Policy for the pollution conditions at the Bainville Site. Admiral possesses no duty to defend the Defendants for claims arising under the 2012–2013 EIL Policy.

## III.   Whether the Dual Entities are precluded from coverage under the 2013–2014 EIL Policy.

Admiral next argues that no coverage exists for the July 2, 2014 Claim. (Doc. 56 at 6). Admiral notes that DTT canceled the 2013–2014 EIL Policy on July 1, 2014. *Id.* Admiral claims that DTT provided its first Notice of Claim on July 2, 2014, during the automatic extended reporting period. *Id.* Admiral contends that no coverage exists for the July 2, 2014 Claim because the Dual Entities discovered the pollution condition before the automatic extended reporting period began. *Id.*

The 2013–2014 EIL Policy provides coverage for certain pollution conditions that may have been discovered during the policy period of October 1, 2013, to October 1, 2014. (Doc. 57 at 26). DTT cancelled the 2013–2014 EIL Policy effective July 1, 2014. (Doc. 59-8 at 50). DTT received a partial

reimbursement of its premium after this cancellation. *Id.* Admiral received no notice of any claim related to the Bainville Site on or before July 1, 2014. (Doc. 56 at 16). As a result, Admiral did not receive notice of any claim during the 2013–2014 EIL Policy period. *Id.*

The 2013–2014 EIL Policy entitles the insured to an automatic 30-day extended reporting period upon cancellation of the Policy. (Doc. 59-8 at 24). The 2013–2014 EIL Policy states that the "Automatic Extended Reporting Period shall apply to *Claims* first made within the Automatic Extended Reporting Period but only with respect to *Pollution Conditions* that (a) are *Discovered* and reported during the Automatic Extended Reporting Period." *Id.* (emphasis in original)*.* The term "Discovered" as used in the 2013–2014 EIL Policy means "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a *Pollution Condition.*" *Id.* at 13 (emphasis in original).

DTT's July 2, 2014 notice of occurrence identified the date of the incident as July 5, 2013. (Doc. 56 at 8). DTT sought coverage under the 2012–2013 EIL Policy, and *not* under the 2013–2014 EIL Policy. *Id.* Defendants acknowledge receipt of four Violation Letters and the Harmons' Breach of Contract Letter before the 2013–2014 EIL Policy period. (Doc. 68 at 22–36). Defendants also acknowledge their awareness of the July 2013 stormwater releases before the

2013–2014 EIL Policy period. *Id.* at 48–49. Defendants further acknowledge that they engaged in settlement discussions with Montana DEQ and received Violation Letter 5 before the 2013–2014 EIL Policy extended reporting period. *Id.* at 49–52. Defendants fail to dispute that the 2013–2014 EIL Policy period precludes coverage for any pollution condition that the Defendants "discovered" before October 1, 2013, or that they had knowledge of before the extended reporting period. (Doc. 72 at 4).

Defendants instead assert that "certainly coverage *has not been requested* by Dual with respect to" the "July 5, 2013" stormwater release. (Doc. 67 at 12 (emphasis added)). The July 2013 stormwater releases constitute the only claims that Defendants made under either EIL Policy during the extended reporting period. (Doc. 72 at 4). Beyond DTT's July 2, 2014 notice of claim, and DTI's July 3, 2014 notice of claim, Admiral alleges that it received no notice of any other claim or possible claim before August 1, 2014, after the thirty-day extended reporting period had expired. (Doc. 72 at 4). The *Montana DEQ* Action, Cause No. DV-14-67, was not filed until November 25, 2014, long after the expiration of the extended reporting period. (Doc. 58-40). The *Harmon* Action, Cause No. DV-15-15, was not filed until 2015. (Doc. 58-12). Defendants fail to dispute that no coverage exists under a claims-made policy if no timely claim was made. (Doc. 72 at 5).

To this point, Admiral has provided a defense to Defendants in the underlying state court claims under the 2013–2014 EIL Policy because some of the allegations in the *Montana DEQ* Action and the *Harmon* Action could relate to the July 2013 stormwater releases. (Doc. 72 at 5). Defendants concede in their summary judgment briefing, however, that they do not seek any coverage for these July 2013 stormwater releases, and that no timely claim was made, under the 2013–2014 EIL Policies. *Id.* Under these facts, Admiral contends that no basis exists for its continued defense of Defendants under the 2013–2014 EIL Policy. *Id.* The Court agrees.

No coverage exists under the 2013–2014 EIL Policy because Defendants knew of the alleged pollution condition at the Bainville Site before the 2013–2014 EIL Policy's inception and before the extended reporting period. Additionally, no coverage exists under the 2013–2014 EIL Policy because Defendants failed to provide notice to Admiral during the extended reporting period of the claims for which they currently seek coverage. Admiral has no duty to defend or indemnify the Defendants under the 2013–2014 EIL Policy.

The Court declines to address Admiral's alternative arguments that both EIL Policies are void ab initio in light of its determination that the Dual Entities are precluded from coverage under both the 2012–2013 EIL Policy and the 2013–2014 EIL Policy. (Doc. 56 at 18–24).

**IV.   Whether the Dual Entities are precluded from coverage under the four CPL Policies.**

Admiral argues that the Dual Entities made material misstatements in their four CPL Policy applications by "failing to truthfully answer questions regarding their compliance with Montana environmental laws, their knowledge of Montana DEQ's multiple Warning and Violation Letters, their knowledge of the Harmons' allegations of pollution at the Bainville Site, and their knowledge of the pollution at the Bainville Site." (Doc. 68 at 6). Admiral asserts that it issued each of the four CPL Policies in specific reliance upon the representations made by the Dual Entities in the applications. *Id*. at 6–7. Admiral argues that these misrepresentations by the Dual Entities support a grant of summary judgment in Admiral's favor on the issue of coverage under the CPL Policies. *Id.*

The CPL Policies state that Admiral's "duty to provide for the defense of any insured, to pay damages on behalf of any insured, or to make any [additional payments] . . . shall immediately terminate . . . [i]f the application attached hereto and made a part of this Policy, including any addendum or addenda thereto, contains any material misrepresentations of fact." (Doc. 68 at 20, 45).

No coverage exists under Louisiana law if the Dual Entities made material misstatements in their CPL Policy applications. *F.D.I.C. v. Duffy*, 835 F. Supp. 307, 313 (E.D. La. 1993). An applicant's misrepresentations are considered "material" if they affect the decision of the insurer to issue the policy. *Id.*

Louisiana law does not require strict proof of fraud to show that an applicant acted with intent to deceive. *Id.* at 314. A court can determine an intent to deceive from the following indicators: (1) the attending circumstances that tend to show the insured's knowledge of the falsity of the representations made in the application and his or her recognition of the materiality thereof; or (2) from circumstances that create a reasonable assumption that the insured recognized the materiality of the misrepresentations. *Id.* (quoting *Johnson v. Occidental Life Ins. Co.*, 368 So.2d 1032, 1036 (La. 1979)).

The 2012–2013 CPL Policy applications asked whether, in the past three years, any member of the application firm was "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them?" (Doc. 56 at 28). Both DTI and DTT responded by checking the "no" box in 2012. *Id.* Neither DTI nor DTT supplied Admiral with a copy of the September 17, 2012 Warning Letter from Montana DEQ. *Id.*

In their 2013–2014 CPL Policy applications, DTT and DTI again responded that they were not "aware of any circumstances that could result in a claim, suit or notice of incident being brought against them." *Id.* at 29. With respect to their 2013–2014 CPL Policy applications, neither DTI nor DTT provided Admiral with a copy of the September 17, 2012 Warning Letter or any of the first four Violation Letters, each of which the Dual Entities received in advance of the applications'

submission. *Id.* DTI and DTT also failed to provide Admiral with information

regarding the three stormwater releases that had occurred at the Bainville Site in

July 2013. *Id.* DTI and DTT further failed to apprise Admiral of the Harmons'

September 25, 2013 Breach of Contract Letter, in which the Harmons allege

environmental impairment at the Bainville Site. *Id.*

Admiral alleges that DTT and DTI made material misstatements on their

2012–2013 CPL Policy applications by failing to disclose the existence of the

September 17, 2012 Warning Letter. *Id.* Admiral further argues that DTI and DTT

made material misstatements on their 2013–2014 CPL Policy applications, by

failing to notify Admiral of the September 17, 2012 Warning Letter, the four

Violation Letters, the three stormwater releases, and the Harmons' Breach of

Contract Letter. *Id.* Admiral insists that the sheer number of nondisclosures made

by the Dual Entities in their CPL Policy applications support a conclusion that the

Dual Entities acted deliberately to conceal this information, in recognition of the

materiality of their misstatements. *Id.* at 30. Admiral insists that it would have

declined issuance of the CPL Policies if DTT and DTI truthfully had answered the

questions in the CPL Policy applications. *Id.*

The Court agrees that the Dual Entities materially misrepresented their

knowledge of the pollution conditions at the Bainville Site, in both the 2012–2013

CPL Policies and the 2013–2014 CPL Policies. Under the terms of the CPL

Policies, any duties that Admiral owes to the Dual Entities shall "terminate" as a result of a material misstatement. (Doc. 56 at 30). Admiral is entitled to a summary judgment ruling that it owes no duties to the Dual Entities under the four CPL Policies because of the Dual Entities' material misstatements. Admiral owes no duty to defend or indemnify Defendants under the four CPL Policies. The Court's decision that the CPL Policies are void ab initio necessarily encompasses any CPL Policy claims related to property damage incurred on the Bainville Site. The Court, therefore, will not address these arguments by Admiral.

<div align="center">

**ORDER**

</div>

Accordingly, **IT IS ORDERED** that Admiral's Motion for Partial Summary Judgment (Doc. 55) is **GRANTED.**

Dated this 5th day of May, 2021.

Brian Morris, Chief District Judge
United States District Court

Lin Deola
MORRISON SHERWOOD WILSON & DEOLA, PLLP
401 North Last Chance Gulch
Helena, Montana 59601
(406) 442-3261
ldeola@mswdlaw.com

KD Feeback
TOOLE & FEEBACK, PLLC
PO Box 907
Lincoln, Montana 59639
(406) 362-4025
kdfeeback@gsjw.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| ADMIRAL INSURANCE COMPANY, | |
| Plaintiff, | **CV-20-53-GF-BMM** |
| v. | |
| DUAL TRUCKING, INC., a Louisiana corporation, DUAL TRUCKING OF MONTANA, L.L.C., a Louisiana limited liability company, DUAL TRUCKING AND TRANSPORT, L.L.C., a Louisiana limited liability company, ANTHONY J. ALFORD, a Louisiana Resident, | **Affidavit of Todd J. Hutchinson** |
| Defendants. | |

STATE OF LOUISIANA          )
                                              :ss
Parish of Terrebonne         )

I, Todd J. Hutchinson, being first duly sworn, deposes and states:

I am over the age of 18 years and competent to testify in this matter. I have reviewed the accompanying response brief in opposition to summary judgment and state the facts therein are true and correct and that the exhibits attached to that brief are referenced herein as follows:

1.    I was the Operations and Sales Manager for Dual Trucking & Transport, LLC ("DTT") , at the Bainville, Montana facility from January 2011 till approximately fall of 2013. I have personal knowledge of the facts and circumstances set forth below.

2.    I originally traveled to Bainville, Montana, in the month of January 2011 in order to set up an oil field service company consisting of heavy hauling and trucking services to the oil field industry. At that time Dual Trucking, Inc. ("DTI") was the lead company in setting up business in the area.

3.    I oversaw building infrastructure on property Dual Trucking of Montana, LLC ("DTM"), leased with option to purchase from Garth and Wagner Harmon, for the purpose of operations in the Williston Basin. The buildings consisted of administrative offices, a truck shop, and storage. The leased property has been paid off in full pursuant to the terms of the option agreement; however, Harmons have refused to convey title to the property. As such, DTM filed suit in Roosevelt County to enforce the terms of the agreement and quiet title. That suit is pending

at this time.

4.      DTM did not conduct business operations in Montana; rather, it operated as a real estate holding company and was the lessee for the leases entered into with the Harmons as described above.  The original lease option agreement with Harmons was entered into with DTI.  DTI subsequently conveyed its interest in the property to DTM and moved out of Montana.

5.      Initially, DTT provided contract trucking services moving oil field equipment from place to place to facilitate drilling operations for various companies.  Later on DTT began providing hot water services and vacuum trucks.

6.      In approximately October of 2011 DTT developed a new technology utilizing a centrifuge system to separate residual invert liquids from drill cuttings and return the diesel based invert to the drill rig for recycling. The process was set up at the Bainville truck yard.

7.      DTT loaded drill cuttings at the individual drill rigs working in the Williston Basin and trucked the cuttings to its facility in Bainville.  The cuttings were processed to recover the residual invert drilling fluid which was then returned to the drill rig for reuse.  The cuttings were then hauled to certified repositories in North Dakota and Canada for disposal.  Dual did not dispose of solid waste at the Bainville facility; rather, the Bainville yard was simply a processing point for waste.

8.     Since DTT was simply trucking materials from point A to point B and was
not disposing of waste, it was not obvious that a Solid Waste Disposal Permit was
necessary.  DTT was communicating with DEQ and other Montana regulatory
agencies and had the permits it believed necessary based upon those contacts.

9.     On or about September 17, 2012, DTT received a letter from DEQ advising
that a complaint from a third party alleging DTT was improperly handling oil field
waste.  On or about March 12 and 13, 2013, DTT was again notified of complaints
by third parties.  DTT responded to DEQ regarding the issues, most of which were
not correct, on March 20, 2013.  Doc  58-18 (Roosevelt County Deputy Reum
"determined that the allegations were either false or meant for another company.")
Due to the fact that DEQ's letters were based upon unsubstantiated allegations and
were not correct, DTT had no reasonable basis to believe it had to file an insurance
claim.

10.     Dual representatives traveled to Helena to meet with DEQ on April 10,
2013, to discuss the matter of DTT's compliance with Montana's solid waste
regulations which up to that time had been unsettled.  At that meeting DEQ first
stated that it felt DTT would need a Solid Waste Management System ("SWMS")
license for its facility.  Dual  Exhibit B,  E.  DEQ also stated at that time that DTT
could continue operations while it undertook permitting activities.  *Id.*

11.     DEQ conducted its initial site investigation at the Bainville facility on July

Exhibit A
Page 4 of 5
4

23, 2013.  At that time DEQ did not note any particular compliance issues with the

Bainville facility aside from permitting issues for the SWMS license.  (Dual

Exhibit F, at 2, installation of liners, stormwater BMPs, and dust control).  DTT

proceeded with permitting and business as usual through 2013.  DTT certainly saw

no need to involve insurers or file notices of claim for normal business operations.

12.	DEQ required and DTT hired a consultant to perform a site investigation as

part of the permitting procedure.  Doc 58-42.  The consultant, Terracon, discovered

modest exceedances of recommended standards in soil samples at the Bainville

site.  *Id.* at 10-12.  Terracon did not detect exceedances in surface or groundwater

samples.

13.	Once a claim was filed, DTT filed a claim.

DATED this _____19th_____ day of March, 2021.

By _____
Todd Hutchinson

///SUBSCRIBED AND SWORN TO before me on the _19th_ day of March 2021.

(*Notarial Seal*)

_____
NOTARY PUBLIC FOR THE STATE OF LOUISIANA

Bar Roll: _____64697_____

Commission Term: _____For Life_____

ER_34

OFFICIAL SEAL
ROBERT C. TOUPS
#64697 - Notary Public
State of Louisiana/Parish of Terrebonne
Commisioned for Life

Exhibit A
Page 5 of 5

5

**Montana Department of**
# ENVIRONMENTAL QUALITY

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901  •  Helena, MT 59620-0901  •  (406) 444-2544  •  Website: www.deq.mt.gov

April 17, 2013

Mr. Austin Knudsen
KNUDSEN LAW, PLLC
PO Box 624
Culbertson, MT 59218

**RECEIVED**

**APR 18 2013**

MT Dept. of Environmental Quality
Enforcement Division

RE:   **DUAL TRUCKING AND TRANSPORT, LLC**
**OILFIELD WASTE PROCESSING AND TREATMENT FACILITY**
**BAINVILLE, MT**

Dear Austin,

This letter is provided as follow-up to your April 15, 2013 letter summarizing our meeting where we discussed the solid waste management rules and license applicability for the subject facility. Based upon our discussions during the meeting, we determined that a solid waste management system license is necessary for operation of Dual Trucking and Transport's waste processing and treatment facility in Bainville. In addition, the Department's Solid Waste Program (SWP) determined that operations at the facility would not be shut down as long as the license application for continued operation was submitted. As a result, Dual Trucking and Transport agreed to submit a solid waste management system license application to the SWP within 60 days of our meeting, or by June 10, 2013.

The SWP looks forward to working with Dual Trucking and Transport on this project. If you or your clients have any questions, please do not hesitate to contact me directly.

Best Regards,

Mary Louise Hendrickson
Solid Waste Program – Licensing Lead
Phone: 406-444-1808; Fax: 406-444-1374
Email: mhendrickson@mt.gov

cc: Mr. Dale Prosperie, Dual Trucking and Transport, LLC., PO Box 167, Bainville, MT  59212
    Mr. Tom Bovington, DEQ ENFD
    Mr. Steve Kilbreath, DEQ DIR

**Exhibit B**
**Page 1 of 1**

393434 MISC REAL   Pages: 15
STATE OF MONTANA ROOSEVELT COUNTY
RECORDED: 03/16/2012  9:05  KOI: AGREEMENT2
Cheryl A Hansen  CLERK AND RECORDER
FEE:$125.00   BY: _Jan Tambreth Deputy_
TO: BROUSSARD & DOVE, APLC  7731 PARK AVE, HOUMA  LA  70364

## LEASE AGREEMENT

KNOW ALL MEN BY THESE PRESENTS, that this Lease Agreement ("Lease")

entered into on the dates hereinafter indicated by and between:

**GARTH HARMON**, a Montana domiciliary whose current mailing address is Post Office Box 2, Bainville, Montana 59212; and

**WAGNER HARMON**, a Montana domiciliary whose current mailing address is 6868 DH1 Drive, Bainville, Montana 59212;

(hereinafter referred to as LESSORS); and

**DUAL TRUCKING, INC.,** a Louisiana corporation whose current mailing address is P.O. Box 1438, Scott, Louisiana 70583, herein represented by its duly authorized representatives, Gordon E. Dove Sr. and Anthony J. Alford.

(hereinafter referred to as LESSEE);

who declared as follows:

WHEREAS, LESSORS are the owners of a certain tract of immovable property more

particularly described on Exhibit "A" attached hereto and made a part hereof.  (hereinafter referred

to as the "Property" or "Leased Premises")

WHEREAS, Lessee wishes to lease the Property from the Lessor to construct a building

thereupon.

NOW THEREFOR, upon the condition that a Building be built on the Leased Premises,

and in consideration of the rents to be paid hereunder and of the agreements, covenants and

conditions contained herein, and for other good and valuable consideration the receipt and

sufficiency of which are hereby acknowledged, Lessor and Lessee covenant and agree as follows:

**ER_36**

HARMON 182

Exhibit 5-1

## ARTICLE 1 - TERMS

Lessor and Lessee agree that this Lease is contingent upon Lessee's construction of a metal building on the property of the Lessor.  In the event that the metal building is not built, for any reason whatsoever, this Lease is null & void, and neither the Lessor nor the Lessee shall carry any obligations under the terms of this Lease.

The Term of the Lease shall be for a period of fifteen (15) years beginning on September 1, 2011 and ending on September 1, 2026 ("Primary Term").  Thereafter Lessee shall have the option to renew this Lease for up to a period of ten (10) years from the expiration of the Primary Term ("Option Years").

## ARTICLE 2 - CONSIDERATION

This Lease during the Primary Term is contingent upon and made for and in consideration of the covenants herein contained and the construction of a metal building ("Building") on the Leased Premises, which at the end of the Primary Term, Lessee agrees to transfer to Lessor all rights, title and interest in the Building and any other improvements constructed on the property. During the Primary Term, the Leased Premises shall carry no monetary charges as the consideration is the transfer of the ownership of the Building from Lessee to Lessor.

Lessor consents and agrees to Lessee's construction of the Building and acknowledges that the ownership of the Building shall be separate than the ownership of the land and shall remain with the Lessee, its heirs or assigns, until the expiration of the Primary Term.

The Building Lessee proposes to construct will be approximately ninety (90) feet in width and one hundred (100) feet in length with a nineteen (19) foot Eave height. The Building will be

Page 2 of 14



**ER_37**

HARMON 183

Exhibit 5-2

constructed on a five (5) inch by nine thousand (9000) square foot slab with two five (5) inch thick concrete aprons, forty (40) feet by one hundred (100) feet (or four thousand (4000) square feet) on each end of the Building. The Building will contain approximately sixteen hundred (1600) square feet of office space with bathrooms. It will be insulated and will contain necessary electrical and plumbing fixtures and wiring.

### ARTICLE 3 - EXERCISE OF OPTION YEARS

In the event that Lessee desires to exercise its option for any of the option years, Lessee shall give Lessor at least sixty (60) days written notice before the expiration of the Primary Term.

The monthly rental during the Option Years, if Lessee so exercises such option, shall be EIGHT THOUSAND AND NO CENTS ($8,000.00) DOLLARS per month, payable in advance by Lessee to Lessor on the 1st day of each month, beginning September 1, 2026.   All payments due under this Lease shall be made to Lessor at an address specified by Lessor upon the exercise of the option.

### ARTICLE 4–USE OF PROPERTY

Lessee will occupy and use the Leased Premises and Building as a trucking mobilization facility to repair, dispatch and operate trucks. The Leased Premises shall not be used for any unlawful purpose.   The Leased Premises herein shall not be used for the location of any establishment selling beer, intoxicating liquors or alcoholic beverages of any kind or nature.

### ARTICLE 5 - INSURANCE

5.01    Liability Insurance.  During the terms of this Lease, Lessee, at its sole expense, agrees to carry a comprehensive general liability policy in the amount of no less than TWO MILLION AND

Page 3 of 14



HARMON 184

Exhibit 5-3

NO CENTS ($2,000,000.00) DOLLARS, combined single limits insurance.  Lessor shall be named as an additional insured under such policy of insurance.

5.02    Fire or Casualty.  During the Primary Term of the Lease, Lessee, at its sole expense, agrees to carry All Risk Replacement Costs insurance on the building and other improvements located on the Leased Premises, in such coverage amounts or as may be reasonably required by Lessor wherein the Lessor shall be named as the insured.  Lessor, except to the extent of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

5.03    Waiver of Subrogation.  Lessee waives and each policy of insurance shall also contain a waiver of subrogation on the part of the insurer against Lessor or his agents for any claim or right of recovery. A copy of all endorsements shall be provided to Lessor.

5.04    Insurance Policies.  Lessee shall provide Lessor with a certificate of insurance and, if requested by Lessor, a certified copy of all polices of insurance and endorsements required by this Lease and shall have such policies provide that the policy cannot be canceled as to the Lessor except upon thirty (30) days written notice to Lessor.

**ARTICLE 6 - INDEMNIFICATION**

Lessee agrees to indemnify, protect, defend and hold harmless Lessor from and against all claims, demands, causes of action, losses, damages and expenses of every kind and character without limit whatsoever and without regard to cause thereof, including defense and attorney's fees related thereto, including, but without limitation, any injuries or death to person(s) or property arising out of, in connection with, or relating to Lessee's occupancy or use of the Premises during any term of this Lease, except as regards to claims caused by the sole negligence or sole fault of

Page 4 of 14



HARMON 185

Exhibit 5-4

Lessor.  In addition, Lessor shall not be liable for any loss of any property of Lessee in or on the Leased Premises nor any damage to any property of Lessee, Lessee's guests, invitees, patrons, customers or employees, in or on the Leased Premises, however occurring, and Lessee agrees to protect, defend, indemnify and save Lessor harmless from and against any and all claims, demands, causes of action, losses or expenses in any way related thereto.

## ARTICLE 7 - CASUALTY

Lessor, except to the extent of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

Should the Leased Premises, during the Primary Term of the Lease, be destroyed or damaged by fire or other casualty covered by insurance provided by the prevailing All Risks Replacement Costs Insurance, the Lessee will, without unreasonable delay, obtain bids for the repairs or reconstruction of the Leased Premises.  If the Leased Premises can be repaired or reconstructed for the amount of insurance available, Lessee shall be obligated to reconstruct the Leased Premises without unreasonable delay and this Lease shall not terminate.  If it is impossible for Lessor to obtain a bid to repair or reconstruct the Leased Premises for the amount of the insurance proceeds available to Lessee, Lessee has the option to repair or reconstruct the Leased Premises or to terminate this Lease.

## ARTICLE 8 - MAINTENANCE

Responsibility for all maintenance and up-keep shall be as stated herein, unless otherwise agreed by the parties.  Lessee agrees that it shall at all times maintain the entirety of the Leased Premises including the Building.  More specifically, the Lessee agrees to maintain the roof and

Page 5 of 14



**ER_40**

HARMON 186

Exhibit 5-5

structure of the Building located on the Leased Premises in good condition and as a prudent administrator and to make all necessary repairs thereto. Notwithstanding anything to the contrary herein, Lessee agrees to be responsible for, to promptly make and pay for all other repairs, maintenance and up-keep of the Leased Premises and to maintain the Leased Premises in good condition and as a prudent administrator, including but not limited to all repairs caused by ordinary wear and tear and/or Lessee's occupancy and/or use of the Leased Premises.

### ARTICLE 9 - COMPLIANCE WITH LAW

Lessee shall comply in connection with this Lease with all laws, regulations or ordinances of any governmental authority or any department thereof for the operation of any business.

### ARTICLE 10 - HAZARDOUS AND NONHAZARDOUS MATERIALS
### AND OTHER CHEMICALS

Lessee shall never in violation of any applicable law permit to be incorporated into, bring into, store at, or place at, use at or otherwise dispose of at, in, or under the leased premises or any buildings or other improvements located on the Leased Premises, any toxic or hazardous materials (as defined hereafter) or nonhazardous materials or any vat or any type of container containing any type of chemical material or cleaner used to clean any type of tools. If Lessee violated this provision or ever has knowledge of the presence of toxic or hazardous materials in, at or under the Leased Premises or building located on the Leased Premises, or the land described herein, Lessee shall notify Lessor in writing promptly after obtaining such knowledge. For purposes of this lease, hazardous or toxic materials shall mean hazardous or toxic chemicals at levels or contents which cause such materials to be classified as hazardous or toxic as then prescribed by the highest industry standards or by the then current levels or content as set from time to time by the U.S. Environmental

Page 6 of 14



**ER_41**

HARMON 187

Exhibit 5-6

Protection Agency ("EPA") or the U.S. Occupational Safety and Health Administration ("OSHA") or as defined under 20 CFR 1910 or 29 CFR 1925 or other applicable governmental laws, rules or regulations as established from time to time by applicable authority of the Federal, State or Parish Government or any other governmental agency of any kind or nature with regulatory or supervisory authority over the subject property, any hazardous or toxic materials in, at or under the Leased Premises or the building located on the Leased Premises, or the land whether the building is located resulting from, introduced from, arising out of, or the damage from which is materially expanded as the direct result of Lessee's acts, negligence or the violation or breach by Lessee of this provision. Lessee shall notify Lessor of its method, time and procedure for any clean up or removal of toxic or hazardous material or any vat or any type of container containing any type of chemical material or cleaner used to clean any type of tools under this provision, and Lessor shall have the right, but not the obligation, to require reasonable changes in such method time or procedure, or to require that the same be done after normal business hours or when the building is otherwise closed (i.e. weekends or holidays).

In addition to Lessee's obligations in the agreement, Lessee further agrees to indemnify, protect, defend and save harmless Lessor from and against all claims, demands, causes of action, damages, losses and expenses of every kind and character without limit whatsoever and without regard, including defense and attorney fees related thereto, in any manner arising from and/or in any way connected with toxic or hazardous materials (as defined hereinabove) or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner used to clean any type of tools being incorporated into, brought into, stored at, used at or otherwise disposed of vat, in or under the Leased Premises or the building or any improvements located on the

Page 7 of **14**



HARMON 188

Exhibit 5-7

Leased Premises at any time during the term of this lease or Lessee's occupancy or Lessee's use of the Leased Premises.

### ARTICLE 11 - UTILITIES

Lessee shall pay for all telephone, electric, gas, water, trash collection and other utilities used on the Leased Premises.

### ARTICLE 12 - AD VALOREM TAXES

During the Primary Term of the Lease, Lessee shall pay all ad valorem taxes and any other taxes, assessment, charges, permits or impositions on the Leased Premises, which includes the land and any improvements permanently attached thereto, including those imposed by any governmental, municipal or political subdivision, during the existence of this Lease or any extension thereof assessed upon the land and/or building and/or improvements permanently attached thereto. Lessee shall pay all other taxes, assessments, charges, permits or impositions on any movable property in any way connected with the Leased Premises. Lessee shall not pay any income taxes attributable to Lessor from the Leased Premises or Lease.

### ARTICLE 13 - RIGHT TO INSPECT

Lessor reserves the right to inspect the premises between the hours of 9:00 a.m. and 5:00 p.m. after giving Lessee 24 hours written notice.

### ARTICLE 14 - IMPROVEMENTS

Lessee may not make any improvements or changes to the Leased Premises, except as otherwise provided in this agreement or with the prior written consent of Lessor. Any improvements or changes made by Lessee after obtaining Lessor's consent shall be made at Lessee's expense and Lessee agrees to promptly pay for the same and not to cause Lessor's property

Page **8** of **14**



**ER_43**

HARMON 189

Exhibit 5-8

to be subject to any lien or encumbrances resulting therefrom.  Upon termination of this Lease for any cause whatsoever, all improvements made to the Leased Premises by the Lessee that are permanently attached thereto, shall, at the option of the Lessor, become the property of the Lessor without any cost therefor to the Lessor, free and clear of any liens or encumbrances whatsoever or the Lessor may require the Lessee to remove said property (excluding the Building and other agreed upon improvements),  from the Leased Premises at Lessee's expense and to restore the premises to its original condition.

### ARTICLE 15 – FAILURE TO COMPLY WITH LEASE

If the Lessee or Lessor fail to perform any of the agreements contained herein, this Lease shall terminate at the option of either party, providing that such party: (i) give the non complying party thirty (30) days written demand of its intention to terminate the Lease and set forth therein a specific breach of this Lease; and (ii) allow the other party thirty (30) days after written demand to remedy any alleged breach.

Such notices shall be mailed to the Lessee as hereinafter provided, and after the expiration of thirty (30) days and, the Lease shall terminate at the option of Lessor, providing that Lessee has not by then paid all rentals due and commenced to remedy all the other defaults and breaches complained of and diligently continues to correct such defects within thirty (30) days of the date of mailing of the aforedescribed notice.

### ARTICLE 16 - INTEREST AND ATTORNEY FEES

During the Option Years, any rent unpaid as it falls due shall bear interest at twelve (12%) percent per annum from the date due. Should it become necessary for Lessor to resort to any legal

Page **9** of **14**



HARMON 190

Exhibit 5-9

proceedings or to employ an attorney for the collection of rent or for the enforcement of any of its rights under this Lease, the Lessee shall pay all such attorney fees in a reasonable amount.

### ARTICLE 17 - SUBLEASE

Lessee shall not have the right to sublease or assign the Leased Premises, except to an affiliate company (one with common ownership to Lessee), unless Lessor consents in writing. Such consent shall not be unreasonable withheld. In the event of a sublease or assignment, the sublessee or assignee will be obligated by all the terms, promises and conditions of this Lease agreement and Lessee also remains responsible for the promises, terms and conditions of this Lease to Lessor. In the event that Lessee subleases or assigns the Lease to a company, other than an affiliate company, Lessor and Lessee will split any lease proceeds equally (50/50) after any expenses related thereto are paid.

Both parties agree and acknowledge that Lessee does not need the written consent of the Lessor to sublease or assign the Leased Premises to an affiliate company. Further, the affiliate company will have identical rights and obligations as the original Lessee to this Lease.

### ARTICLE 18 - RETURN OF PREMISES

Lessee shall use the Leased Premises as a good and prudent administrator and will pay the rent promptly when due. Upon the completion of this Lease, Lessee will deliver the Leased Premises swept broom clean and in good condition, subject only to the wear and tear occasioned by the prudent use of the Leased Premises.

### ARTICLE 19 - JURISDICTION

Lessee and Lessor, by execution of this Lease, expressly confers jurisdiction "in personam" and/or "in rem" and consents to venue in the state of Kansas, which is a neutral state, for the

Page 10 of 14



HARMON 191

Exhibit 5-10

purpose of any legal proceedings brought by Lessor for enforcement of any rights of Lessor under the terms of this Lease.

### ARTICLE 20 - SUCCESSORS AND ASSIGNS

The covenants herein contained shall bind, and the benefits and advantages shall inure to the respective successors and assigns of the parties hereto.

### ARTICLE 21 - LEASE SUBJECT TO

Lessor and Lessee hereby acknowledge and agree that this Lease is subject to any and all recorded rights, ways, privileges, servitudes and subordinations thereunto belonging or in anywise appertaining to the Leased Premises herein.  Lessor and Lessee further acknowledge and agree that any and all of Lessor's mortgages affecting the Leased Premises shall be subordinate to this Lease. Lessee understands and agrees that from time to time some special document may be needed to subordinate Lessor's mortgage or mortgages to this Lease and that Lessee will fully cooperate and execute any subordination documents required by Lessor's lender.

### ARTICLE 22 - CHANGES IN LEASE

This Lease shall not be changed, altered or abrogated in any respect, except by written agreement of both parties executed in the same manner as this original contract of lease.  It is further understood by all parties that this Lease is non-renewable.

### ARTICLE 23 - NOTICES

Lessor and Lessee agree that any and all notices required or permitted hereunder directed to Lessee or Lessor shall be given by registered or certified U.S. Mail, return receipt requested, postage prepaid and addressed to Lessor and Lessee as stated below:

TO LESSOR:

Page **11** of **14**



**ER_46**

HARMON 192

Exhibit 5-11

TO LESSEE:  Dual Trucking, Inc.
P.O. Box 1438
Scott, LA 70583

or such other address as either of the parties may hereafter designate in writing.

### ARTICLE 26 - AUTHORITY

This Lease has been authorized by all necessary action on the part of Lessor and Lessee.

The respective undersigned representatives of Lessor and Lessee represent and warrant that they

have the full right, power, legal capacity, and authority to enter into this Lease on behalf of Lessor

or Lessee, as the case may be, and to perform their obligations hereunder.

THUS   DONE   AND   SIGNED   in   duplicate   on   this   _22_   day   of

_Aug_____, 2011, in the presence of the undersigned competent witnesses and Notary,

after due reading of the whole.

**WITNESSES:**                    **LESSORS:**

Page 12 of 14

**ER_47**

Cathy Craig *Cathy Craig*

Garth Harmon
Print Name:

GARTH [Full Name]

Wagner Harmon
Print Name:

WAGNER [Full Name]

Drake Harmon *Drake Harmon*

NOTARY PUBLIC
Print Name: *Cleo W Rameden*
License No. *570251*

CLEO W RAMEDEN
Notary Public
State of North Dakota
My Commission Expires Jan 27, 2017

THUS   DONE   AND   SIGNED   in   duplicate   on   this   _22_   day   of
_August_____, 2011, in the presence of the undersigned competent witnesses and Notary,
after due reading of the whole.

Page **13** of **14**

**ER_48**

WITNESSES:

Print Name: _Cathy Craig_

Print Name: _On the time_

SYE J. BROUSSARD (91044)
NOTARY PUBLIC

LESSEE:
DUAL TRUCKING, INC

BY: GORDON E. DOVE
Title: _Secretary_

BY: ANTHONY A. ALFORD
Title: _Pres_

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

Page 14 of 14

**ER_49**

HARMON 195

Exhibit 5-14



## EXHIBIT A

A PARCEL FOR LEASE PURPOSES,
LOCATED IN THE SOUTHEAST QUARTER OF SECTION 17,
TOWNSHIP 28 NORTH, RANGE 58 EAST, P.M.M.,
ROOSEVELT COUNTY, MONTANA

## ASSIGNMENT OF LEASE

**THIS AGREEMENT TO ASSIGN** any and all rights pursuant to the attached **LEASE AGREEMENT** is made and effective on this ___8th___ day of December, 2011, by and between:

**DUAL TRUCKING, INC.** a Louisiana corporation whose current mailing address is Post Office Box 1438, Scott, Louisiana 70583 ("Assignee"), by its duly authorized representative, Gordon Dove; and

**DUAL TRUCKING OF MONTANA, LLC**, a Louisiana limited liability company whose current mailing address is 7731 Park Avenue, Houma, Louisiana 70364 ("Assignor"), by its duly authorized representative, Brian Robichaux.

## WITNESSETH:

**NOW, THEREFORE**, in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by each of the parties hereto, intending to be legally bound, Dual Trucking, Inc. ("Assignor") and Dual Trucking of Montana, LLC. ("Assignee") do hereby agree as follows:

1.  Assignment.  The Assignor hereby assigns, gives, conveys, and transfers unto the Assignee, its successors and assigns, as of the Effective Date, any and all of the Assignor's rights and interest pursuant to the Lease Agreement between Dual Trucking, Inc. and Garth and Wagner Harmon, dated August 22, 2011 and attached as Exhibit A to this Agreement.

2.  Assumption.  The Assignee hereby accepts the foregoing assignment and, in consideration thereof, the Assignee hereby covenants and agrees that, on and after the Effective Date, the Assignee shall assume, observe, perform, fulfill and be bound by all terms, covenants, conditions and obligations of the Equipment Lease that arise on and after the Effective Date and are to be observed, performed and fulfilled by the assignor on and after the Effective Date in the same manner and to the same extent as if the Assignee were named therein.

3.  Successors and Assigns.  The terms and conditions of this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

4.  Counterparts.  This Assignment may be executed in several counterparts, all of which together shall constitute one and the same instrument.

**ER_51**

Exhibit 6-1

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on this *8th* day of December, 2011.

WITNESSES:

Printed: _Rachael Randell_

Printed: _MONA DOVE_

ASSIGNOR:

DUAL TRUCKING, INC.

BY: _____

**GORDON E.DOVE**
Title: _Member/Secretary_

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
NOTARY PUBLIC   PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on this *8th* day of December, 2011.

WITNESSES:

Printed: _Rachael Rambo+_

Printed: _MONA DOVE_

ASSIGNEE:

**DUAL TRUCKING OF MONTANA, LLC**

BY: _____
**BRIAN ROBICHAUX**
Title: _Member_

NOTARY PUBLIC   SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

**ER_52**

Exhibit 6-2

EXHIBIT A

## LEASE AGREEMENT

**KNOW ALL MEN BY THESE PRESENTS.** that this Lease Agreement ("Lease") entered into on the dates hereinafter indicated by and between:

**GARTH HARMON,** a Montana domiciliary whose current mailing address is Post Office Box 2. Bainville, Montana 59212; and

**WAGNER HARMON**, a Montana domiciliary whose current mailing address is 6868 DHI Drive. Bainville. Montana 59212;

(hereinafter referred to as LESSORS); and

**DUAL TRUCKING, INC.,** a Louisiana corporation whose current mailing address is P.O. Box 1438, Scott, Louisiana 70583. herein represented by its duly authorized representatives. Gordon E. Dove Sr. and Anthony J. Alford.

(hereinafter referred to as LESSEE);

who declared as follows:

**WHEREAS.** LESSORS are the owners of a certain tract of immovable property more particularly described on Exhibit "A" attached hereto and made a part hereof. (hereinafter referred to as the "Property" or "Leased Premises")

**WHEREAS**, Lessee wishes to lease the Property from the Lessor to construct a building thereupon.

**NOW THEREFOR.** upon the condition that a Building be built on the Leased Premises. and in consideration of the rents to be paid hereunder and of the agreements. covenants and conditions contained herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee covenant and agree as follows:

Exhibit 6-3

## ARTICLE 1 - TERMS

Lessor and Lessee agree that this Lease is contingent upon Lessee's construction of a metal building on the property of the Lessor. In the event that the metal building is not built, for any reason whatsoever, this Lease is null & void, and neither the Lessor nor the Lessee shall carry any obligations under the terms of this Lease.

The Term of the Lease shall be for a period of fifteen (15) years beginning on September 1, 2011 and ending on September 1, 2026 ("Primary Term"). Thereafter Lessee shall have the option to renew this Lease for up to a period of ten (10) years from the expiration of the Primary Term ("Option Years").

## ARTICLE 2 - CONSIDERATION

This Lease during the Primary Term is contingent upon and made for and in consideration of the covenants herein contained and the construction of a metal building ("Building") on the Leased Premises, which at the end of the Primary Term, Lessee agrees to transfer to Lessor all rights, title and interest in the Building and any other improvements constructed on the property. During the Primary Term, the Leased Premises shall carry no monetary charges as the consideration is the transfer of the ownership of the Building from Lessee to Lessor.

Lessor consents and agrees to Lessee's construction of the Building and acknowledges that the ownership of the Building shall be separate than the ownership of the land and shall remain with the Lessee, its heirs or assigns, until the expiration of the Primary Term.

The Building Lessee proposes to construct will be approximately ninety (90) feet in width and one hundred (100) feet in length with a nineteen (19) foot Eave height. The Building will be

Page 2 of 14



**ER_54**

Exhibit 6-4

constructed on a five (5) inch by nine thousand (9000) square foot slab with two five (5) inch thick concrete aprons, forty (40) feet by one hundred (100) feet (or four thousand (4000) square feet) on each end of the Building. The Building will contain approximately sixteen hundred (1600) square feet of office space with bathrooms. It will be insulated and will contain necessary electrical and plumbing fixtures and wiring.

### ARTICLE 3 - EXERCISE OF OPTION YEARS

In the event that Lessee desires to exercise its option for any of the option years, Lessee shall give Lessor at least sixty (60) days written notice before the expiration of the Primary Term.

The monthly rental during the Option Years, if Lessee so exercises such option, shall be EIGHT THOUSAND AND NO CENTS ($8,000.00) DOLLARS per month, payable in advance by Lessee to Lessor on the 1st day of each month, beginning September 1, 2026. All payments due under this Lease shall be made to Lessor at an address specified by Lessor upon the exercise of the option.

### ARTICLE 4--USE OF PROPERTY

Lessee will occupy and use the Leased Premises and Building as a trucking mobilization facility to repair, dispatch and operate trucks. The Leased Premises shall not be used for any unlawful purpose. The Leased Premises herein shall not be used for the location of any establishment selling beer, intoxicating liquors or alcoholic beverages of any kind or nature.

### ARTICLE 5 - INSURANCE

5.01   <u>Liability Insurance</u>. During the terms of this Lease, Lessee, at its sole expense, agrees to carry a comprehensive general liability policy in the amount of no less than TWO MILLION AND

Page 3 of 14



Exhibit 6-5

NO CENTS ($2,000,000.00) DOLLARS, combined single limits insurance.   Lessor shall be named as an additional insured under such policy of insurance.

5.02    Fire or Casualty.   During the Primary Term of the Lease, Lessee, at its sole expense, agrees to carry All Risk Replacement Costs insurance on the building and other improvements located on the Leased Premises, in such coverage amounts or as may be reasonably required by Lessor wherein the Lessor shall be named as the insured.  Lessor, except to the extent of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

5.03    Waiver of Subrogation.   Lessee waives and each policy of insurance shall also contain a waiver of subrogation on the part of the insurer against Lessor or his agents for any claim or right of recovery. A copy of all endorsements shall be provided to Lessor.

5.04    Insurance Policies.   Lessee shall provide Lessor with a certificate of insurance and, if requested by Lessor, a certified copy of all polices of insurance and endorsements required by this Lease and shall have such policies provide that the policy cannot be canceled as to the Lessor except upon thirty (30) days written notice to Lessor.

## ARTICLE 6 - INDEMNIFICATION

Lessee agrees to indemnify, protect, defend and hold harmless Lessor from and against all claims, demands, causes of action, losses, damages and expenses of every kind and character without limit whatsoever and without regard to cause thereof, including defense and attorney's fees related thereto, including, but without limitation, any injuries or death to person(s) or property arising out of, in connection with, or relating to Lessee's occupancy or use of the Premises during any term of this Lease, except as regards to claims caused by the sole negligence or sole fault of

Page 4 of 14



Exhibit 6-6

Lessor.  In addition, Lessor shall not be liable for any loss of any property of Lessee in or on the Leased Premises nor any damage to any property of Lessee, Lessee's guests, invitees, patrons, customers or employees, in or on the Leased Premises, however occurring, and Lessee agrees to protect, defend, indemnify and save Lessor harmless from and against any and all claims, demands, causes of action, losses or expenses in any way related thereto.

## ARTICLE 7 - CASUALTY

Lessor, except to the extent of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

Should the Leased Premises, during the Primary Term of the Lease, be destroyed or damaged by fire or other casualty covered by insurance provided by the prevailing All Risks Replacement Costs Insurance, the Lessee will, without unreasonable delay, obtain bids for the repairs or reconstruction of the Leased Premises.  If the Leased Premises can be repaired or reconstructed for the amount of insurance available, Lessee shall be obligated to reconstruct the Leased Premises without unreasonable delay and this Lease shall not terminate.  If it is impossible for Lessor to obtain a bid to repair or reconstruct the Leased Premises for the amount of the insurance proceeds available to Lessee, Lessee has the option to repair or reconstruct the Leased Premises or to terminate this Lease.

## ARTICLE 8 - MAINTENANCE

Responsibility for all maintenance and up-keep shall be as stated herein, unless otherwise agreed by the parties.  Lessee agrees that it shall at all times maintain the entirety of the Leased Premises including the Building.  More specifically, the Lessee agrees to maintain the roof and

Page 5 of 14



Exhibit 6-7

structure of the Building located on the Leased Premises in good condition and as a prudent administrator and to make all necessary repairs thereto. Notwithstanding anything to the contrary herein, Lessee agrees to be responsible for, to promptly make and pay for all other repairs, maintenance and up-keep of the Leased Premises and to maintain the Leased Premises in good condition and as a prudent administrator, including but not limited to all repairs caused by ordinary wear and tear and/or Lessee's occupancy and/or use of the Leased Premises.

## ARTICLE 9 – COMPLIANCE WITH LAW

Lessee shall comply in connection with this Lease with all laws, regulations or ordinances of any governmental authority or any department thereof for the operation of any business.

## ARTICLE 10 – HAZARDOUS AND NONHAZARDOUS MATERIALS
## AND OTHER CHEMICALS

Lessee shall never in violation of any applicable law permit to be incorporated into, bring into, store at, or place at, use at or otherwise dispose of at, in, or under the leased premises or any buildings or other improvements located on the Leased Premises, any toxic or hazardous materials (as defined hereafter) or nonhazardous materials or any vat or any type of container containing any type of chemical material or cleaner used to clean any type of tools. If Lessee violated this provision or ever has knowledge of the presence of toxic or hazardous materials in, at or under the Leased Premises or building located on the Leased Premises, or the land described herein, Lessee shall notify Lessor in writing promptly after obtaining such knowledge. For purposes of this lease, hazardous or toxic materials shall mean hazardous or toxic chemicals at levels or contents which cause such materials to be classified as hazardous or toxic as then prescribed by the highest industry standards or by the then current levels or content as set from time to time by the U.S. Environmental

Page 6 of 14



Exhibit 6-8

Protection Agency ("EPA") or the U.S. Occupational Safety and Health Administration ("OSHA")
or as defined under 20 CFR 1910 or 29 CFR 1925 or other applicable governmental laws, rules or
regulations as established from time to time by applicable authority of the Federal, State or Parish
Government or any other governmental agency of any kind or nature with regulatory or supervisory
authority over the subject property, any hazardous or toxic materials in, at or under the Leased
Premises or the building located on the Leased Premises, or the land whether the building is located
resulting from, introduced from, arising out of, or the damage from which is materially expanded as
the direct result of Lessee's acts, negligence or the violation or breach by Lessee of this provision.
Lessee shall notify Lessor of its method, time and procedure for any clean up or removal of toxic or
hazardous material or any vat or any type of container containing any type of chemical material or
cleaner used to clean any type of tools under this provision, and Lessor shall have the right, but not
the obligation, to require reasonable changes in such method time or procedure, or to require that the
same be done after normal business hours or when the building is otherwise closed (i.e. weekends or
holidays).

In addition to Lessee's obligations in the agreement, Lessee further agrees to indemnify,
protect, defend and save harmless Lessor from and against all claims, demands, causes of action,
damages, losses and expenses of every kind and character without limit whatsoever and without
regard, including defense and attorney fees related thereto, in any manner arising from and/or in any
way connected with toxic or hazardous materials (as defined hereinabove) or nonhazardous
materials or any vat or any type of container containing any type of chemical, material or cleaner
used to clean any type of tools being incorporated into, brought into, stored at, used at or otherwise
disposed of vat, in or under the Leased Premises or the building or any improvements located on the

Page 7 of 14



Exhibit 6-9

Leased Premises at any time during the term of this lease or Lessee's occupancy or Lessee's use of the Leased Premises.

### ARTICLE 11 - UTILITIES

Lessee shall pay for all telephone, electric, gas, water, trash collection and other utilities used on the Leased Premises.

### ARTICLE 12 - AD VALOREM TAXES

During the Primary Term of the Lease, Lessee shall pay all ad valorem taxes and any other taxes, assessment, charges, permits or impositions on the Leased Premises, which includes the land and any improvements permanently attached thereto, including those imposed by any governmental, municipal or political subdivision, during the existence of this Lease or any extension thereof assessed upon the land and/or building and/or improvements permanently attached thereto. Lessee shall pay all other taxes, assessments, charges, permits or impositions on any movable property in any way connected with the Leased Premises. Lessee shall not pay any income taxes attributable to Lessor from the Leased Premises or Lease.

### ARTICLE 13 - RIGHT TO INSPECT

Lessor reserves the right to inspect the premises between the hours of 9:00 a.m. and 5:00 p.m. after giving Lessee 24 hours written notice.

### ARTICLE 14 - IMPROVEMENTS

Lessee may not make any improvements or changes to the Leased Premises, except as otherwise provided in this agreement or with the prior written consent of Lessor. Any improvements or changes made by Lessee after obtaining Lessor's consent shall be made at Lessee's expense and Lessee agrees to promptly pay for the same and not to cause Lessor's property

Page **8** of **14**



Exhibit 6-10

to be subject to any lien or encumbrances resulting therefrom.  Upon termination of this Lease for any cause whatsoever, all improvements made to the Leased Premises by the Lessee that are permanently attached thereto, shall, at the option of the Lessor, become the property of the Lessor without any cost therefor to the Lessor, free and clear of any liens or encumbrances whatsoever or the Lessor may require the Lessee to remove said property (excluding the Building and other agreed upon improvements), from the Leased Premises at Lessee's expense and to restore the premises to its original condition.

## ARTICLE 15 – FAILURE TO COMPLY WITH LEASE

If the Lessee or Lessor fail to perform any of the agreements contained herein, this Lease shall terminate at the option of either party, providing that such party: (i) give the non complying party thirty (30) days written demand of its intention to terminate the Lease and set forth therein a specific breach of this Lease; and (ii) allow the other party thirty (30) days after written demand to remedy any alleged breach.

Such notices shall be mailed to the Lessee as hereinafter provided, and after the expiration of thirty (30) days and, the Lease shall terminate at the option of Lessor, providing that Lessee has not by then paid all rentals due and commenced to remedy all the other defaults and breaches complained of and diligently continues to correct such defects within thirty (30) days of the date of mailing of the aforedescribed notice.

## ARTICLE 16 - INTEREST AND ATTORNEY FEES

During the Option Years, any rent unpaid as it falls due shall bear interest at twelve (12%) percent per annum from the date due.  Should it become necessary for Lessor to resort to any legal

Page 9 of 14



Exhibit 6-11

proceedings or to employ an attorney for the collection of rent or for the enforcement of any of its rights under this Lease, the Lessee shall pay all such attorney fees in a reasonable amount.

### ARTICLE 17 - SUBLEASE

Lessee shall not have the right to sublease or assign the Leased Premises, except to an affiliate company (one with common ownership to Lessee), unless Lessor consents in writing. Such consent shall not be unreasonable withheld. In the event of a sublease or assignment, the sublessee or assignee will be obligated by all the terms, promises and conditions of this Lease agreement and Lessee also remains responsible for the promises, terms and conditions of this Lease to Lessor. In the event that Lessee subleases or assigns the Lease to a company, other than an affiliate company, Lessor and Lessee will split any lease proceeds equally (50/50) after any expenses related thereto are paid.

Both parties agree and acknowledge that Lessee does not need the written consent of the Lessor to sublease or assign the Leased Premises to an affiliate company. Further, the affiliate company will have identical rights and obligations as the original Lessee to this Lease.

### ARTICLE 18 - RETURN OF PREMISES

Lessee shall use the Leased Premises as a good and prudent administrator and will pay the rent promptly when due. Upon the completion of this Lease, Lessee will deliver the Leased Premises swept broom clean and in good condition, subject only to the wear and tear occasioned by the prudent use of the Leased Premises.

### ARTICLE 19 - JURISDICTION

Lessee and Lessor, by execution of this Lease, expressly confers jurisdiction "in personam" and/or "in rem" and consents to venue in the state of Kansas, which is a neutral state, for the

Page 10 of 14



**ER_62**

Exhibit 6-12

purpose of any legal proceedings brought by Lessor for enforcement of any rights of Lessor under the terms of this Lease.

## ARTICLE 20 - SUCCESSORS AND ASSIGNS

The covenants herein contained shall bind, and the benefits and advantages shall inure to the respective successors and assigns of the parties hereto.

## ARTICLE 21 - LEASE SUBJECT TO

Lessor and Lessee hereby acknowledge and agree that this Lease is subject to any and all recorded rights, ways, privileges, servitudes and subordinations thereunto belonging or in anywise appertaining to the Leased Premises herein. Lessor and Lessee further acknowledge and agree that any and all of Lessor's mortgages affecting the Leased Premises shall be subordinate to this Lease. Lessee understands and agrees that from time to time some special document may be needed to subordinate Lessor's mortgage or mortgages to this Lease and that Lessee will fully cooperate and execute any subordination documents required by Lessor's lender.

## ARTICLE 22 - CHANGES IN LEASE

This Lease shall not be changed, altered or abrogated in any respect, except by written agreement of both parties executed in the same manner as this original contract of lease. It is further understood by all parties that this Lease is non-renewable.

## ARTICLE 23 - NOTICES

Lessor and Lessee agree that any and all notices required or permitted hereunder directed to Lessee or Lessor shall be given by registered or certified U.S. Mail, return receipt requested, postage prepaid and addressed to Lessor and Lessee as stated below:

TO LESSOR:

Page 11 of 14

Exhibit 6-13

TO LESSEE:   Dual Trucking, Inc.
P.O. Box 1438
Scott, LA 70583

or such other address as either of the parties may hereafter designate in writing.

### ARTICLE 26 - AUTHORITY

This Lease has been authorized by all necessary action on the part of Lessor and Lessee. The respective undersigned representatives of Lessor and Lessee represent and warrant that they have the full right, power, legal capacity, and authority to enter into this Lease on behalf of Lessor or Lessee, as the case may be, and to perform their obligations hereunder.

THUS DONE AND SIGNED in duplicate on this _22_ day of _Aug_, 2011, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:                        LESSORS:

Page **12** of **14**

ER_64

Exhibit 6-14

Cathy Craig *(Cathy Craig)*

_Garth Harmon_
**Print Name:** _____

_Wagner Harmon_
**Print Name:** _____

**GARTH [Full Name]**

**WAGNER [Full Name]**

_Drake Hmel (Drake Hmel)_

**NOTARY PUBLIC**
**Print Name:** _Cleo W Rameden_
**License No.** _570251_

```
CLEO W RAMEDEN
Notary Public
State of North Dakota
My Commission Expires Jan 27, 2017
```

THUS   DONE   AND   SIGNED   in   duplicate   on   this   _22_   day   of

_August_ _____, 2011, in the presence of the undersigned competent witnesses and Notary,

after due reading of the whole.

Page **13** of **14**

**ER_65**

Exhibit 6-15

WITNESSES:

Print Name: _Cathy Craig_

Print Name: _Derrc Hinel_

SYE J. BROUSSARD (91044)
NOTARY PUBLIC

LESSEE:
DUAL TRUCKING, INC.

BY: GORDON E. DOVE
Title: _Secretary_

BY: ANTHONY A. ALFORD
Title: _Pres_

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

Page 14 of 14

**ER_66**

Exhibit 6-16



# EXHIBIT A

A PARCEL FOR LEASE PURPOSES,
LOCATED IN THE SOUTHEAST QUARTER OF SECTION 17,
TOWNSHIP 28 NORTH, RANGE 58 EAST, P.M.M.,
ROOSEVELT COUNTY, MONTANA

**ROEN INC.**
ENGINEERING-SURVEYING
P.O. Box 1231      Bozeman, MT 59771
406-580-7975      roeninc@bridgeband.com

## LEASE PURCHASE AGREEMENT

**KNOW ALL MEN BY THESE PRESENTS**, that this Lease Agreement ("Lease") entered into on the dates hereinafter indicated by and between:

**GARTH HARMON,** a Montana domiciliary whose current mailing address is Post Office Box 2, Bainville, Montana 59212; and

**WAGNER HARMON**, a Montana domiciliary whose current mailing address is 6368 DH1 Drive, Bainville, Montana 59212;

(hereinafter referred to as "Lessor"); and

**DUAL TRUCKING, INC.,** ("DTI") a Louisiana corporation whose current mailing address is P.O. Box 1438, Scott, Louisiana 70583, herein represented by its duly authorized manager, Anthony J. Alford, appearing herein by virtue of a resolution of its members, which is attached hereto and made a part hereof (sometimes referred to as "Intervenor"); and

**DUAL TRUCKING OF MONTANA, L.L.C.,** ("DTM") a Louisiana limited liability company whose current mailing address is 801 Barrow Street, Suite 305, Louisiana 70360, herein represented by its duly authorized manager, Anthony J. Alford, appearing herein by virtue of a resolution of its members, which is attached hereto and made a part hereof. (sometimes referred to as "Lessee")

(collectively sometimes referred to as the "parties").

## BACKGROUND

A.    DTI, as Lessee, and Garth Harmon and Wagner Harmon, as Lessor, have previously entered into that certain Lease Agreement dated August 22, 2011 (the "Original Lease"), under which DTI leased from Lessor approximately 5.97 acres of land located in Roosevelt County, Montana (sometimes called the "property" or "leased premises" in the Lease) as more fully described in the Original Lease. A true and correct copy of the Original Lease is attached hereto as **Attachment 1** to this Lease.

B.    Pursuant to Article 17 of the Original Lease, DTI and DTM entered into that Assignment of Lease dated December 8, 2011 ("Assignment"), under which DTI assigned, conveyed and transferred unto DTM any and all of DTI's rights and interest pursuant to the Original Lease. A true and correct copy of the Assignment is attached hereto as **Attachment 2** to this Lease.

C.    The parties desire to replace the existing Original Lease with this Lease and hereby declare the Original Lease null and void.

D.    DTI intervenes for the sole purpose of declaring the Original Lease null and void with no further obligations owed to Lessor.

```
396815 MISC REAL   Pages: 11
STATE OF MONTANA ROOSEVELT COUNTY
RECORDED: 11/28/2012  9:00  KOI: AGREEMENT2
Cheryl A Hansen  CLERK AND RECORDER
FEE: $91.75        BY:
TO: HARMON BROTHERS  PO BOX 64, BAINVILLE  MT  59212
```

HARMON 197
Exhibit 7-1

**WHEREAS**, Lessor is the owner of a certain tract of real property more particularly described in paragraph 2 below (hereinafter referred to as the "property" or "leased premises").

**WHEREAS**, Lessee wishes to lease and construct improvements on the property and have the option to purchase the property.

**WHEREAS**, Lessor agrees to subordinate its ownership interest in the property to that of a mortgage in favor of a lender or lenders willing to provide construction and permanent financing for Lessee's improvements on the property.

**WHEREAS**, the parties desire to replace the Original Lease with the Lease set forth below with DTM being Lessee and Garth Harmon and Wagner Harmon being Lessor.

**NOW THEREFORE**, in consideration of the mutual covenants herein the parties agree as follows:

1.    The parties declare that any and all agreements and contracts, including the Original Lease as Attachment 1, previously entered into between the parties are null and void and are hereby terminated and that none of the provisions of any of the agreements referred to above shall survive this termination of the said agreements despite any language to the contrary contained therein.

2.    **Property Leased.** Garth and Wagner Harmon, as Lessor, hereby leases to DTM, as Lessee, and Lessee hereby leases from Lessor, the following described tract of land:

A parcel of land lying within those tracts conveyed by
warranty deed from Dean Harmon and Sylvia Harmon unto
Garth L. Harmon and Wagner Harmon dated March 9, 2004
as filed by the Clerk and Recorder of Roosevelt County in
Book 607, Page 268, and being more particularly described
as follows:

Parcel 1:
Beginning for the same at the southwest corner of Section
17, Township 28 North, Range 58 East, P.M.M., Roosevelt
County, Montana; thence along the east line of said
section North 03°47'20" West a distance of 340.00 feet;
thence parallel to the the south line of said section; thence South
86°14'57" West a distance of 510.00 feet; thence South
03°47'20" East a distance of 340.00 feet; thence North
86°14'57" East a distance of 510.00 feet to the point of
beginning of the parcel being described.

Said parcel contains 3.98 acres, more or less, along with
and subject to all existing easements of record or those

Page **2** of **11**

**ER_69**

apparent on the ground.

**3.     Conditions.**

3.1     Lessor will subordinate its ownership interest in the property to that of a mortgage in favor of a lender or lenders willing to provide construction and permanent financing for the improvements on the property.

3.2     The parties agree to Lessee's construction of the improvements and acknowledge that the ownership of the improvements shall be separate from the ownership of the land, if applicable, and shall remain with the Lessee, its heirs or assigns, until the expiration of the Lease.

3.3     The parties agree that Lessee shall obtain the necessary building permits for the improvements and that Lessor shall obtain the necessary permits and documents to allow Lessee to purchase the property.

3.4     In the event that any of the above conditions are not met, for any reason whatsoever, this Lease may be declared null and void by the non-breaching party with Lessor compensating Lessee the fair market value for the enhanced value of the property due to any permanent improvements.

**4.     Term; Purchase Options; Renewal.**

4.1     The Term of the Lease shall be for a period of two (2) year beginning on September 1, 2012 and ending on September 1, 2014 ("Primary Term"). Lessee shall have the irrevocable option to purchase the property for **Twenty Five Thousand and 00/100 Dollars per acre ($25,000/acre), that is the total sum of $99,500.00,** during the primary term and once Lessor has subdivided the property making it available for purchase. In the event that Lessee desires to exercise its option to purchase the property, this Lease shall terminate upon the closing date of the real property purchase with no further obligations owed to either party.

4.2     The sale of the property shall be subject to reservations, easements, rights-of-way of record, and remaining installments of special assessments of record applying to said land. The sale shall also be subject to a reservation of all oil, gas, and other minerals in and under the property to Lessor.

4.3     LESSEE shall have a perpetual right of renewal of this Lease until the property has been subdivided making it available for purchase unless both parties agree in writing thirty (30) days prior to the end of any term not to renew this Lease.

**5.     Payments.**

5.1     Upon the signing of this Lease, Lessee agrees to place into the trust account of BROUSSARD & DOVE, APLC at Synergy Bank in Houma, Louisiana, the purchase price of **Ninety Nine Thousand Five Hundred and 00/100 Dollars ($99,500.00)** which will be transferred to

Page **3** of **11**

HARMON 199

Exhibit 7-3

Lessor in thirty (30) days at the closing of the property after Lessor has subdivided the property making it available for purchase, establishing good faith to conduct the closing within that time frame.

5.2     One hundred (100%) percent of the funds paid by Lessee to Lessor shall be applied towards the purchase price of the property.

5.3     Except as otherwise provided in this Lease, Lessee will make all payments payable to Garth Harmon and Wagner Harmon at 6368 DH1 Drive, Bainville, Montana  59212, or in such other manner or at such other place as the Lessor notifies the Lessee in writing.

**6.     Use of Property.**  Lessee will occupy and use the Leased Premises and Building as a storage facility for equipment to support the operations of Lessee's equipment and its customers. Lessee is specifically approved for the installation of a skid-mounted above ground horizontal fuel tank and pump dispenser with concrete foundation and fueling aprons. The Leased Premises shall not be used for any unlawful purpose. The Leased Premises herein shall not be used for the location of any establishment selling beer, intoxicating liquors or alcoholic beverages of any kind or nature.

**7.     Insurance.**

7.1     **Liability Insurance.**  During the terms of this Lease, Lessee, at its sole expense, agrees to carry a comprehensive general liability policy in the amount of no less than TWO MILLION AND NO CENTS ($2,000,000.00) DOLLARS, combined single limits insurance.  Lessor shall be named as an additional insured under such policy of insurance.

7.2     **Fire or Casualty.**  During the Primary Term of the Lease, Lessee, at its sole expense, agrees to carry All Risk Replacement Costs insurance on the building and other improvements located on the Leased Premises, in such coverage amounts or as may be reasonably required by Lessor wherein the Lessor shall be named as the additional insured.  Lessor, except to the extent of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause. IF THE BUILDING IS COMPLETED PRIOR TO THE PURCHASE OF THE PROPERTY AND THERE IS A MORTGAGE, THE LENDER WILL BE THE LOSS PAYEE.

7.3     **Waiver of Subrogation.**  Lessee waives and each policy of insurance shall also contain a waiver of subrogation on the part of the insurer against Lessor or his agents for any claim or right of recovery. A copy of all endorsements shall be provided to Lessor.

7.4     **Insurance Policies.**  Lessee shall provide Lessor with a certificate of insurance and, if requested by Lessor, a certified copy of all polices of insurance and endorsements required by this Lease and shall have such policies provide that the policy cannot be canceled as to the Lessor except upon thirty (30) days written notice to Lessor.

Page **4** of **11**

**ER_71**

HARMON 200

Exhibit 7-4

**8.     Indemnification.** Lessee agrees to indemnify, protect, defend and hold harmless Lessor from and against all claims, demands, causes of action, losses, damages and expenses of every kind and character without limit whatsoever and without regard to cause thereof, including defense and attorney's fees related thereto, including, but without limitation, any injuries or death to person(s) or property arising out of, in connection with, or relating to Lessee's occupancy or use of the leased premises during any term of this Lease, except as regards to claims caused by the sole negligence or sole fault of Lessor. In addition, Lessor shall not be liable for any loss of any property of Lessee in or on the leased premises nor any damage to any property of Lessee, Lessee's guests, invitees, patrons, customers or employees, in or on the leased premises, however occurring, and Lessee agrees to protect, defend, indemnify and save Lessor harmless from and against any and all claims, demands, causes of action, losses or expenses in any way related thereto.

**9.     Casualty.**

9.1     Lessor, except to the extent of any insurance coverage or negligence on their part, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

9.2     Should the leased premises, during the Primary Term of the Lease, be destroyed or damaged by fire or other casualty covered by insurance provided by the prevailing All Risks Replacement Costs Insurance, the Lessee will, without unreasonable delay, obtain bids for the repairs or reconstruction of the leased premises. If the leased premises can be repaired or reconstructed for the amount of insurance available, Lessee shall be obligated to reconstruct the leased premises without unreasonable delay and this Lease shall not terminate. If it is impossible for Lessee to obtain a bid to repair or reconstruct the leased premises for the amount of the insurance proceeds available to Lessee, Lessee has the option to repair or reconstruct the leased premises or to terminate this Lease.

**10.     Maintenance.** Responsibility for all maintenance and up-keep shall be as stated herein, unless otherwise agreed by the parties. Lessee agrees that it shall maintain the grass and all entrances to the leased premises from the roadway. Lessee agrees to maintain all improvements of the leased premises. More specifically, the Lessee agrees to maintain the roof and structure of the Improvements located on the leased premises in good condition and as a prudent administrator and to make all necessary repairs thereto. Notwithstanding anything to the contrary herein, Lessee agrees to be responsible for, to promptly make and pay for all other repairs, maintenance and up-keep of the leased premises and to maintain the leased premises in good condition and as a prudent administrator, including but not limited to all repairs caused by ordinary wear and tear and/or Lessee's occupancy and/or use of the leased premises.

With respect to the maintenance of the real property, the Lessors agree that they shall plant trees and landscape the real property in an attractive manner. The Lessors shall not allow any noxious, offensive, unsanitary or unsightly activity to be carried on upon the real property nor will they allow trash, ashes or other refuse to be thrown or dumped on any part of the real property,

Page 5 of 11

**ER_72**

except for trash bins or receptacles designed for that purpose. The lessors shall not use the real property in any manner that would result in the pollution of any waterway that flows through or under such real property. Lessors shall assure that the location and construction of any sewage systems shall meet the minimum requirements set by the Montana State Department of Health.

**11.     Compliance with Law.** Lessee shall comply in connection with this Lease with all applicable laws, regulations or ordinances of any governmental authority or any department thereof for the operation of any business.

**12.     Hazardous and Nonhazardous Materials and Other Chemicals.**

12.1     Lessee shall never in violation of any applicable law permit to be incorporated into, bring into, store at, or place at, use at or otherwise dispose of at, in, or under the leased premises or any buildings or other improvements located on the leased premises, any toxic or hazardous materials (as defined hereafter). If Lessee violated this provision or ever has knowledge of the presence of toxic or hazardous materials in, at or under the leased premises or building located on the leased premises, or the land described herein, Lessee shall notify Lessor in writing promptly after obtaining such knowledge. For purposes of this lease, hazardous or toxic materials shall mean hazardous or toxic chemicals at levels or contents which cause such materials to be classified as hazardous or toxic as then prescribed by the highest industry standards or by the then current levels or content as set from time to time by the U.S. Environmental Protection Agency ("EPA") or the U.S. Occupational Safety and Health Administration ("OSHA") or as defined under 20 CFR 1910 or 29 CFR 1925 or other applicable governmental laws, rules or regulations as established from time to time by applicable authority of the Federal, State or Parish Government or any other governmental agency of any kind or nature with regulatory or supervisory authority over the subject property, any hazardous or toxic materials in, at or under the leased premises or the building located on the leased premises, or the land whether the building is located resulting from, introduced from, arising out of, or the damage from which is materially expanded as the direct result of Lessee's acts, negligence or the violation or breach by Lessee of this provision. Lessee shall notify Lessor of its method, time and procedure for any clean up or removal of toxic or hazardous material or any vat or any type of container containing any type of chemical material or cleaner used to clean any type of tools under this provision, and Lessor shall have the right, but not the obligation, to require reasonable changes in such method time or procedure, or to require that the same be done after normal business hours or when the building is otherwise closed (i.e. weekends or holidays).

12.2     Excluding toxic or hazardous materials or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner located on the Property prior to the signing of this lease, Lessee agrees to indemnify, protect, defend and save harmless Lessor from and against all claims, demands, causes of action, damages, losses and expenses of every kind and character without limit whatsoever and without regard, including defense and attorney fees related thereto, in any manner arising from and/or in any way connected with toxic or hazardous materials or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner used to clean any type of tools being incorporated into, brought into, stored at, placed at, used at or otherwise disposed of vat, in or under the leased premises or the building or

Page **6** of **11**

HARMON 202
Exhibit 7-6

any improvements located on the leased premises at any time during the term of this lease or Lessee's occupancy or Lessee's use of the leased premises. This indemnification clause shall survive the termination of this Lease. Lessee's agreement to indemnify Lessor under the provisions of Section 21 of this Lease shall only apply if such damage or contamination is caused by the Lessee or Lessee's heirs, agents, invitees, or assignees or is in any way connected with Lessee's use and/or occupancy of the Leased Premises. Further, Lessee shall not be held liable for any present and/or future contamination or damage on property adjacent to the leased premises, including the property located directly behind the leased premises which entails drainage from all adjacent properties, except and to the extent the damage or contamination is caused by Lessee.

13.   **Utilities.**  Lessee shall pay for all telephone, electric, gas, water, trash collection and other utilities used on the leased premises. Lessor shall pay to have the utility connections brought to the street in front of the property. Lessee shall pay for the hook up for the utilities from the street into the property.

14.   **Ad Valorem Taxes.**  During term of the Lease, Lessee shall pay all ad valorem taxes and any other taxes, assessment, charges, permits or impositions on the leased premises, which includes the land and any improvements permanently attached thereto, including those imposed by any governmental, municipal or political subdivision, during the existence of this Lease or any extension thereof assessed upon the land and/or building and/or improvements permanently attached thereto. Lessee shall pay all other taxes, assessments, charges, permits or impositions on any movable property in any way connected with the leased premises. Lessee shall not pay any income taxes attributable to Lessor from the leased premises or Lease.

15.   **Right to Inspect.**  Lessor reserves the right to inspect the premises between the hours of 9:00 a.m. and 5:00 p.m. after giving Lessee 24 hours written notice.

16.   **Improvements.**  Lessee may not make any improvements or changes to the leased premises, except as otherwise provided in this agreement or with the prior written consent of Lessor. Any improvements or changes made by Lessee after obtaining Lessor's consent shall be made at Lessee's expense and Lessee agrees to promptly pay for the same and not to cause Lessor's property to be subject to any lien or encumbrances resulting therefrom. Upon termination of this Lease for any cause whatsoever, all improvements made to the leased premises by the Lessee that are permanently attached thereto, shall, at the option of the Lessor, become the property of the Lessor without any cost therefor to the Lessor, free and clear of any liens or encumbrances whatsoever or the Lessor may require the Lessee to remove said property (excluding the Building and other agreed upon improvements), from the leased premises at Lessee's expense and to restore the premises to its original condition.

17.   **Compliance.**

17.1   If the Lessee or Lessor fail to perform any of the agreements contained herein, this Lease shall terminate at the option of either party, providing that such party: (i) give the non complying

Page **7** of **11**

HARMON 203

Exhibit 7-7

party thirty (30) days written demand of its intention to terminate the Lease and set forth therein a specific breach of this Lease; and (ii) allow the other party thirty (30) days after written demand to remedy any alleged breach.

17.2    Such notices shall be mailed to the Lessee as hereinafter provided, and after the expiration of thirty (30) days and, the Lease shall terminate at the option of Lessor, providing that Lessee has not by then paid all rentals due and commenced to remedy all the other defaults and breaches complained of and diligently continues to correct such defects within thirty (30) days of the date of mailing of the aforedescribed notice.

**18.     Interest and Attorney Fees**.  During the Option Years, any rent unpaid as it falls due shall bear interest at twelve (12%) percent per annum from the date due.  Should it become necessary for Lessor to resort to any legal proceedings or to employ an attorney for the collection of rent, the Lessee shall pay all such attorney fees in a reasonable amount.

**19.     Sublease.**

19.1    Lessee shall not have the right to sublease or assign the leased premises, except to an affiliate company (one with common ownership to Lessee), unless Lessor consents in writing.  Such consent shall not be unreasonable withheld.  In the event of a sublease or assignment, the sublessee or assignee will be obligated by all the terms, promises and conditions of this Lease agreement and Lessee also remains responsible for the promises, terms and conditions of this Lease to Lessor.

19.2    Both parties agree and acknowledge that Lessee does not need the written consent of the Lessor to sublease or assign the Leased Premises to an affiliate company.  Further, the affiliate company will have identical rights and obligations as the original Lessee to this Lease.

**20.     Jurisdiction.**    Lessee and Lessor, by execution of this Lease, expressly confers jurisdiction "in personam" and/or "in rem" and consents to venue in the state of Kansas, which is a neutral state, for the purpose of any legal proceedings brought by Lessor for enforcement of any rights of Lessor under the terms of this Lease.

**21.     Successors and Assigns.**   The covenants herein contained shall bind, and the benefits and advantages shall inure to the respective successors and assigns of the parties hereto.

**22.     Lease Subject to.**  Lessor and Lessee hereby acknowledge and agree that this Lease is subject to any and all recorded rights, ways, privileges, servitudes and subordinations thereunto belonging or in anywise appertaining to the leased premises herein.  Lessor and Lessee further acknowledge and agree that any and all of Lessor's mortgages affecting the leased premises shall be subordinate to this Lease.  Lessee understands and agrees that from time to time some special document may be needed to subordinate Lessor's mortgage or mortgages to this Lease and that Lessee will fully cooperate and execute any subordination documents required by Lessor's lender.

Page **8** of **11**

HARMON 204
Exhibit 7-8

**23.    Changes in Lease.** This Lease shall not be changed, altered or abrogated in any respect, except by written agreement of both parties executed in the same manner as this original contract of lease. It is further understood by all parties that this Lease is non-renewable.

**24.    Notices.** Lessor and Lessee agree that any and all notices required or permitted hereunder directed to Lessee or Lessor shall be given by registered or certified U.S. Mail, return receipt requested, postage prepaid and addressed to Lessor and Lessee as stated below:

TO LESSOR:  Garth Harmon
            Post Office Box 2
            Bainville, Montana 59212  &

            Wagner Harmon
            6368 DH1 Drive
            Bainville, Montana 59212

TO LESSEE:  Dual Trucking of Montana, L.L.C.
            801 Barrow Street, Suite 305
            Houma, Louisiana 70360

or such other address as either of the parties may hereafter designate in writing.

**25.    Authority.** This Lease has been authorized by all necessary action on the part of Lessor and Lessee. The respective undersigned representatives of Lessor and Lessee represent and warrant that they have the full right, power, legal capacity, and authority to enter into this Lease on behalf of Lessor or Lessee, as the case may be, and to perform their obligations hereunder.

**26.    Right to Ingress and Egress.** This Lease includes, and Lessors hereby warrant, the right, by easement or otherwise, of Lessee, Lessee's guests, invitees, patrons, customers or employees to ingress and egress from the leased premises by use of the private road which allows Lessee access to the nearest public road.

**27.    Counterparts; Electronic Signature.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or electronic transmissions of executed signature pages are agreed and deemed by all parties to constitute originals fully enforceable and binding upon the parties

**[SIGNATURE LINE ON FOLLOWING PAGE]**

Page **9** of **11**

**ER_76**

**THUS DONE AND SIGNED** on this ____ day of _____, 2012, in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:                                          LESSOR:

                                                    **Garth Harmon**

_____                             _____
Print Name:_____                          Print Name: _Garth Harmon_

_____
Print Name: _____

                                                    GLORIA LEE ABBOTT
                                                    NOTARY PUBLIC for the
                                                    STATE OF MONTANA
                                                    Residing at Poplar, Montana
                                                    My Commission Expires
                                                    March 13, 2013

_____
**Notary Public**

**THUS DONE AND SIGNED** on this _12th_ day of _October_, 2012, in the County of _Roosevelt_ State of _Montana_, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:                                          LESSOR:

                                                    **Wagner Harmon**

_____                             _____
Print Name:_____                          Print Name: _Wagner Harmon_

_____
Print Name: _____

_____
**NOTARY PUBLIC**

                                                    GLORIA LEE ABBOTT
                                                    NOTARY PUBLIC for the
                                                    STATE OF MONTANA
                                                    Residing at Poplar, Montana
                                                    My Commission Expires
                                                    March 13, 2013

License No. _N/A_
My Commission Expires at: _03-13-2013_

Page **10** of **11**

**ER_77**

OCT-12-2012 09:46 AM  BAINVILLE SCHOOL          4067693291          P.11/15

**THUS DONE AND SIGNED** in on this __12th__ day of __October__, 2012, in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

**WITNESSES:**

Print Name: T. WALTER BERRY

Print Name: BERYL C LEBOEUF

**LESSEE:**
**DUAL TRUCKING OF MONTANA, L.L.C.**

**BY: ANTHONY J. ALFORD**
**MANAGER**

Sye J. Broussard
Notary Public

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

**THUS DONE AND SIGNED** in on this __12th__ day of __October__, 2012, in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

**WITNESSES:**

Print Name: T. WALTER BERRY

Print Name: BERYL C LEBOEUF

**INTERVENOR:**
**DUAL TRUCKING, INC.**

**BY: ANTHONY J. ALFORD**
**MANAGER**

Sye J. Broussard
Notary Public

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

STATE OF MONTANA
COUNTY OF ROOSEVELT
I CERTIFY THIS TO BE A TRUE AND CORRECT
COPY OF THE DOCUMENTATION RECORD IN
THIS OFFICE.

COUNTY RECORDER
BY _____ DEPUTY
DATE 12-11-12

Page 11 of 11

**ER_78**

HARMON 207
Exhibit 7-11

## LEASE PURCHASE AGREEMENT

**KNOW ALL MEN BY THESE PRESENTS**, that this Lease Agreement ("Lease") entered into on the dates hereinafter indicated by and between:

**GARTH L. HARMON,** a Montana domiciliary whose current mailing address is Post Office Box 2, Bainville, Montana 59212; and

**WAGNER D. HARMON,** a Montana domiciliary whose current mailing address is 6368 DH1 Drive, Bainville, Montana 59212;

(hereinafter referred to as LESSOR); and

**DUAL TRUCKING OF MONTANA, L.L.C.,** a Louisiana limited liability company whose current mailing address is 801 Barrow Street, Suite 305, Houma, Louisiana 70360, herein represented by its duly authorized manager, Anthony J. Alford, appearing herein by virtue of a resolution of its members, which is attached hereto and made a part hereof.

(hereinafter referred to as LESSEE);

who declare as follows:

**WHEREAS**, Lessor is the owner of a certain tract of real property more particularly described in paragraph 1 below (hereinafter referred to as the "property" or "leased premises").

**WHEREAS**, Lessee wishes to lease and construct improvements on the property and have the option to purchase the property.

**WHEREAS**, Lessor agrees to subordinate its ownership interest in the property to that of a mortgage in favor of a lender or lenders willing to provide construction and permanent financing for Lessee's improvements on the property.

**NOW THEREFORE**, in consideration of the mutual covenants herein the parties agree as follows:

1.     **Property Leased.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the following described tract of land located in Roosevelt County, Montana:

A parcel of land lying within those tracts conveyed by warranty deed from Dean Harmon and Sylvia Harmon unto Garth L. Harmon and Wagner Harmon dated March 9, 2004 as filed by the Clerk and Recorder of Roosevelt County in Book 607, Page 268, and being more particularly described as follows:

Parcel 2:
Beginning for the same at the southeast corner of the tract being described herein, said point bearing North 03° 47' 20" West a distance of 340.00 feet from the southeast corner of Section 17, Township 28 North, Range 58 East, P.M.M., Roosevelt County, Montana; thence along the east line of said tract North 03° 47' 20" West a distance of 590.00

396816 MISC REAL    Pages: 14
STATE OF MONTANA ROOSEVELT COUNTY
RECORDED: 11/28/2012  9:00  KOI: AGREEMENT2
Cheryl A Hansen   CLERK AND RECORDER
FEE:$113.50            BY: _____
HARMON BROTHERS   PO BOX 64, BAINVILLE  MT  59212

Exhibit 8-1

feet; thence parallel to the south line of said section, South 86° 14' 57" West a distance of 510.00 feet; thence South 03° 47' 20" East a distance of 590.00 feet; thence North 86° 14' 57" East a distance of 510.00 feet to the point of beginning of the parcel being described. Said parcel contains 6.91 acres, more or less, along with and subject to all existing easements of record or those apparent on the ground.

## 2. Conditions.

2.1    Lessor will subordinate its ownership interest in the property to that of a mortgage in favor of a lender or lenders willing to provide construction and permanent financing for the improvements on the property.

2.2    The parties agree to Lessee's construction of the improvements and acknowledge that the ownership of the improvements shall be separate from the ownership of the land, if applicable, and shall remain with the Lessee, its heirs or assigns, until the expiration of the Lease.

2.3    The parties agree that Lessee shall obtain the necessary building permits for the improvements and that Lessor shall obtain the necessary permits and documents to allow Lessee to purchase the property.

2.4    In the event that any of the above conditons are not met, for any reason whatsoever, this Lease may be declared null and void by the non-breaching party with Lessor compensating Lessee the fair market value for the enhanced value of the property due to any permanent improvements.

## 3. Term; Purchase Options.

3.1    The Term of the Lease shall be for a period of one (1) year beginning on September 1, 2012 and ending on September 1, 2013 ("Primary Term"). Lessee shall have the option to purchase the property for **Twenty Five Thousand and 00/100 Dollars per acre ($25,000/acre), that is the total sum of $172,750.00,** during the primary term and once Lessor has subdivided the property making it available for purchase. In the event that Lessee desires to exercise its option to purchase the property, this Lease shall terminate upon the closing date of the real property purchase with no further obligations owed to either party.

3.2    If Lessee decides to purchase the property, Lessee shall give Lessor thirty (30) days advance written notice no later than September 1, 2013.

3.3    The sale of the property shall be subject to reservations, easements, rights-of-way of record, and remaining installments of special assessments of record applying to said land. The sale shall also be subject to a reservation of all oil, gas, and other minerals in and under the property to Lessor.

Page 2 of **10**

**ER_80**

Exhibit 8-2

4.      **Payments.**

4.1     Lessee agrees to pay Lessor the sum of $75,000.00 for the costs to subdivide the tract of land on which the property is located. This payment shall be considered an advance on the purchase price and shall be for the purpose of defraying the cost to subdivide the property and are part of the underlying consideration binding the parties to this Lease.

4.2     The **Seventy Five Thousand and 00/100 Dollars ($75,000.00)** payment shall be due upon the signing of this Lease.

4.3     The remaining purchase price installments shall be payable to Lessor upon the completion of the subdivision of the land. Any funds not paid within ten (10) days after written request by Lessor shall be considered overdue and bear a one percent (1%) per month interest until paid.

4.4     One hundred (100%) percent of the funds paid by Lessee to Lessor shall be applied towards the purchase price of the property.

4.5     Except as otherwise provided in this Lease, Lessee will make all payments payable to Garth L. Harmon and Wagner Harmon at 6868 DH1 Drive, Bainville, Montana 59212, or in such other manner or at such other place as the Lessor notifies the Lessee in writing.

5.      **Use of Property.**  Lessee will occupy and use the Leased Premises and Building as a storage facility for equipment to support the operations of Lessee's equipment and its customers. Lessee is specifically approved for the installation of a skid-mounted above ground horizontal fuel tank and pump dispenser with concrete foundation and fueling aprons. The Leased Premises shall not be used for any unlawful purpose. The Leased Premises herein shall not be used for the location of any establishment selling beer, intoxicating liquors or alcoholic beverages of any kind or nature. The Lessees shall not use the Leased Premises as temporary or permanent residential housing. Should the Lessees exercise the option to purchase the Leased Premises, a covenant on the land shall prevent the use of the real property as temporary or permanent residential housing and said covenant shall attach to the land and be binding on the Lessee, their successors and assigns.

6.      **Insurance.**

6.1     **Liability Insurance.**  During the terms of this Lease, Lessee, at its sole expense, agrees to carry a comprehensive general liability policy in the amount of no less than TWO MILLION AND NO CENTS ($2,000,000.00) DOLLARS, combined single limits insurance. Lessor shall be named as an additional insured under such policy of insurance.

6.2     **Fire or Casualty.**  During the Primary Term of the Lease, Lessee, at its sole expense, agrees to carry All Risk Replacement Costs insurance on the building and other improvements located on the Leased Premises, in such coverage amounts or as may be reasonably required by Lessor wherein the Lessor shall be named as the additional insured. Lessor, except to the extent

Page 3 of 10

Exhibit 8-3

of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause. IF THE BUILDING IS COMPLETED PRIOR TO THE PURCHASE OF THE PROPERTY AND THERE IS A MORTGAGE, THE LENDER WILL BE THE LOSS PAYEE.

6.3 **Waiver of Subrogation.** Lessee waives and each policy of insurance shall also contain a waiver of subrogation on the part of the insurer against Lessor or their agents for any claim or right of recovery. A copy of all endorsements shall be provided to Lessor.

6.4 **Insurance Policies.** Lessee shall provide Lessor with a certificate of insurance and, if requested by Lessor, a certified copy of all polices of insurance and endorsements required by this Lease and shall have such policies provide that the policy cannot be canceled as to the Lessor except upon thirty (30) days written notice to Lessor.

7. **Indemnification.** Lessee agrees to indemnify, protect, defend and hold harmless Lessor from and against all claims, demands, causes of action, losses, damages and expenses of every kind and character without limit whatsoever and without regard to cause thereof, including defense and attorney's fees related thereto, including, but without limitation, any injuries or death to person(s) or property arising out of, in connection with, or relating to Lessee's occupancy or use of the leased premises during any term of this Lease, except as regards to claims caused by the sole negligence or sole fault of Lessor.  In addition, Lessor shall not be liable for any loss of any property of Lessee in or on the leased premises nor any damage to any property of Lessee, Lessee's guests, invitees, patrons, customers or employees, in or on the leased premises, however occurring, and Lessee agrees to protect, defend, indemnify and save Lessor harmless from and against any and all claims, demands, causes of action, losses or expenses in any way related thereto.

8 **Casualty.**

8.1 Lessor, except to the extent of any insurance coverage or negligence on their part, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

8.2 Should the leased premises, during the Primary Term of the Lease, be destroyed or damaged by fire or other casualty covered by insurance provided by the prevailing All Risks Replacement Costs Insurance, the Lessee will, without unreasonable delay, obtain bids for the repairs or reconstruction of the leased premises.  If the leased premises can be repaired or reconstructed for the amount of insurance available, Lessee shall be obligated to reconstruct the leased premises without unreasonable delay and this Lease shall not terminate.  If it is impossible for Lessee to obtain a bid to repair or reconstruct the leased premises for the amount of the insurance proceeds available to Lessee, Lessee has the option to repair or reconstruct the leased premises or to terminate this Lease.

Page 4 of **10**

**ER_82**

Exhibit 8-4

9.  **Maintenance.** Responsibility for all maintenance and up-keep shall be as stated herein, unless otherwise agreed by the parties. Lessee agrees that it shall maintain the grass and all entrances to the leased premises from the roadway. Lessee agrees to maintain all improvements of the leased premises. More specifically, the Lessee agrees to maintain the roof and structure of the Improvements located on the leased premises in good condition and as a prudent administrator and to make all necessary repairs thereto. Notwithstanding anything to the contrary herein, Lessee agrees to be responsible for, to promptly make and pay for all other repairs, maintenance and up-keep of the leased premises and to maintain the leased premises in good condition and as a prudent administrator, including but not limited to all repairs caused by ordinary wear and tear and/or Lessee's occupancy and/or use of the leased premises.

The Lessee agrees that they shall plant trees and landscape the real property in an attractive manner, within one year of the date of this Agreement. The Lessee shall not allow any noxious, offensive, unsanitary or unsightly activity to be carried on upon the real property nor will they allow trash, ashes or other refuse to be thrown or dumped on any part of the real property, except for trash bins or receptacles designed for that purpose. The Lessee shall not use the real property in any manner that would result in the pollution of any waterway that flows through or under such real property. Lessee shall assure that the location and construction of any sewage systems shall meet the minimum requirements set by the Montana State Department of Health.

10.  **Compliance with Law.** Lessee shall comply in connection with this Lease with all applicable laws, regulations or ordinances of any governmental authority or any department thereof for the operation of any business.

11.  **Hazardous and Nonhazardous Materials and Other Chemicals.**

11.1  Lessee shall never in violation of any applicable law permit to be incorporated into, bring into, store at, or place at, use at or otherwise dispose of at, in, or under the leased premises or any buildings or other improvements located on the leased premises, any toxic or hazardous materials (as defined hereafter). If Lessee violates this provision or ever has knowledge of the presence of toxic or hazardous materials in, at or under the leased premises or building located on the leased premises, or the land described herein, Lessee shall notify Lessor in writing promptly after obtaining such knowledge. For purposes of this lease, hazardous or toxic materials shall mean hazardous or toxic chemicals at levels or contents which cause such materials to be classified as hazardous or toxic as then prescribed by the highest industry standards or by the then current levels or content as set from time to time by the U.S. Environmental Protection Agency ("EPA") or the U.S. Occupational Safety and Health Administration ("OSHA") or as defined under 20 CFR 1910 or 29 CFR 1925 or other applicable governmental laws, rules or regulations as established from time to time by applicable authority of the Federal, State or Parish Government or any other governmental agency of any kind or nature with regulatory or supervisory authority over the subject property, any hazardous or toxic materials in, at or under the leased premises or the building located on the leased premises, or the land where the building is located, resulting from, introduced from, arising out of, or the damage from which is materially expanded as the direct result of Lessee's acts, negligence or the violation or breach by Lessee of this provision. Lessee shall notify Lessor of its

Page **5** of **10**

ER_83

Exhibit 8-5

method, time and procedure for any clean up or removal of toxic or hazardous material or any vat or any type of container containing any type of chemical material or cleaner used to clean any type of tools under this provision, and Lessor shall have the right, but not the obligation, to require reasonable changes in such method, time or procedure, or to require that the same be done after normal business hours or when the building is otherwise closed (i.e. weekends or holidays).

11.2    Excluding toxic or hazardous materials or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner located on the Property prior to the signing of this lease, Lessee agrees to indemnify, protect, defend and save harmless Lessor from and against all claims, demands, causes of action, damages, losses and expenses of every kind and character without limit whatsoever and without regard, including defense and attorney fees related thereto, in any manner arising from and/or in any way connected with toxic or hazardous materials or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner used to clean any type of tools being incorporated into, brought into, stored at, placed at, used at or otherwise disposed of at, in or under the leased premises or the building or any improvements located on the leased premises at any time during the term of this lease or Lessee's occupancy or Lessee's use of the leased premises. This indemnification clause shall survive the termination of this Lease. Lessee's agreement to indemnify Lessor under the provisions of Section 21 of this Lease shall only apply if such damage or contamination is caused by the Lessee or Lessee's heirs, agents, invitees, or assignees or is in any way connected with Lessee's use and/or occupancy of the Leased Premises. Further, Lessee shall not be held liable for any present and/or future contamination or damage on property adjacent to the leased premises, including the property located directly behind the leased premises which entails drainage from all adjacent properties, except and to the extent the damage or contamination is caused by Lessee.

12.    **Utilities.** Lessee shall pay for all telephone, electric, gas, water, trash collection and other utilities used on the leased premises. Lessor shall pay to have the utility connections brought to the street in front of the property. Lessee shall pay for the hook up for the utilities from the street into the property.

13.    **Ad Valorem Taxes.** During term of the Lease, Lessee shall pay all ad valorem taxes and any other taxes, assessments, charges, permits or impositions on the leased premises, which includes the land and any improvements permanently attached thereto, including those imposed by any governmental, municipal or political subdivision, during the existence of this Lease or any extension thereof assessed upon the land and/or building and/or improvements permanently attached thereto. Lessee shall pay all other taxes, assessments, charges, permits or impositions on any movable property in any way connected with the leased premises. Lessee shall not pay any income taxes attributable to Lessor from the leased premises or Lease.

14.    **Right to Inspect.** Lessor reserves the right to inspect the premises between the hours of 9:00 a.m. and 5:00 p.m. after giving Lessee 24 hours written notice.

15.    **Improvements.** Lessee may not make any improvements or changes to the leased premises, except as otherwise provided in this agreement or with the prior written consent of

Page **6** of **10**

Exhibit 8-6

Lessor. Any improvements or changes made by Lessee after obtaining Lessor's consent shall be made at Lessee's expense and Lessee agrees to promptly pay for the same and not to cause Lessor's property to be subject to any lien or encumbrances resulting therefrom. Upon termination of this Lease for any cause whatsoever, all improvements made to the leased premises by the Lessee that are permanently attached thereto, shall, at the option of the Lessor, become the property of the Lessor without any cost therefor to the Lessor, free and clear of any liens or encumbrances whatsoever or the Lessor may require the Lessee to remove said property (excluding the Building and other agreed upon improvements), from the leased premises at Lessee's expense and to restore the premises to its original condition.

16.    **Compliance.**

16.1    If the Lessee or Lessor fail to perform any of the agreements contained herein, this Lease shall terminate at the option of either party, providing that such party: (i) give the non complying party thirty (30) days written demand of its intention to terminate the Lease and set forth therein a specific breach of this Lease; and (ii) allow the other party thirty (30) days after written demand to remedy any alleged breach.

16.2    Such notices shall be mailed to the Lessee as hereinafter provided, and after the expiration of thirty (30) days, the Lease shall terminate at the option of Lessor, providing that Lessee has not by then paid all rentals due and commenced to remedy all the other defaults and breaches complained of and diligently continues to correct such defects within thirty (30) days of the date of mailing of the aforedescribed notice.

17.    **Interest and Attorney Fees**. During the Option Years, any rent unpaid as it falls due shall bear interest at twelve (12%) percent per annum from the date due. Should it become necessary for Lessor to resort to any legal proceedings or to employ an attorney for the collection of rent, the Lessee shall pay all such attorney fees in a reasonable amount.

18.    **Sublease.**

18.1    Lessee shall not have the right to sublease or assign the leased premises, except to an affiliate company (one with common ownership to Lessee), unless Lessor consents in writing. Such consent shall not be unreasonably withheld. In the event of a sublease or assignment, the sublessee or assignee will be obligated by all the terms, promises and conditions of this Lease agreement and Lessee also remains responsible for the promises, terms and conditions of this Lease to Lessor. In the event that Lessee subleases or assigns the Lease to a company, other than an affiliate company, Lessor and Lessee will split any lease proceeds equally (50/50) after any expenses related thereto, including but not limited to the rent set out in clause 4. above, are paid.

18.2    Both parties agree and acknowledge that Lessee does not need the written consent of the Lessor to sublease or assign the Leased Premises to an affiliate company. Further, the affiliate company will have identical rights and obligations as the original Lessee to this Lease.

Page 7 of 10

Exhibit 8-7

19.    **Jurisdiction.**   Lessee and Lessor, by execution of this Lease, expressly confer jurisdiction "in personam" and/or "in rem" and consent to venue in the state of Kansas, which is a neutral state, for the purpose of any legal proceedings brought by Lessor for enforcement of any rights of Lessor under the terms of this Lease.

20.    **Successors and Assigns.**   The covenants herein contained shall bind, and the benefits and advantages shall inure to the respective successors and assigns of the parties hereto.

21.    **Lease Subject to.**   Lessor and Lessee hereby acknowledge and agree that this Lease is subject to any and all recorded rights, ways, privileges, servitudes and subordinations thereunto belonging or in anywise appertaining to the leased premises herein.  Lessor and Lessee further acknowledge and agree that any and all of Lessor's mortgages affecting the leased premises shall be subordinate to this Lease.  Lessee understands and agrees that from time to time some special document may be needed to subordinate Lessor's mortgage or mortgages to this Lease and that Lessee will fully cooperate and execute any subordination documents required by Lessor's lender.

22.    **Changes in Lease.**   This Lease shall not be changed, altered or abrogated in any respect, except by written agreement of both parties executed in the same manner as this original contract of lease.  It is further understood by all parties that this Lease is non-renewable.

23.    **Notices.**   Lessor and Lessee agree that any and all notices required or permitted hereunder directed to Lessee or Lessor shall be given by registered or certified U.S. Mail, return receipt requested, postage prepaid and addressed to Lessor and Lessee as stated below:

TO LESSOR:  Garth Harmon
            Post Office Box 2
            Bainville, Montana 59212  &

            Wagner D. Harmon
            6368 DH1 Drive
            Bainville, Montana 59212

TO LESSEE:  Dual Trucking of Montana, L.L.C.
            801 Barrow Street, Suite 305
            Houma, Louisiana 70360

or such other address as either of the parties may hereafter designate in writing.

24.    **Authority.**   This Lease has been authorized by all necessary action on the part of Lessor and Lessee.  The respective undersigned representatives of Lessor and Lessee represent and warrant that they have the full right, power, legal capacity, and authority to enter into this Lease on behalf of Lessor or Lessee, as the case may be, and to perform their obligations hereunder.

Page **8** of **10**

Exhibit 8-8

**25.** **Right to Ingress and Egress.** This Lease includes, and Lessors hereby warrant, the right, by easement or otherwise, of Lessee, Lessee's guests, invitees, patrons, customers or employees to ingress and egress from the leased premises by use of the private road which allows Lessee access to the nearest public road.

LESSOR:

Garth L. Harmon

Print Name: _Garth L Harmon_

Wagner Harmon

Print Name: _Wagner Harmon_

STATE OF MONTANA        )
                        : ss.
County of Richland      )

On this 5th day of October, 2012, before me, a Notary Public for the State of Montana, personally appeared Garth L. Harmon, known to me to be the person who executed the within instrument and acknowledged to me that he executed the same.

(Notary Stamp)

PETER O. MALTESE
NOTARY PUBLIC for the
State of Montana
Residing at
Sidney, Montana
My Commission Expires
December 31, 2014

Peter O. Maltese
Notary Public for State of Montana

Page **9** of **10**

Exhibit 8-9

STATE OF MONTANA          )
                          : ss.
County of Richland        )

On this 8th day of October, 2012, before me, a Notary Public for the State of Montana, personally appeared Wagner Harmon, known to me to be the person who executed the within instrument and acknowledged to me that he executed the same.

**PETER O. MALTESE**
NOTARY PUBLIC for the
State of Montana
(Notary Seal/Stamp)   Residing at
Sidney, Montana
My Commission Expires
**December 31, 2014**

_Peter O. Maltese_
Peter O. Maltese
(Printed or Typed Name of Notary Public)
Residing at Sidney MT
My commission expires 12-31-2014

THUS DONE AND SIGNED in on this 12th day of October , 2012, in the County of Terrebonne , State of Louisiana , in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:

_Jackie O. Broussard_
Print Name: Jackie D. Broussard

_signature_
Print Name: Twacter Berry

**LESSEE:**
**DUAL TRUCKING OF MONTANA, L.L.C.**

_signature_

BY: ANTHONY J. ALFORD
MANAGER

_signature_
NOTARY PUBLIC _Sye J. Broussard_
License No. 90414
My Commission Expires at: death

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

Page **10** of **10**

**ER_88**

Exhibit 8-10

## AMENDMENT TO LEASE AGREEMENT

THIS AMENDMENT TO LEASE AGREEMENT (this "Amendment") is made and entered into as of the 11th day of October, 2012 (the "Effective Date") by and between:

**GARTH HARMON,** a Montana domiciliary whose current mailing address is Post Office Box 2, Bainville, Montana 59212; and

**WAGNER HARMON,** a Montana domiciliary whose current mailing address is 6868 DH1 Drive, Bainville, Montana 59212;

(hereinafter referred to as LESSOR); and

**DUAL TRUCKING OF MONTANA, L.L.C.,** a Louisiana limited liability company whose current mailing address is 801 Barrow Street, Suite 305, Louisiana 70360, herein represented by its duly authorized manager, Anthony J. Alford, appearing herein by virtue of a resolution of its members, which is attached hereto and made a part hereof.

(hereinafter referred to as LESSEE);

### BACKGROUND

A.    LESSOR AND LESSEE have previously entered into that certain Lease Agreement dated October 5, 2012 (the "Original Lease"), under which LESSEE leased from LESSOR approximately 6.91 acres of land located in Roosevelt County, Montana (sometimes called the "property" or "leased premises" in the Lease) as more fully described in the Original Lease. A true and correct copy of the Original Lease is attached hereto as **Attachment 1** to this Amendment.

B.    The parties desire to amend the Original Lease as set forth below.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants and mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties each intending to be legally bound hereby, agree to amend, and do hereby amend, the Original Lease as follows:

LESSEE shall have a perpetual right of renewal of this Lease until the property has been subdivided making it available for purchase unless both parties agree in writing thirty (30) days prior to the end of any term not to renew this Lease.

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same

**ER_89**

Exhibit 8-11

instrument. Facsimile or electronic transmissions of executed signature pages are agreed and deemed by all parties to constitute originals fully enforceable and binding upon the parties.

All other terms and conditions contained in the Original Lease, as well as the Exhibits to the Original Lease shall be applicable to this Amendment to the Original Lease. Additionally, unless specifically modified, all terms and conditions of the Original Lease remain unchanged and in full effect.

In the event of any conflict between this Amendment and the Original Lease, the terms of this Amendment shall govern.

**[SIGNATURE LINE ON FOLLOWING PAGE]**

**ER_90**

Exhibit 8-12

**THUS DONE AND SIGNED** on this _12_ day of _Oct_, 2012, in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

**WITNESSES:**

**LESSOR:**
**Garth Harmon**

Print Name: _____

Print Name: _Garth Harmon_

Print Name: _____

_____
**NOTARY PUBLIC**
License No. _N/A_
My Commission Expires at: _03-13-2013_

GLORIA LEE ABBOTT
NOTARY PUBLIC for the
STATE OF MONTANA
SEAL
Residing at Poplar, Montana
My Commission Expires
March 13, 2013

**THUS DONE AND SIGNED** in on this _10th_ day of _October_, 2012, in the County of _Roosevelt_, State of _Montana_, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

**WITNESSES:**

**LESSOR:**
**Wagner Harmon**

Print Name: _____

Print Name: _Wagner Harmon_

Print Name: _____

_____
**NOTARY PUBLIC**
License No. _N/A_
My Commission Expires at: _03-13-2013_

GLORIA LEE ABBOTT
NOTARY PUBLIC for the
STATE OF MONTANA
SEAL
Residing at Poplar, Montana
My Commission Expires
March 13, 2013

**ER_91**

Exhibit 8-13

OCT-12-2012 09:47 AM  BAINVILLE SCHOOL          4067693291          P. 15/15

**THUS DONE AND SIGNED** in on this _12th_ day of _October_, 2012,
in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent
witnesses and Notary, after due reading of the whole.

WITNESSES:

Print Name: _T. Walter Borey_

Print Name: _BERYL C LEBOEUF_

LESSEE:
Dual Trucking of Montana, L.L.C.

ANTHONY J. ALFORD
MANAGER

Sye J. Broussard
Notary Public

SYE J. BROUSSARD
NOTARY ID NUMBER 91077
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

STATE OF MONTANA
COUNTY OF ROOSEVELT
I CERTIFY THIS TO BE A TRUE AND CORRECT
COPY OF THE DOCUMENTATION RECORD IN
THIS OFFICE
_____
COUNTY RECORDER
BY _____ **DEPUTY**
DATE  12 / 11 / 12

**ER_92**

Exhibit 8-14

## LEASE PURCHASE AGREEMENT

**KNOW ALL MEN BY THESE PRESENTS**, that this Lease Agreement ("Lease") entered into on the dates hereinafter indicated by and between:

**GARTH HARMON,** a Montana domiciliary whose current mailing address is Post Office Box 2, Bainville, Montana 59212; and

**WAGNER HARMON**, a Montana domiciliary whose current mailing address is 6368 DH1 Drive, Bainville, Montana 59212;

(hereinafter referred to as LESSOR); and

**DUAL TRUCKING OF MONTANA, L.L.C.,** a Louisiana limited liability company whose current mailing address is 801 Barrow Street, Suite 305, Louisiana 70360, herein represented by its duly authorized manager, Anthony J. Alford, appearing herein by virtue of a resolution of its members, which is attached hereto and made a part hereof.

(hereinafter referred to as LESSEE);

who declare as follows:

**WHEREAS**, Lessor is the owner of a certain tract of real property more particularly described in paragraph 1 below (hereinafter referred to as the "property" or "leased premises").

**WHEREAS**, Lessee wishes to lease and construct improvements on the property and have the option to purchase the property.

**WHEREAS**, Lessor agrees to subordinate its ownership interest in the property to that of a mortgage in favor of a lender or lenders willing to provide construction and permanent financing for Lessee's improvements on the property.

**NOW THEREFORE**, in consideration of the mutual covenants herein the parties agree as follows:

**1.      Property Leased.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the following described tract of land:

A legal survey shall be forthcoming upon execution of a new survey on the property to supplement the following property description.

Approximately 12 acres, more or less, more particularly described on the attached map as the "Truck Parking Area." Said property is adjacent to the west of that property leased from Garth Harmon and Wagner Harmon to Dual Trucking of Montana, L.L.C. entered into on October 10, 2012 in Roosevelt County, Bainville, Montana bearing the following legal description:

396817 MISC REAL   Pages: 11
STATE OF MONTANA ROOSEVELT COUNTY
RECORDED: 11/28/2012  9:00  KOI: AGREEMENT2
Cheryl A Hansen  CLERK AND RECORDER
FEE: $91.75      BY:
TO: HARMON BROTHERS  PO BOX 64, BAINVILLE  MT  59212

Exhibit 9-1

A parcel of land lying within those tracts conveyed by
warranty deed from Dean Harmon and Sylvia Harmon unto
Garth L. Harmon and Wagner Harmon dated March 9, 2004
as filed by the Clerk and Recorder of Roosevelt County in
Book 607, Page 268, and being more particularly described
as follows:

Parcel 1:
Beginning for the same at the southwest corner of Section
17, Township 28 North, Range 58 East, P.M.M., Roosevelt
County, Montana; thence along the east line of said
section North 03°47'20" West a distance of 340.00 feet;
thence parallel to the the south line of said section; thence South
86°14'57" West a distance of 510.00 feet; thence South
03°47'20" East a distance of 340.00 feet; thence North
86°14'57" East a distance of 510.00 feet to the point of
beginning of the parcel being described.

Said parcel contains 3.98 acres, more or less, along with
and subject to all existing easements of record or those
apparent on the ground.

## 2.   Conditions:

2.1    Lessor will subordinate its ownership interest in the property to that of a mortgage in favor
of a lender or lenders willing to provide construction and permanent financing for the improvements
on the property.

2.2    Lessor will be 2nd position to a mortgage in favor of a bank of Lessee's choosing for that
property leased from Garth Harmon and Wagner Harmon to Dual Trucking of Montana, L.L.C.
entered into on October 10, 2012 in Roosevelt County, Bainville, Montana bearing the legal
description described above to be used as collateral for Lessee purchasing the leased premises.

2.2    The parties agree to Lessee's construction of the improvements and acknowledge that the
ownership of the improvements shall be separate from the ownership of the land, if applicable,
and shall remain with the Lessee, its heirs or assigns, until the expiration of the Lease.

2.3    The parties agree that Lessee shall obtain the necessary building permits for the
improvements and that Lessor shall obtain the necessary permits and documents to allow Lessee to
purchase the property.

2.4    In the event that any of the above conditions are not met, for any reason whatsoever, this
Lease may be declared null and void by the non-breaching party with Lessor compensating Lessee
the fair market value for the enhanced value of the property due to any permanent improvements.

Exhibit 9-2

**3.    Term; Purchase Options; Renewal.**

3.1    The Term of the Lease shall be for a period of two (2) years beginning on September 1, 2012 and ending on September 1, 2014 ("Primary Term"). Lessee shall have the irrevocable option to purchase the property for **Twenty Five Thousand and 00/100 Dollars per acre ($25,000/acre)**, total amount to be determined upon forthcoming survey, during the primary term and once Lessor has subdivided the property making it available for purchase.  In the event that Lessee desires to exercise its option to purchase the property, this Lease shall terminate upon the closing date of the real property purchase with no further obligations owed to either party.

3.2    If Lessee decides to purchase the property, Lessee shall give Lessor thirty (30) days advance written notice no later than September 1, 2013.

3.3    The sale of the property shall be subject to reservations, easements, rights-of-way of record, and remaining installments of special assessments of record applying to said land.  The sale shall also be subject to a reservation of all oil, gas, and other minerals in and under the property to Lessor.

3.4    LESSEE shall have a perpetual right of renewal of this Lease until the property has been subdivided making it available for purchase unless both parties agree in writing thirty (30) days prior to the end of any term not to renew this Lease.

**4.    Payments.**

4.1    As part of the underlying consideration, Lessee agrees to pay Lessor the sum of **Ten and 00/100 Dollars ($10.00)** upon the signing of this Lease.

4.2    One hundred (100%) percent of the funds paid by Lessee to Lessor shall be applied towards the purchase price of the property.

4.5    Except as otherwise provided in this Lease, Lessee will make all payments payable to Garth Harmon and Wagner Harmon at 6368 DH1 Drive, Bainville, Montana  59212, or in such other manner or at such other place as the Lessor notifies the Lessee in writing.

**5.    Use of Property.**  Lessee will occupy and use the Leased Premises and Building as a storage facility for equipment to support the operations of Lessee's equipment and its customers. Lessee is specifically approved for the installation of a skid-mounted above ground horizontal fuel tank and pump dispenser with concrete foundation and fueling aprons.  The Leased Premises shall not be used for any unlawful purpose.  The Leased Premises herein shall not be used for the location of any establishment selling beer, intoxicating liquors or alcoholic beverages of any kind or nature.

Page **3** of **11**

Exhibit 9-3

**6.    Insurance.**

6.1    **Liability Insurance.**  During the terms of this Lease, Lessee, at its sole expense, agrees to carry a comprehensive general liability policy in the amount of no less than TWO MILLION AND NO CENTS ($2,000,000.00) DOLLARS, combined single limits insurance.  Lessor shall be named as an additional insured under such policy of insurance.

6.2    **Fire or Casualty.**  During the Primary Term of the Lease, Lessee, at its sole expense, agrees to carry All Risk Replacement Costs insurance on the building and other improvements located on the Leased Premises, in such coverage amounts or as may be reasonably required by Lessor wherein the Lessor shall be named as the additional insured.  Lessor, except to the extent of any insurance coverage, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause. IF THE BUILDING IS COMPLETED PRIOR TO THE PURCHASE OF THE PROPERTY AND THERE IS A MORTGAGE, THE LENDER WILL BE THE LOSS PAYEE.

6.3    **Waiver of Subrogation.**  Lessee waives and each policy of insurance shall also contain a waiver of subrogation on the part of the insurer against Lessor or his agents for any claim or right of recovery. A copy of all endorsements shall be provided to Lessor.

6.4    **Insurance Policies.**  Lessee shall provide Lessor with a certificate of insurance and, if requested by Lessor, a certified copy of all polices of insurance and endorsements required by this Lease and shall have such policies provide that the policy cannot be canceled as to the Lessor except upon thirty (30) days written notice to Lessor.

**7.    Indemnification.**  Lessee agrees to indemnify, protect, defend and hold harmless Lessor from and against all claims, demands, causes of action, losses, damages and expenses of every kind and character without limit whatsoever and without regard to cause thereof, including defense and attorney's fees related thereto, including, but without limitation, any injuries or death to person(s) or property arising out of, in connection with, or relating to Lessee's occupancy or use of the leased premises during any term of this Lease, except as regards to claims caused by the sole negligence or sole fault of Lessor.  In addition, Lessor shall not be liable for any loss of any property of Lessee in or on the leased premises nor any damage to any property of Lessee, Lessee's guests, invitees, patrons, customers or employees, in or on the leased premises, however occurring, and Lessee agrees to protect, defend, indemnify and save Lessor harmless from and against any and all claims, demands, causes of action, losses or expenses in any way related thereto.

**8    Casualty.**

8.1    Lessor, except to the extent of any insurance coverage or negligence on their part, shall not be liable for any damage to, or destruction of, any of Lessee's improvements or other personal property located on the leased premises caused by fire or any other cause.

Page **4** of **11**

**ER_96**

Exhibit 9-4

8.2     Should the leased premises, during the Primary Term of the Lease, be destroyed or damaged by fire or other casualty covered by insurance provided by the prevailing All Risks Replacement Costs Insurance, the Lessee will, without unreasonable delay, obtain bids for the repairs or reconstruction of the leased premises. If the leased premises can be repaired or reconstructed for the amount of insurance available, Lessee shall be obligated to reconstruct the leased premises without unreasonable delay and this Lease shall not terminate. If it is impossible for Lessee to obtain a bid to repair or reconstruct the leased premises for the amount of the insurance proceeds available to Lessee, Lessee has the option to repair or reconstruct the leased premises or to terminate this Lease.

**9.     Maintenance.** Responsibility for all maintenance and up-keep shall be as stated herein, unless otherwise agreed by the parties. Lessee agrees that it shall maintain the grass and all entrances to the leased premises from the roadway. Lessee agrees to maintain all improvements of the leased premises. More specifically, the Lessee agrees to maintain the roof and structure of the Improvements located on the leased premises in good condition and as a prudent administrator and to make all necessary repairs thereto. Notwithstanding anything to the contrary herein, Lessee agrees to be responsible for, to promptly make and pay for all other repairs, maintenance and up-keep of the leased premises and to maintain the leased premises in good condition and as a prudent administrator, including but not limited to all repairs caused by ordinary wear and tear and/or Lessee's occupancy and/or use of the leased premises.

With respect to the maintenance of the real property, the Lessors agree that they shall plant trees and landscape the real property in an attractive manner. The Lessors shall not allow any noxious, offensive, unsanitary or unsightly activity to be carried on upon the real property nor will they allow trash, ashes or other refuse to be thrown or dumped on any part of the real property, except for trash bins or receptacles designed for that purpose. The lessors shall not use the real property in any manner that would result in the pollution of any waterway that flows through or under such real property. Lessors shall assure that the location and construction of any sewage systems shall meet the minimum requirements set by the Montana State Department of Health.

**10.    Compliance with Law.** Lessee shall comply in connection with this Lease with all applicable laws, regulations or ordinances of any governmental authority or any department thereof for the operation of any business.

**11.    Hazardous and Nonhazardous Materials and Other Chemicals.**

11.1    Lessee shall never in violation of any applicable law permit to be incorporated into, bring into, store at, or place at, use at or otherwise dispose of at, in, or under the leased premises or any buildings or other improvements located on the leased premises, any toxic or hazardous materials (as defined hereafter). If Lessee violated this provision or ever has knowledge of the presence of toxic or hazardous materials in, at or under the leased premises or building located on the leased premises, or the land described herein, Lessee shall notify Lessor in writing promptly after obtaining such knowledge. For purposes of this lease, hazardous or toxic materials shall mean

Page **5** of **11**

ER_97

Exhibit 9-5

hazardous or toxic chemicals at levels or contents which cause such materials to be classified as hazardous or toxic as then prescribed by the highest industry standards or by the then current levels or content as set from time to time by the U.S. Environmental Protection Agency ("EPA") or the U.S. Occupational Safety and Health Administration ("OSHA") or as defined under 20 CFR 1910 or 29 CFR 1925 or other applicable governmental laws, rules or regulations as established from time to time by applicable authority of the Federal, State or Parish Government or any other governmental agency of any kind or nature with regulatory or supervisory authority over the subject property, any hazardous or toxic materials in, at or under the leased premises or the building located on the leased premises, or the land whether the building is located resulting from, introduced from, arising out of, or the damage from which is materially expanded as the direct result of Lessee's acts, negligence or the violation or breach by Lessee of this provision. Lessee shall notify Lessor of its method, time and procedure for any clean up or removal of toxic or hazardous material or any vat or any type of container containing any type of chemical material or cleaner used to clean any type of tools under this provision, and Lessor shall have the right, but not the obligation, to require reasonable changes in such method time or procedure, or to require that the same be done after normal business hours or when the building is otherwise closed (i.e. weekends or holidays).

11.2    Excluding toxic or hazardous materials or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner located on the Property prior to the signing of this lease, Lessee agrees to indemnify, protect, defend and save harmless Lessor from and against all claims, demands, causes of action, damages, losses and expenses of every kind and character without limit whatsoever and without regard, including defense and attorney fees related thereto, in any manner arising from and/or in any way connected with toxic or hazardous materials or nonhazardous materials or any vat or any type of container containing any type of chemical, material or cleaner used to clean any type of tools being incorporated into, brought into, stored at, placed at, used at or otherwise disposed of vat, in or under the leased premises or the building or any improvements located on the leased premises at any time during the term of this lease or Lessee's occupancy or Lessee's use of the leased premises.  This indemnification clause shall survive the termination of this Lease. Lessee's agreement to indemnify Lessor under the provisions of Section 21 of this Lease shall only apply if such damage or contamination is caused by the Lessee or Lessee's heirs, agents, invitees, or assignees or is in any way connected with Lessee's use and/or occupancy of the Leased Premises. Further, Lessee shall not be held liable for any present and/or future contamination or damage on property adjacent to the leased premises, including the property located directly behind the leased premises which entails drainage from all adjacent properties, except and to the extent the damage or contamination is caused by Lessee.

**12.**    **Utilities.**  Lessee shall pay for all telephone, electric, gas, water, trash collection and other utilities used on the leased premises.  Lessor shall pay to have the utility connections brought to the street in front of the property.  Lessee shall pay for the hook up for the utilities from the street into the property.

**13.**    **Ad Valorem Taxes.**  During term of the Lease, Lessee shall pay all ad valorem taxes and any other taxes, assessment, charges, permits or impositions on the leased premises, which includes the land and any improvements permanently attached thereto, including those imposed

Page **6** of **11**

Exhibit 9-6

by any governmental, municipal or political subdivision, during the existence of this Lease or any extension thereof assessed upon the land and/or building and/or improvements permanently attached thereto. Lessee shall pay all other taxes, assessments, charges, permits or impositions on any movable property in any way connected with the leased premises. Lessee shall not pay any income taxes attributable to Lessor from the leased premises or Lease.

**14.     Right to Inspect.** Lessor reserves the right to inspect the premises between the hours of 9:00 a.m. and 5:00 p.m. after giving Lessee 24 hours written notice.

**15.     Improvements.** Lessee may not make any improvements or changes to the leased premises, except as otherwise provided in this agreement or with the prior written consent of Lessor. Any improvements or changes made by Lessee after obtaining Lessor's consent shall be made at Lessee's expense and Lessee agrees to promptly pay for the same and not to cause Lessor's property to be subject to any lien or encumbrances resulting therefrom. Upon termination of this Lease for any cause whatsoever, all improvements made to the leased premises by the Lessee that are permanently attached thereto, shall, at the option of the Lessor, become the property of the Lessor without any cost therefor to the Lessor, free and clear of any liens or encumbrances whatsoever or the Lessor may require the Lessee to remove said property (excluding the Building and other agreed upon improvements), from the leased premises at Lessee's expense and to restore the premises to its original condition.

**16.     Compliance.**

16.1     If the Lessee or Lessor fail to perform any of the agreements contained herein, this Lease shall terminate at the option of either party, providing that such party: (i) give the non complying party thirty (30) days written demand of its intention to terminate the Lease and set forth therein a specific breach of this Lease; and (ii) allow the other party thirty (30) days after written demand to remedy any alleged breach.

16.2     Such notices shall be mailed to the Lessee as hereinafter provided, and after the expiration of thirty (30) days and, the Lease shall terminate at the option of Lessor, providing that Lessee has not by then paid all rentals due and commenced to remedy all the other defaults and breaches complained of and diligently continues to correct such defects within thirty (30) days of the date of mailing of the aforedescribed notice.

**17.     Interest and Attorney Fees.** During the Option Years, any rent unpaid as it falls due shall bear interest at twelve (12%) percent per annum from the date due. Should it become necessary for Lessor to resort to any legal proceedings or to employ an attorney for the collection of rent, the Lessee shall pay all such attorney fees in a reasonable amount.

**18.     Sublease.**

Page **7** of **11**

ER_99

Exhibit 9-7

18.1 Lessee shall not have the right to sublease or assign the leased premises, except to an affiliate company (one with common ownership to Lessee), unless Lessor consents in writing. Such consent shall not be unreasonable withheld. In the event of a sublease or assignment, the sublessee or assignee will be obligated by all the terms, promises and conditions of this Lease agreement and Lessee also remains responsible for the promises, terms and conditions of this Lease to Lessor.

18.2 Both parties agree and acknowledge that Lessee does not need the written consent of the Lessor to sublease or assign the Leased Premises to an affiliate company. Further, the affiliate company will have identical rights and obligations as the original Lessee to this Lease.

**19. Jurisdiction.** Lessee and Lessor, by execution of this Lease, expressly confers jurisdiction "in personam" and/or "in rem" and consents to venue in the state of Kansas, which is a neutral state, for the purpose of any legal proceedings brought by Lessor for enforcement of any rights of Lessor under the terms of this Lease.

**20. Successors and Assigns.** The covenants herein contained shall bind, and the benefits and advantages shall inure to the respective successors and assigns of the parties hereto.

**21. Lease Subject to.** Lessor and Lessee hereby acknowledge and agree that this Lease is subject to any and all recorded rights, ways, privileges, servitudes and subordinations thereunto belonging or in anywise appertaining to the leased premises herein. Lessor and Lessee further acknowledge and agree that any and all of Lessor's mortgages affecting the leased premises shall be subordinate to this Lease. Lessee understands and agrees that from time to time some special document may be needed to subordinate Lessor's mortgage or mortgages to this Lease and that Lessee will fully cooperate and execute any subordination documents required by Lessor's lender.

**22. Changes in Lease.** This Lease shall not be changed, altered or abrogated in any respect, except by written agreement of both parties executed in the same manner as this original contract of lease. It is further understood by all parties that this Lease is non-renewable.

**23. Notices.** Lessor and Lessee agree that any and all notices required or permitted hereunder directed to Lessee or Lessor shall be given by registered or certified U.S. Mail, return receipt requested, postage prepaid and addressed to Lessor and Lessee as stated below:

TO LESSOR: Garth Harmon
Post Office Box 2
Bainville, Montana 59212 &

Wagner Harmon
6368 DH1 Drive
Bainville, Montana 59212

Page **8** of **11**

Exhibit 9-8

TO LESSEE:   Dual Trucking of Montana, L.L.C.
             801 Barrow Street, Suite 305
             Houma, Louisiana 70360

or such other address as either of the parties may hereafter designate in writing.

**24.      Authority.**  This Lease has been authorized by all necessary action on the part of Lessor and Lessee.  The respective undersigned representatives of Lessor and Lessee represent and warrant that they have the full right, power, legal capacity, and authority to enter into this Lease on behalf of Lessor or Lessee, as the case may be, and to perform their obligations hereunder.

**25.      Right to Ingress and Egress.**  This Lease includes, and Lessors hereby warrant, the right, by easement or otherwise, of Lessee, Lessee's guests, invitees, patrons, customers or employees to ingress and egress from the leased premises by use of the private road which allows Lessee access to the nearest public road.

**26.      Counterparts; Electronic Signature.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile or electronic transmissions of executed signature pages are agreed and deemed by all parties to constitute originals fully enforceable and binding upon the parties

### [SIGNATURE LINE ON FOLLOWING PAGE]

Page **9** of **11**

**ER_101**

Exhibit 9-9

**THUS DONE AND SIGNED** on this ~~Oct~~ 12 day of _Oct_____, 2012, in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:

LESSOR:

**Garth Harmon**

_____
**Print Name:**_____

**Print Name:** _Garth Harmon_

_____
**Print Name:** _____

NOTARY PUBLIC
**License No.** _N/A_
**My Commission Expires at:** _03-13-2013_

> GLORIA LEE ABBOTT
> NOTARY PUBLIC for the
> STATE OF MONTANA
> SEAL
> Residing at Poplar, Montana
> My Commission Expires
> March 13, 2013

**THUS DONE AND SIGNED** on this _12_ day of _Oct_____, 2012, in the County of _Roosevelt_, State of _Montana_, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:

LESSOR:

**Wagner Harmon**

_____
**Print Name:**_____

**Print Name:** _Wagner Harmon_

_____
**Print Name:** _____

NOTARY PUBLIC
**License No.** _N/A_
**My Commission Expires at:** _03-13-2013_

> GLORIA LEE ABBOTT
> NOTARY PUBLIC for the
> STATE OF MONTANA
> SEAL
> Residing at Poplar, Montana
> My Commission Expires
> March 13, 2013

Page **10** of **11**

Exhibit 9-10

OCT-12-2012 09:37 AM   BAINVILLE SCHOOL          4067693291          P. 11/11

**THUS DONE AND SIGNED** in on this _12th_ day of _October_ , 2012, in the Parish of Terrebonne, State of Louisiana, in the presence of the undersigned competent witnesses and Notary, after due reading of the whole.

WITNESSES:

Print Name: _T. WALTER BERRY_

Print Name: _BERYL C LEBOEUF_

LESSEE:
DUAL TRUCKING OF MONTANA, L.L.C.

BY: ANTHONY J. ALFORD
MANAGER

Sye J. Broussard
Notary Public

SYE J. BROUSSARD
NOTARY ID NUMBER 91044
BAR ROLL NUMBER 33035
STATE OF LOUISIANA
PARISH OF TERREBONNE
MY COMMISSION IS FOR LIFE

STATE OF MONTANA
COUNTY OF ROOSEVELT
I CERTIFY THIS TO BE A TRUE AND CORRECT
COPY OF THE DOCUMENTATION RECORD IN
THIS OFFICE.

COUNTY RECORDER
BY _____ DEPUTY
DATE _12.11.12_

Page 11 of 11

**ER_103**

Exhibit 9-11



**Montana Department of**
# ENVIRONMENTAL QUALITY

Brian Schweitzer, Governor
Richard H. Opper, Director

P.O. Box 200901 • Helena, MT 59620-0901 • (406) 444-2544 • www.deq.mt.gov

September 17, 2012

### WARNING LETTER

Dual Trucking of Montana, LLC
Anthony J. Alford
P.O. Box 1438
Scott, LA 70583

CERTIFIED MAIL #7009 2820 0000 7019 2773
Return Receipt Requested

**Re: Violations of the Montana Solid Waste Management Act [CVID# 15855]**

Dear Mr. Alford:

On July 26, 2012, the Department of Environmental Quality (DEQ) received a complaint alleging oil field exploration and production waste (Special Waste) was placed on the Harmon property on County Road 1009 near Bainville, Montana (Property), Geocode 17-4051-20-1-03-01-0000. This violates the Montana Solid Waste Management Act (SWMA).

The Montana Code Annotated (MCA) 75-10-802(8) defines oil field exploration and production wastes as a "Special Waste" which means "solid waste that has unique handling, transportation, or disposal requirements to ensure protection of the public health, safety, and welfare and the environment." MCA 75-10-203(3) defines disposal as "the discharge , injection, deposit, dumping spilling, leaking or placing of any solid waste into or onto the land so that the solid waste or any constituent of it may enter the environment or be emitted into the air or discharged into any waters, including ground water."
The presence of solid waste disposed to the ground constitutes a violation of Sections 75-10-212 and 75-10-221, MCA. These sections cover disposal of waste and that no person may dispose of solid waste without a license from DEQ.

If the allegations are correct, you are operating an unlicensed Solid Waste Management Facility (Facility) and are in violation the SWMA.

In order to reach compliance with the SWMA, upon of receipt of this letter you are required to:
- Immediately discontinue operating the Facility unless it is licensed by DEQ's Solid Waste Program.
- Within 15 days, hire an environmental consultant and develop a corrective action plan for cleaning up the Special Waste on the Property.
http://deq.mt.gov/lust/downloadables/Consultlist/consultantlist.mcpx

Enforcement Division • Permitting & Compliance Division • Planning, Prevention & Assistance Division • Remediation Division

Dual - 20068

Exhibit 11-1

Dual Trucking of Montana, LLC
Anthony J. Alford
September 17, 2012
Page 2

- Within 30 days, the Special Waste must be legally removed and properly disposed of either at a licensed landfill or recycling facility.
- Within 60 days, provide to me at the address below the cleanup report provided by your environmental consultant, before and after photographs of the site, and landfill receipts indicating that the Special Waste has been removed from the Property and disposed at a properly licensed solid waste management facility.

If you believe any of the above stated facts are inaccurate, please contact me at the phone number or email address listed below.

Within five days of receipt of this letter contact me at the phone number or email address below to discuss your corrective action plan.

Should you choose not to follow the requirements of this letter DEQ is prepared to initiate a formal enforcement action that may include the assessment of penalties.

Contact me if you would like a copy of the Montana rules and regulations discussed above, or they are available on the Internet at www.deq.mt.gov/dir/legal/index.asp.

Sincerely,

Thomas P Bovington
Environmental Enforcement Specialist
Enforcement Division
P.O. Box 200901
Helena, MT 59620-0901
406-444-2711; fax: 406-444-1923
tbovington@mt.gov

cc via email:   Rick Thompson, DEQ WUTMB-SW
                Steve Kilbreath, DEQ Eastern Montana Oil and Gas Development Coordinator
                Ron Smith, Roosevelt County Sanitarian

cc:             Timothy J. Thomson, 315 Barrow Street, Houma, LA 70360
                Brian Robichaux, 315 Barrow Street, Houma, LA 70360
                Gordon Earl Dove, Sr., 5 Glen Oaks, Houma, LA 70360
                Lee Buffington, P.O. Box 167, Bainville, MT 59212

**ER_105**

A. Clifford Edwards
Triel Culver
A. Christopher Edwards
John W. Edwards
EDWARDS, FRICKLE & CULVER
1648 Poly Drive, Suite 206
Billings, MT 59102
Telephone: (406)256-8155
Telefax: (406)256-8159
Email: edwardslawfirm.org

Jon E. Doak .
DOAK & ASSOCIATES, P.C.
100 North 27th Street, Suite 200
P. O. Box 1875
Billings, Montana  59103
Telephone: (406) 896-8904
Telefax: (406) 896-8937
Email: doaklaw@wtp.net

Attorneys for Plaintiffs
Garth L Harmon & Wagner Harmon

ROOSEVELT COUNTY
CLERK OF COURT
TIME          FILED

JUN 23 2015

JERI TOAVS

DEPUTY CLERK

## MONTANA FIFTEENTH JUDICIAL DISTRICT COURT
## ROOSEVELT COUNTY

| | |
|---|---|
| *GARTH L. HARMON, WAGNER HARMON, and SHOTGUN CREEK DEVELOPMENTS, LLC*<br><br>Plaintiffs<br><br>-vs-<br><br>*DUAL TRUCKING, INC., a Louisiana corporation, DUAL TRUCKING OF MONTANA, L.L.C, a Louisiana limited liability company, DUAL TRUCKING AND TRANSPORT, L.L.C., a Louisiana limited liability Company, ANTHONY J. ALFORD, a Louisiana Resident, KJK TRUCKING, LLC, a Louisiana limited liability company, ALFORD FARMS, LLC, a Louisiana liability company, CARON TRANSPORTATION SYSTEMS USA, INC., a Delaware corporation, WHITNEY BANK, a Mississippi corporation, CONTINENTAL RESOURCES, INC., an Oklahoma corporation, CETCO ENERGY SERVICES COMPANY, LLC, a* | Cause No. DV 15-15<br><br>Judge David Cybulski<br><br><br>**SECOND AMENDED COMPLAINT** |

1

Exhibit 12-1

| *Delaware Limited liability company, WHITING PETROLEUM CORPORATION, a Delaware corporation, HESS CORPORATION, a Delaware Corporation, PETRO-HUNT, LLC a Texas Limited Liability Company, PURITY OILFIELD SERVICES, a Texas Limited Liability Company, ZENERGY OPERATING COMPANY, a Delaware Limited Liability Company, STATE OF MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, and JOHN DOES1 through 50,* | |
|---|---|
| Defendants | |

COME NOW the Plaintiffs, Garth L. Harmon and Wagner Harmon, and Shotgun Creek Development LLC, by and through their undersigned counsel, and for their complaint against the Defendants state and allege as follows:

## FACTS COMMON TO ALL COUNTS AGAINST DUAL TRUCKING

1.  Plaintiffs Wagner Harmon and Garth L. Harmon (together with Plaintiff Shotgun Creek, collectively "Harmons") are brothers and residents of Roosevelt County, Montana.

2.  Wagner Harmon and Garth Harmon are sole members of the member-managed Shotgun Creek Development LLC, owner of the W1/2SE1/4 of Section 17, Township 28 North, Range 58 East, P.M.M., Roosevelt County, MT; and are the owners, as tenants in common in undivided interests, of that real property in Roosevelt County formerly described as the E1/2SE1/4 of Section 17, Township 28 North, Range 58 East, P.M.M., and now known as Lots 1, 2, 3, 4, and 5 of the Shotgun Creek Commercial Park, according to the plat thereof recorded November 20, 2014 under Document No. 406406, File No. 6771, Plat No. 410B, Records of Roosevelt County.

2

Exhibit 12-2

3.    Upon information and belief, Defendant Dual Trucking, Inc. ("DTI") is a Louisiana corporation, the President of which in August, 2011, was Anthony J. Alford.

4.    Upon information and belief, Defendant Dual Trucking and Transport, L.L.C. ("DT&T), is a manager-managed Louisiana limited liability company, organized in October, 2010; the manager of which was in 2011 and has continued to be Anthony J. Alford.

5.    Upon information and belief, Defendant Anthony J. Alford ("Alford") resides in Houma, Louisiana.

6.    Upon information and belief, Defendant Dual Trucking of Montana, L.L.C. ("DTM") is a member-managed Louisiana limited liability company, organized in October, 2011, the members of which are KJK Trucking, LLC of Houma, Louisiana and Alford Farms, LLC also of Houma, Louisiana.

7.    Upon information and belief, Defendant KJK Trucking, LLC ("KJK Trucking"), is a member-managed Louisiana limited liability company, organized in May, 2011, the members of which are Anthony J. Alford, Katherine Alford and Joshua Alford, all of Houma, Louisiana.

8.    Upon information and belief, Defendant Alford Farms, LLC ("Alford Farms") is a manager-managed Louisiana limited liability company, organized in February, 2011, the manager of which is Barry Alford of Houma, Louisiana.

9.    Upon information and belief, Defendant Caron Transportation Systems USA, Inc. ("Caron"), is a Delaware corporation, incorporated in July, 2013.

10.    Upon information and belief, Encore Food Services LLC ("Encore") is a manager-managed Louisiana limited liability company, organized in March, 2008.

3

**ER_108**

Exhibit 12-3

11.    Upon information and belief, Defendant Whitney Bank ("Whitney Bank") is a
       Mississippi banking corporation, qualified to do business as a foreign corporation in
       Louisiana.

12.    Upon information and belief, Defendant Continental Resources, Inc. ("Continental")
       is an Oklahoma corporation.

13.    Upon information and belief, Defendant CETCO Energy Services Company LLC
       ("Cetco") is a Delaware limited liability company, headquartered in Houma,
       Louisiana.

14.    Upon information and belief, Defendant Whiting Petroleum Corporation ("Whiting")
       is a Delaware corporation.

15.    Upon information and belief, Defendant Hess Corporation ("Hess") is a Delaware
       Corporation based in New York.

16.    Upon information and belief, Defendant Petro-Hunt, LLC ("Petro-Hunt") is a Texas
       manager managed limited liability company based in Dallas.

17.    Upon information and belief, Defendant Purity Oilfield Services ("Purity") is a Texas
       based manager managed limited liability company based in Dallas.

18.    Upon information and belief, Defendant Zenergy Operating Company ("Zenergy") is
       a Delaware LLC company based in Tulsa, Oklahoma.

19.    Defendants John Does 1 through 50 are other corporations, limited liability
       companies, or business entities, currently unknown to Plaintiffs, that did or may have,
       during the period September 1, 2011 to the present, ship or transport with, or entrust
       for disposal, to any of DTI, DT&T or DTM in the Bakken region of North Dakota

4

Exhibit 12-4

and/or Montana oil field wastes or materials or substances deemed toxic or hazardous under Federal or Montana law or regulations.

20.  Defendant Montana Department of Environmental Quality ("DEQ") is a department or agency of the State of Montana.

21.  Venue and jurisdiction are proper in the Montana District Court in and for Roosevelt County, as the real property at issue lies in such county, the leases at issue were to be performed in such county, and the torts alleged were perpetrated in such county.

**FACTS CONCERNING LEASE AND OCCUPANCY OF HARMONS' PROPERTY**

22.  On about August 22, 2011, Harmons, as Lessors, and DTI, as Lessee, executed a lease as to an approximately 6.97 acre parcel in the very southeast corner of Harmons' property in the E1/2SE1/4 of Section 17, T28N, R58E, described by reference to a survey sketch that was attached as Exhibit "A" to the Lease, to be used by DTI as: "a trucking mobilization facility to repair, dispatch and operate trucks."

23.  The base term of the 8/22/11 Harmon/DTI Lease was to commence September 1, 2011, and expire September 1, 2026.

24.  The Harmon/DTI Lease was executed by the Harmons, as Lessor, and by DTI, as Lessee, through Gordon E. Dove as its Secretary, and Anthony Alford, as its President; and was recorded March 16, 2012 at Document No. 393434 of the Roosevelt County, Montana records. A true and correct copy of the Harmon/DTI Lease is attached as Exhibit 1.

25.  The Harmon/DTI Lease expressly provided at Article 4 that: "The Leased Premises shall not be used for any unlawful purpose"; provided at Article 6 that the Lessee would indemnify and hold harmless Harmons as Lessor from and against any claims,

5

Exhibit 12-5

suits or demands "arising out of, in connection with, or relating to Lessee's

occupancy or use of the Premises during any term of this Lease…"; provided at

Article 9 that: "Lessee shall comply in connection with this Lease with all laws,

regulations or ordinances of any governmental authority or any department thereof

for the operation of any business"; and provided at Article 10 in relevant part that:

"Lessee shall never in violation of any applicable law permit to be incorporated into,

bring into, store at, or place at, use, or otherwise dispose of, at, in, or under the leased

premises . . . any toxic or hazardous materials….".

26.    Article 10 of the Harmon/DTI Lease further provided that the Lessee would

indemnify Harmons and hold them harmless against: "all claims, demands, causes of

action, damages, losses and expenses of every kind and character . . .including

defense and attorney fees related thereto" arising from or connected to the bringing of

toxic or hazardous materials onto the premises.

27.    The Harmon/DTI Lease provided at Article 17 that the Lessee did not have the right

to sublease or assign the premises without the Lessors' consent in writing "except to

an affiliate company (one with common ownership to Lessee)"; and provided that any

assignee would be obligated by all terms of the Lease and the Lessee would also

remain "responsible for the premises, terms and conditions of this lease to Lessor."

28.    Upon information and belief, on about December 8, 2011, the Lessee, DTI, assigned

its rights and obligations under the Harmon/DTI Lease to "Dual Trucking of

Montana, L.L.C." ("DTM"), without Harmons' knowledge or consent.

6

**ER_111**

Exhibit 12-6

29. Upon information and belief, DTM is not and was not in December, 2011 "an affiliate
    company (one with common ownership to Lessee [DTI])" as defined in Article 17 of
    the Harmon/DTI Lease.

30. Upon information and belief, between June and December, 2011, DT&T began
    transporting from North Dakota to Montana oil field wastes for drilling companies,
    well service companies and/or oil and gas well operators.

31. Upon information and belief, between December, 2011 and October, 2012, DTI,
    DTM, and/or DT&T began introducing onto the premises subject to the Harmon/DTI
    Lease, without Harmons' knowledge or consent and contrary to the uses and purposes
    described in the Harmon/DTI Lease, oil field waste hauled from the Bakken area in
    North Dakota, which included "toxic" and/or "hazardous" materials as defined in the
    Harmon/DTI Lease.

32. Upon information and belief, on about July 26, 2012, without Harmons' knowledge
    or consent and without a license or permit from the State of Montana, DTM and/or
    DT&T began operating on the property subject to the Harmon/DTI Lease a solid
    waste disposal facility handling oil field waste hauled from North Dakota.

33. On about October 5, 2012, Harmons agreed to lease to DTM another parcel in the
    E1/2SE1/4 of Section 17, T28N, R58E, described by metes and bounds as follows:

    "Parcel 2:
         Beginning for the same at the southeast corner of the tract being described
         herein, said point bearing North 03°47'20" West a distance of 340.00 feet
         from the southeast corner of Section 17, Township 28 North, Range 58
         East. P.M.M., Roosevelt County, Montana; thence along the east line of
         said section North 03°47'20" West a distance of 590.00feet; thence
         parallel to the south line of said section, South 86°14'57" West a distance
         of 510.00 feet' thence South 03°47'20" East a distance of 590.00 feet;
         thence North 86°14'57" East a distance of 510.00 feet to the point of
         beginning of the parcel being described. Said parcel contains 6.91 acres,

7

**ER_112**

Exhibit 12-7

more or less, along with and subject to all existing easements of record or those apparent on the ground."

34. On October 5, 2012, Harmons, for themselves as Lessors, and on October 8, 2012, DTM, by Alford as its Manager, executed a "Lease Purchase Agreement" covering and concerning the property described above by metes and bounds, for a "Primary Term" of one year beginning September 1, 2012 and ending September 1, 2013 (hereinafter, as amended the "Parcel 2 Lease").

35. The Parcel 2 Lease included in its Section 3.1 an option in DTM to: "purchase the property for Twenty Five Thousand and 00/100 Dollars per acre ($25,000/acre), that is the total sum of $172,500.00 during the primary term and once Lessor has subdivided the property making it available for purchase."

36. Section 3.2 of the Parcel 2 Lease provided that: "If Lessee decides to purchase the property, Lessee shall give Lessor thirty (30) days advance written notice no later than September 1, 2013."

37. On October 12, 2012, Harmons and DTM, through Alford, its Manager, executed an Amendment to Lease Agreement, amending the Parcel 2 Lease as follows:

> "LESSEE shall have a perpetual right of renewal of this Lease until the property has been subdivided making it available for purchase unless both parties agree in writing thirty (30) days prior to the end of any term not to renew the Lease."

38. On October 12, 2012, Harmons, as Lessors, and DTM as Lessee (through Alford, its Manager), with DTI signing as "Intervenor" (through Alford), signed a Lease Purchase Agreement (hereafter the "Parcel 1 Lease") expressly declaring that:

> "The parties declare that any and all agreements and contracts, including the Original Lease as Attachment 1 [the 8/22/2011 Harmon/DTI Lease] previously entered into between the parties are null and void and are hereby terminated and that none of the provisions of any of the agreements referred to above shall

8

**ER_113**

Exhibit 12-8

survive the termination of the said agreements despite any of the language to the contrary contained therein."

39.  The Parcel 1 Lease purported to cover a parcel described by metes and bounds and

containing "3.98 acres, more or less…;" and provided in Section 4.1 thereof that the

"Primary Term" of the Lease would be for two (2) years, from September 1, 2012 to

September 1, 2014.

40.  Section 4.1 of the Parcel 1 Lease also provided in part that:

"Lessee shall have the irrevocable option to purchase the property for Twenty Five Thousand and 00/100 Dollars per acre ($25,000/acre), that is the total sum of $99,500.00, during the primary term and once Lessor has subdivided the property making it available for purchase."

41.  Section 4.3 of the Parcel 1 Lease provided that:

"LESSEE shall have a perpetual right of renewal of this Lease until the property has been subdivided making it available for purchase unless both parties agree in writing thirty (30) days prior to the end of any term not to renew this Lease."

42.  On about October 12, 2012, Harmons and DTM (through Alford as its Manager)

executed a third Lease Purchase Agreement (the "Parcel 3 Lease"), this one to cover:

"Approximately 12 acres, more or less, more particularly described on the attached map as the 'Truck Parking Area.' Said property is adjacent to the west of that property leased from Garth Harmon and Wagner Harmon to Dual Trucking of Montana, L.L.C. entered into on October 10, 2012 in Roosevelt County, Bainville, Montana . . ."

43.  The Parcel 3 Lease provided in its Section 3.1 that its "Primary Term" would be for a

period of two years from September 1, 2012 to September 1, 2014.

44.  In Section 3.1 thereof, the Parcel 3 Lease also granted the Lessee an option to

purchase the premises in the following language:

9

**ER_114**

Exhibit 12-9

> "Lessee shall have the irrevocable option to purchase the property for Twenty
> Five Thousand and 00/100 Dollars per acre ($25,000/acre), total amount to be
> determined upon forthcoming survey, during the primary term and once Lessor
> has subdivided the property making it available for purchase."

45.   Section 3.2 of the Parcel 3 Lease provided that: "If Lessee decides to purchase the

property, Lessee shall give Lessor thirty (30) days advance written notice no later

than September 1, 2013."

46.   Section 3.4 of the Parcel 3 Lease provided that:

> "LESSEE shall have a perpetual right of renewal of this Lease until the property
> has been subdivided making it available for purchase unless both parties agree in
> writing thirty (30) days prior to the end of any term not to renew this Lease."

47.   The Parcel 1 Lease, the Parcel 2 Lease, and the Parcel 3 Lease were recorded on

November 28, 2012 as Documents Nos. 396815, 396816, and 396817, respectively,

in the office of the Roosevelt County Clerk and Recorder; and true and correct copies

thereof are attached to this Complaint as Exhibits "2", "3", and "4", respectively.

48.   Each and all of the Parcel 1 Lease, the Parcel 2 Lease, and the Parcel 3 Lease

provided, as to the proposed and permitted use of the respective parcels of the

Harmons' property, in relevant part as follows:

> "Lessee will occupy and use the Leased Premises and Building as a storage
> facility for equipment to support the operations of Lessee's equipment and its
> customers. Lessee is specifically approved for the installation of a skid-mounted
> above ground horizontal fuel tank and pump dispenser with concrete foundation
> and fueling aprons. The Leased Premises shall not be used for any unlawful
> purpose."

49.   Each and all of the Parcel 1 Lease, Parcel 2 Lease and Parcel 3 Lease provided that

the Lessee would indemnify the Harmons against any and all claims arising from or

in connection with the Lessee's use and occupancy of the leased premises; would

10

**ER_115**

Exhibit 12-10

"comply in connection with this Lease with all applicable laws, regulations or ordinances of any governmental authority or any department thereof for the operation of any business"; and provided in relevant part as follows regarding hazardous materials:

> "Lessee shall never in violation of any applicable law permit to be incorporated into, bring into, store at, or place at, use at or otherwise dispose of at, in , or under the leased premises or any buildings or other improvements located on the leased premises, any toxic or hazardous materials (as defined hereafter). If Lessee violated this provision or ever has knowledge of the presence of toxic or hazardous materials in, at or under the leased premises or building located on the leased premises, or the land described herein, Lessee shall notify Lessor in writing promptly after obtaining such knowledge."

50. Regarding defaults, each of the Parcel 1 Lease (at Section 17.1), Parcel 2 Lease (at Section 16.1) and Parcel 3 Lease (at Section 16.1) provided as follows:

> "If the Lessee or the Lessor fail to perform any of the agreements contained herein, this Lease shall terminate at the option of either party, providing that such party: (i) give the non complying party thirty (30) days written demand of its intention to terminate the Lease and set forth therein a specific breach of this Lease; and (ii) allow the other party thirty (30) days after written demand to remedy any alleged breach."

51. At no time prior to October 12, 2012 when the Harmon/DTI Lease was superseded by the Parcel 1 Lease executed by all of the Harmons, DTI, and DTM did DTI, as Lessee, or DTM as its purported assignee give Harmons notice of default under such Lease.

52. Upon information and belief, on about September 17, 2012, the DEQ sent DT&T, DTI, and/or DTM a letter warning concerning operation on the Harmons' property in the E1/2SE1/4 of Section 17, T28N, R58E of a solid waste management system ("SWMS") without a license; and demanding that the addressee immediately

11

Exhibit 12-11

discontinue operating such facility until properly licensed, hire an environmental consultant to clean up all solid waste on the property within 15 days, and have such solid waste removed to a licensed waste facility within 30 days.

53.  Upon information and belief, on September 26, 2012, the DEQ inspected in person the premises subject to the Harmon/DTI Lease and confirmed to DEQ's apparent satisfaction that an unlicensed SWMS was being operated on the premises.

54.  At no time prior to the October 12, 2012 execution of the Parcel 1 Lease superseding the Harmon/DTI Lease (nor for many months thereafter) did Harmons have knowledge that either DTI or its purported assignee DTM had commenced or permitted any of DTI, DTM and/or DT&T to commence the operation of an SWMS facility on the leasehold premises without a Montana license or permit; or had commenced or permitted any of DTI, DTM and/or DT&T to commence the introduction onto the leased premises of oil field wastes or materials defined as "toxic" or "hazardous" under the Harmon/DTI Lease.

55.  Upon information and belief, from and after October 12, 2012, DTM continued without Harmons' knowledge or consent to permit DTI, DTM and/or DT&T to introduce onto the Parcel 1 Lease premises, Parcel 2 Lease premises, and/or the Parcel 3 Lease premises oil field wastes or materials defined as "toxic" or "hazardous" under the three October 12, 2012 Harmon/DTM Leases.

56.  Upon information and belief, from and after October 12, 2012, DTM continued without Harmons' knowledge or consent to permit DTI, DTM and/or DT&T to continue to operate an SWMS facility on the Harmons' property subject to the October 12, 2012 Leases without a license from the State of Montana.

12

**ER_117**

Exhibit 12-12

57.     Upon information and belief, on about March 13, 2013, the DEQ sent DTI, DTM
        and/or DT&T a violation letter demanding the same corrective actions demanded in
        the DEQ's September 17, 2012 letter.

58.     Upon information and belief, in April, 2013, representatives of the Montana DEQ met
        with representatives of DTI, DTM and/or DT&T; confirmed in person that a license
        was required for the operation of an SWMS facility on the premises subject to the
        Harmon/DTM Leases; and requested that an application for such a license be
        submitted by June 10, 2013.

59.     At no time prior to April, 2013 had any of DTI, DTM or DT&T notified Harmons
        that DEQ had determined or alleged the operation of an unlicensed SWMS facility on
        the premises subject to the Harmon/DTM Leases or demanded the clean up or
        removal of solid waste from such premises.

60.     Upon information and belief, one or both of DTM and/or DT&T submitted on about
        June 10, 2013 an application to the DEQ for an SWMS facility on the premises
        subject to the Harmon/DTM Leases.

61.     Upon information and belief, at no time after June 10, 2013 did any of DTI, DTM
        and/or DT&T secure from the Montana DEQ a license for operation of an SWMS
        facility on the premises subject to the October, 2012 Harmon/DTM Leases, or
        perform to the satisfaction of the DEQ clean up of the solid waste on the premises or
        removal of such waste from the premises as first demanded by DEQ in September,
        2012.

62.     Beginning in the summer of 2013, Harmons became aware that a spill of oil field
        wastes had occurred on the premises subject to the Harmon/DTM Leases, and that the

13

**ER_118**

Exhibit 12-13

boundary of the leased premises had been breached allowing unknown contaminants to migrate off such premises and onto Harmons' neighboring property.

63. In the Fall of 2013, Harmons had the leased premises and neighboring property tested, and it was determined that the premises and neighboring property had been contaminated by the operations of DTI, DTM and/or DT&T on the premises.

64. By letter dated September 25, 2013 from Harmons' attorneys, directed to Alford, DTM was given notice of numerous breaches and defaults under the October, 2012 Harmon/DTM Leases, including without limitation: use of the premises for an unlawful purpose; allowing noxious, offensive, unsanitary or unsightly activity on the premises; failure to comply with applicable Federal, State and local laws and regulations in their operations on the premises; violating applicable law by bringing onto, storing at or disposing of toxic or hazardous material on the premises; and failure to notify Harmons about the violations on the premises.

65. The 9/25/13 notice of default demanded notification to Harmons of the "method, time and procedure to clean up and/or remove the toxic or hazardous materials on the Property."

66. Upon information and belief, none of DTI, DTM and/or DT&T at any time after receiving the 9/25/13 notice notified Harmons of their intended method, time or procedure for cleaning up and/or removing the toxic or hazardous materials from the Harmons' property, or commenced remedying the numerous breaches of the leases described above.

67. By letter dated July 8, 2014 from their attorneys to DTM, Harmons gave notice of intent to terminate the October, 2012 Harmon/DTM Leases for breach due to the

14

**ER_119**

Exhibit 12-14

allowing of two construction liens to be filed against the leased premises; and

allowing toxic or hazardous materials to be incorporated into, brought on, stored at,

placed at, used or otherwise disposed of on the premises; and failure to promptly

notify Harmons in writing regarding knowledge of such materials on the premises.

68.    Upon information and belief, neither of the two construction liens were released

within thirty days of the July 8, 2014 notice of intent to terminate, and none of DTI,

DTM and/or DT&T commenced diligently to remedy the other breaches noted in the

July 8, 2014 letter within thirty days.

69.    On about July 30, 2014, DTM (by Alford as Managing Member) executed a

purported Sublease of the entire premises subject to the October, 2012 Harmon/DTM

Leases to Defendant Caron for a Primary Term of two years from August 1, 2014,

subject to all terms, conditions and provisions set forth in the Harmon/DTM Leases.

70.    In the 7/30/14 DTM/Caron Sublease, DTM expressly represented, among other

things, that it was in the process of "conducting certain environmental hazards and

contamination remediation"; that the Lessor (DTM) was fully responsible for the

completion and costs of such environmental assessment and remediation; that

possession of the property would be given to Caron prior to completion of the

assessment and remediation; and that Caron would not be responsible for any of the

hazardous conditions or environmental assessment and remediation except as regards

any hazardous condition arising from the negligence or fault of Caron.

71.    On about August 15, 2014, Harmons signed a written consent to the DTM/Caron

Sublease, expressly affirming in such consent that: "the third party sub-lessee shall be

additionally obligated by the terms and conditions of the Lease Purchase Agreements

<div align="center">15</div>

<div align="center">**ER_120**</div>

Exhibit 12-15

[the Parcel 1 Lease, the Parcel 2 Lease, and the Parcel 3 Lease] and that Lessee [DTM] remains similarly obligated to Lessors [Harmons] as set forth therein."

72. The Town Council annexed the Harmons' property in the SE1/4 of Section 17, T28N R58E into the Town of Bainville by resolution adopted August 21, 2014, recorded August 28, 2014 in the Roosevelt County (misc.) records at Document No. 405416.

73. At no time prior to September 1, 2014 did DTM give written notice to Harmons, under any of the Parcel 1 Lease, the Parcel 2 Lease or the Parcel 3 Lease of exercise by DTM of its option to purchase the parcels subject to any of such Leases.

74. At no time prior to September 1, 2014, did DTM give written notice to Harmons under any of the Parcel 1 Lease, the Parcel 2 Lease or the Parcel 3 Lease of renewal or extension of any of such Leases.

75. By letter from their attorney dated September 15, 2014, Harmons gave notice to DTM and its counsel of termination of the October, 2012 Harmon/DTM Leases due to the Lessee's failures to cure within 60 days of the July 8, 2014 notice the breaches of lease described therein, except for securing the release of one of the two construction liens referenced in the July 8, 2014 notice letter.

76. In the September 15, 2014 notice of termination letter, Harmons demanded that DTM vacate the Harmons' premises immediately and remove any non-permanent personal or business property from the premises.

77. Upon information and belief, DTM has removed its non-permanent and business property from the premises that were subject to the October, 2012 Harmon/DTM Leases.

**ER_121**

Exhibit 12-16

78. Upon information and belief, Defendant Caron has continued to use and occupy the premises that were subject to the October, 2012 Harmon/DTM Leases, paying $26,000.00 per month, which has been remitted to Harmons, until February, 2015.

79. On about November 20, 2014, a plat of subdivision of Harmons' property in the E1/2SE1/4 of Section 17, T28N R58E into Lots 1, 2, 3, 4 and 5 of the Shotgun Creek Commercial Park was approved and recorded under Document No. 406406, File No. 6771 and Plat No. 410B of the records of Roosevelt County, Montana.

80. On or about November 25, 2014 the State of Montana through the Montana DEQ filed suit in the Montana District Court for the Fifteenth Judicial District, Roosevelt County, against DT&T alleging violation of numerous Montana Statutes including but not limited to the operation on property in the E1/2SE1/4 of Section 17, T28N R58E leased from Harmons of an unlicensed Solid Waste Management System "SWMS" in violation of MCA § 75-10-221(1) and §75-10-203(12), as well as disposal of solid waste into or onto land so that solid waste may enter the environment or be emitted into the air or discharged into any waters, including ground water in violation MCA § 75-10-203(3).

81. In its Complaint, the DEQ asserted that the unlicensed waste facility had been operated on the premises leased from Harmons for 643 days--from July, 26, 2012 through April 30, 2014.

82. Upon information and belief, as of the date hereof, none of DTI, DTM or DT&T has filed an answer to the DEQ Complaint.

83. Moreover, based on DEQ's complaint and on information and belief, DTI, DTM and/or DT&T caused or allowed pollutants to go onto, off, seep into, remain on, flow

17

**ER_122**

Exhibit 12-17

under and over, and flow off it's the premises subject to the October 2012

Harmon/DTM Leases and onto Harmons' surrounding properties without Harmons'

knowledge, information, or permission; and such pollutants remain on the leased

premises and Harmons' neighboring property.

84.    The DEQ has alleged in its Complaint that in the course of operating an unlicensed

solid waste management system on the premises leased from Harmons, defendants

DTI, DTM and/or DT&T were using chemicals such as sodium hypochlorite,

CurdeSorb X-Dry, ammonium persulfate, RM-10, muriatic acide, CEtfloc F984C,

caustic soda, flocculent, demulsifier and water clarifier; and the operators identified

21 on site materials that it characterized as "pollutants of concern."

85.    Furthermore, the DEQ Complaint alleges DEQ took its own test samples of the leased

and neighboring properties, and found there was invert waste, oil, diesel, and other

chemicals on the leased property and that it had been allowed to be spilled onto and

off the leased property and onto Harmons' neighboring property.

**FACTS COMMON TO WASTE PRODUCTION COMPANIES THAT CONTRACTED
WITH OR ALLOWED DUAL TO STORE COMPANIES' WASTE ON PROPERTY**

86.    Upon information and belief, Defendants Continental, Whiting, Hess, Petro-Hunt,

Purity, Zenergy, Cetco, and John Does 1 through 50 (collectively "Defendants" under

this heading) contracted with DTI, DTM and/or DT&T and/or third party

transportation companies to dispose of their toxic chemicals and materials on the

premises subject to the October 2012 Harmon/DTM Lease while DTI, DTM and/or

DT&T were unauthorized, unlicensed, and illegally processing, receiving, and

dumping the above-described Defendants' waste on the  leased Harmon premises.

18

**ER_123**

Exhibit 12-18

87.   Defendants knew or should have known that their toxic waste was being disposed of at an unlicensed, unauthorized, illegal, non-compliant waste facility in Montana that created a nuisance, trespass, and non-delegable duty requiring that the Defendants ensure that their ultra-hazardous toxic waste is being disposed of in a reasonable, safe, and legal manner.

88.   On information and belief Defendant Cetco, working with or for the Dual entities, failed in its handling and disposition of the Toxic Waste on the Plaintiffs' property.

89.   Further, Defendants' negligently failed to take any steps, much less reasonable steps, to ensure that their waste was being taken to a properly licensed facility qualified and engineered to handle Defendants' toxic waste.

90.   Defendants' hired and contracted with DTI, DTM and/or DT&T and/or other third party transportation companies without any regard of the catastrophic potential for injury to persons or property when the above-described Defendants' toxic waste was being disposed of at an unlicensed, illegal, facility that was unequipped to handle such toxic waste.

91.   According to the DEQ, DTI, DTM and/or DT&T never obtained the proper permit for receiving, processing, or disposing of Defendants' toxic waste; and operated and received waste for 643 days while never obtaining a license.  The described Defendants' allowed their toxic waste to be received, processed, dumped, and disposed onto the premises subject to the October, 2012 Harmon/DTM Leases during this entire 643 day period.

92.   Defendants' toxic waste disposal is an ultra-hazardous activity and cannot be delegated.

19

**ER_124**

Exhibit 12-19

## FACTS COMMON TO THE MONTANA DEPARTMENT OF ENVIROMENTAL QUALITY

93.   According to State law and the State of Montana's own Complaint filed November 25, 2014, the Montana DEQ is responsible for the administration and enforcement of the Solid Waste Management Act (Title 75, chapter 10, part 2, MCA) (the Act).  DEQ is specifically authorized by §§ 75-10-228 and 75-10-231, MCA, to institute and maintain enforcement proceedings, including civil actions seeking civil penalties and injunctions, for violation of the Act or rules adopted pursuant to the Act.

94.   Under the Act, DEQ is charged with ensuring that businesses that are operating a solid waste management system "SWMS" are properly licensed in accordance with the Act, DEQ regulations, and State law.

95.   DEQ, as evidenced by its November 25, 2014 Complaint, knew, as early as July 26, 2012 that DTI, DTM and/or DT&T were operating on property leased from Harmons a SWMS without a license.

96.   Upon information and belief, on September 17, 2012, the DEQ sent DTI, DTM and/or DT&T a warning letter concerning its operation of a SWMS without a license and required a cleanup report including receipts and pictures of where the waste was being disposed of within 60 days.

97.   On September 26, 2012, the DEQ inspected, in person, the facility and confirmed it was operating as a SWMS without a license.

98.   Not until March 13, 2013, six months after its September 17, 2013 letter, did the DEQ send a violation letter demanding the same corrective actions requested in the DEQ's September 17, 2012 letter.

99.

Exhibit 12-20

Not until two months after the June 10, 2013, submission of an application to the

DEQ for licensure of an SWMS facility on the premises leased from Harmons, did

DEQ, on August 22, 2013,did the DEQ send a letter identifying deficiencies in the

June 10, 2013 application.

100.    Not until September 24, 2013, did DEQ determine that the response to their August

22, 2013 deficiency letter was inadequate.

101.    On November 1, 2013, DEQ requested soil and hydrologic tests on the premises

subject to the October 2012 Harmon/DTM Leases.

102.    On November 18, 2013, DEQ determined that the supplementation and response by

DTI, DTM and/or DT&T to the DEQ's August 22, 2013 deficiency letter was still

inadequate.

103.    On November 27, 2013, the DEQ sent another deficiency letter for the third time and

proposed a ground water monitoring plan, and addressed deficiencies in the

applicant's ability to handle radionuclide concentrations greater than 30 pCi/gm;

requiring the applicant not receive such waste.

104.    On December 4, 2013, Defendant a consultant retained by DTI, DTM and/or DT&T

sent a revised well and test pit plan for the proposed SWMS facility and represented a

hydrogeologic and soils characterization report would be forthcoming.

105.    Again, on April 11, 2014 the DEQ inspected the premises subject to the

Harmon/DTM Leases and witnessed DTI, DTM and/or DT&T treating, recovering,

storing, and disposing of solid waste on the premises. Tests from the same day

confirmed that invert waste was spilling on the leased ground and that samples on the

21

**ER_126**

Exhibit 12-21

Harmons' property, adjacent to the leased ground, had hydrocarbon concentrations above what is considered naturally occurring.

106. Employees of DTI, DTM and/or DT&T onsite admitted to the DEQ that storm water had discharged off-site onto Harmons' neighboring property.

107. None of DTI, DTM or DT&T ever satisfied the deficiencies, ever obtained a license, or ever made a good faith effort to obtain a license under the watchful eye of the DEQ for nearly two years.

108. Beginning in July 2012 the DEQ knew and continued to allow DTI, DTM and/or DT&T to operate a SWMS for oil field waste that was largely unlined and unlicensed while using chemicals such as sodium hypochlorite, CurdeSorb X-Dry, ammonium persulfate, RM-10, muriatic acide, CEtfloc F984C, caustic soda, flocculent, demulsifier and water clarifier and 21 other on site materials characterized as "pollutants of concern" according to the DEQ's own Complaint.

109. Finally, on April 22, 2014, two years after the DEQ was aware that DTI, DTM and/or DT&T was operating an illegal SWMS on premises leased from Harmons, the DEQ made its first request that such operations cease. Upon ionformation and belief, DTI, DTM and/or DT&T advised DEQ by letter dated April 30, 2014 stating such operations were ceasing.

110. Astonishingly, the DEQ, in its own moving papers, acknowledges and illustrates its deplorable (non)response; the DEQ's negligent failure to properly oversee, enforce, and remedy the illegal waste site directly resulted in injury to Harmons and any others impacted by the unlicensed operation.

Exhibit 12-22

111.    The DEQ is the most powerful and most appropriate governing entity that possessed
        the knowledge, influence, and legal authority to shut down the operation by DTI.
        DTM and/or DT&T on the leased premises; but DEQ did not. The DEQ owes
        obligations to the State of Montana and all its' citizens, and negligently breached
        those duties repeatedly.

112.    The DEQ allowed DTI, DTM and/or DT&T to illegally operate, pollute, and maintain
        a business for a shocking 643 illegal days according to DEQ's own Complaint. The
        DEQ failed in every aspect to protect the citizen taxpayers that fund the department,
        from the harm DEQ is charged with protecting against.

## A. CAUSES OF ACTION AGAINST DTI, DTM, DT&T and ALFORD AND TO QUIET TITLE

### Count I: Breach of Contract

113.    Harmons reallege the allegations set forth above.

114.    Upon information and belief, from about August, 2011, DTI, DTM and DT&T are
        and have been so thoroughly interconnected in their management, ownership,
        operations and finances in connection with the transportation, handling, storage, and
        disposition of oil field wastes, including toxic and hazardous materials in the Bakken
        region of North Dakota and Montana as to be virtually indistinguishable, one from the
        other, as to materially mislead Harmons, the public and the state and federal
        governmental entities with applicable jurisdiction into believing they were one and
        the same entity, justifying abrogation of their corporate shells and holding them
        jointly and severally liable for the torts and breaches of legal obligations by each.

115.    Prior to October 12, 2012, DTI, DTM and/or DT&T breached the Lessee's
        obligations under the August 22, 2011 Harmon/DTI Lease by: using the leased

23

**ER_128**

Exhibit 12-23

premises for purposes other than those represented and provided for in Article 4 of

the Lease and using the Leased Premises for an unlawful purpose in violation of

Article 4; failing to comply in connection with the Lease with all laws, regulations or

ordinances of any governmental authority or any department thereof for the operation

of any business, in violation of Article 9 of the Lease; and permitting in violation of

applicable law to be incorporated into, brought onto, stored at, or placed at, used, or

otherwise disposed of at, in, or under the leased premises of toxic or hazardous

materials, in violation of Article 10 of the Lease.

116. By such breaches, and particularly the operation of an unlicensed SWMS facility on

the premises and contamination thereof between July 26, 2012 and October 12, 2012,

Harmons have suffered injury to the leased premises and their adjoining property.

117. DTM and/or DT&T have breached the terms and provisions of each and all of the

October, 2012 Parcel 1 Lease, Parcel 2 Lease and Parcel 3 Lease by, among other

defaults: occupying and using the Leased Premises for purposes other than "as a

storage facility for equipment to support the operations of Lessee's equipment and its

customers" and using the premises for an unlawful purpose, as provided in Section 6

of the Parcel 1 Lease and Section 5 of each of the Parcel 2 Lease and Parcel 3 Lease;

failure to use the premises in such manner as to avoid pollution of any waterway that

flows through or under the property in violation of Section 10 of the Parcel 1 Lease

and Section 9 of the other two leases; failure to comply in use of the Leased Premises

with all applicable laws, regulations or ordinances in the operation of their businesses,

in violation of Section 11 of the Parcel 1 Lease and Section 10 of the Parcel 2 and

Parcel 3 Leases; permitting in violation of applicable law to be incorporated into,

24

Exhibit 12-24

brought onto, stored at, or placed at, used, or otherwise disposed of at, in, or under the

leased premises of toxic or hazardous materials, in violation of Section 12.1 of the

Parcel 1 Lease and Section 11.1 of each of the Parcel 2 and Parcel 3 Leases; and

permitting construction liens to be filed against the Leased Premises, in breach of

Section 16 of the Parcel 1 Lease and Section 15 of the other two leases.

118.  By such defaults, not timely cured despite written notices of default in September,

2013 and July, 2014, DTM and/or DT&T breached each and all of the October, 2012

Harmon/DTM Leases, causing Harmons injury to the leased premises in the

SE1/4SE1/4 of Section 17, now known as Lots 1, 2 and 3 of the Shotgun Creek

Commercial Park according to the filed plat thereof.

119.  As the proximate result of the breaches of the August 22, 2011 Harmon/DTI Lease

and the three October 2012 Harmon/DTM Leases, Harmons have incurred damages

to be proven at trial.

120.  Because of the breaches by DTI, DTM, and DT&T of the leases, Harmons have been

required to retain legal counsel and to incur attorneys' fees and costs for which they

are entitled to be reimbursed under each of the said leases.

121.  Harmons reallege the allegations set forth in Paragraphs 1 through 116 above as if

fully set forth herein.

### Count II: For Declaratory Judgment

122.   Harmons reallege the allegations contained in the previous paragraphs.

123.   Under Section 4.1 of the Parcel 1 Lease, the Lessee was granted by Harmons an

option to purchase the leased premises described therein "during the primary term"

and once the Lessor had subdivided the property; "Primary Term" being defined

Exhibit 12-25

therein as the period beginning on September 1, 2012 and ending on September 1, 2014.

124.   DTM, the Lessee under the Parcel 1 Lease, did not at any time prior to September 1, 2014 give Harmons notice of exercise of its option to purchase the property described in the Lease.

125.   Under Section 3.1 of the Parcel 2 Lease, the Lessee was granted by Harmons an option to purchase the leased premises during the primary term, "Primary Term" being expressly defined therein as the period beginning September 1, 2012 and ending on September 1, 2013.

126.   Section 3.2 of the Parcel 2 Lease expressly provided that the Lessee must give the Lessor thirty (30) days advance written notice "no later than September 1, 2013."

127.   DTM as Lessee did not at any time prior to September 1, 2013, give Harmons written notice of its decision to purchase the property subject to the Parcel 2 Lease.

128.   Under Section 3.1 of the Parcel 3 Lease, the Lessee was granted an option to purchase the property subject thereto "during the primary term and once Lessor has subdivided the property"; "Primary Term" being defined in that section as the period beginning September 1, 2012 and ending September 1, 2014.

129.   Section 3.2 of the Parcel 3 Lease also expressly provided that the Lessee must give the Lessor thirty (30) days advance written notice of its decision to purchase the property.

130.   The Lessee under the Parcel 3 Lease did not give Harmons written notice of its decision to purchase the leased property at any time prior to September 1, 2013.

**ER_131**

Exhibit 12-26

131. In consequence of the numerous lease defaults in connection with each and all of the October 2012 Harmon/DTM Leases, Harmons gave written notice July 8, 2014 of intention to terminate the leases, as provided in Section 17.1 of the Parcel 1 Lease and Section 16.1 of each of the Parcel 2 Lease and the Parcel 3 Lease.

132. In consequence of the failures of DTM and/or DT&T to timely cure the various noticed lease defaults under the three October 2012 Leases, the Harmons gave written notice of termination of all three on September 15, 2014.

133. At no time prior to written notice of termination of the three October 2012 Leases did DTM or DT&T give notice to Harmons of the Lessee's intent or decision to exercise an option to purchase the subject parcels.

134. Pursuant to MCA Section 27-8-202, this Court may declare and adjudicate the respective rights, status, and other legal relations between the parties, whether or not further relief could be claimed.

135. Harmons claim that any rights of DTM and/or DT&T under any of the Parcel 1 Lease, the Parcel 2 Lease, or the Parcel 3 Lease to exercise an option to purchase the parcels subject thereto expired upon the Lessee's failure to give notice of exercise before September 1, 2014; or in the alternative, that such rights terminated when the leases were terminated by notice September 15, 2014 before any notice of exercise were given Harmons.

136. The Harmons further claim that any rights, title or interest of DTM and/or DT&T in or to the parcels subject to the three October 2012 Leases were terminated effective September 15, 2014 upon Harmons giving notice of termination of such leases in accordance with the provisions for termination thereof.

27

**ER_132**

Exhibit 12-27

## Count III: Quiet Title

137.  Harmons reallege the paragraphs set forth above.

138.  Pursuant to MCA Section 70-28-101, *et seq.*, this Court can adjudicate the respective

rights, title and interests of the parties who will or may claim some interest, lien or

encumbrance upon the Harmons' real property in the E1/2SE1/4 of Section 17, T28N,

R58E, P.M.M.

139.  The Harmon/DTI Lease has been recorded March 16, 2012 at Document No. 393434

of the Roosevelt County records; and has not been released of record notwithstanding

that such lease was superseded effective October 12, 2012 by the express terms of the

Parcel 1 Lease between Harmons and DTM.

140.  The Harmon/DTM Parcel 1 Lease, Parcel 2 Lease and Parcel 3 Lease were all three

recorded  November 28, 2012 at Documents Nos. 396815, 396816, and 396817,

respectively, of the Roosevelt County records; and all three of such Leases were

terminated effective September 15, 2014 by written notice in accordance with the

terms thereof.

141.  Defendant Whitney Bank may claim some interest in the Harmons' property in the

E1/2SE1/4 of Section 17 by virtue of a U.C.C. Financing Statement referencing

Whitney Bank as Secured Party and Encore Food Services, LLC as Debtor that was

recorded December 12, 2011 at Document No. 392207 in the Roosevelt County

records.

142.  Encore Food Services, LLC does not and did not in December, 2011, have any right,

title or interest in the Harmons' property in the E1/2SE1/4 of Section 17, but only in

28

**ER_133**

Exhibit 12-28

the *W1/2SE1/4 of Section 17*, and thus the legal description of subject real property

set forth in the Encore/Whitney Bank Financing Statement is and was overbroad.

143. Defendant Caron will or may claim some interest in the property based upon its

Sublease Agreement with DTM dated July 30, 2014, a copy of which was recorded

September 29, 2014 at Document No. 405760 of the Roosevelt County records.

144. The October 2012 Harmon/DTM Leases were terminated upon written notice

effective September 15, 2014, and thus the Sublease between DTM and Caron was no

longer in force and effect; and any occupancy of Caron on the Harmons' property in

Section 17 was on a month-to-month basis.

145. The recorded Harmon/DTI Lease Agreement, the recorded Encore/Whitney Bank

Financing Statement, the three recorded October 2012 Harmon/DTM Leases, and the

recorded DTM/Caron Sublease all cloud title to the Harmons' property located in the

E1/2SE1/4 of Section 17, T28N, R58E; and none of the lien claimants have any

further right, title or interest in the Harmons' property. Harmons are therefore entitled

to an order of the Court quieting title in Harmons and against such Defendants DTI,

DTM, Whitney Bank and Caron and declaring their respective recorded claims null,

void and of no further force or effect with respect to Harmons' real property.

**Count IV: Breach of the Covenant of Good Faith and Fair Dealing**

146. By virtue of DTM's October 2012 Leases with Harmons to use and occupy portions

of their property for the conduct of business upon the Harmons' property in

accordance with all applicable laws, regulations and ordinances; and DTM then

allowing itself, DTI and/or DT&T to enter on the property for purposes of

establishing a legal and licensed SWMS; and the failure of DTM, DTI and/or DT&T

29

**ER_134**

Exhibit 12-29

to do so while in sole control of Harmons' property created a special relationship between DTM and Harmons. Because of the special relationship, DTM was the only party to the relationship that had knowledge of what was happening on the property.

147. The Parties contracted and agreed that DTM would operate and permit operations on the Harmons' property only within the laws and regulations required by the state of Montana as well as agreed upon in contract.

148. Defendant DTM's actions are governed by contract and common industry standards required of a lessee operating or permitting operation of a SWMS on leased ground for commercial use. DTM and/or anyone permitted on the Harmons' property by DTM was required to properly license and operate its business while protecting Harmons' property against harm.

149. Further, Defendant DTM was the only Party to the contract that had actual knowledge and information that DTM and/or its permittees was violating the contract and industry standards operating an SWMS; DTM failed to inform Harmons of its contractual and common law violations that would have allowed Harmons to protect their property. By the time Harmons became aware of the contractual and common law violations in operations on the Harmons' property, such property was already irreparably damaged.

150. Defendant DTM's conduct constitutes a willful and material violation of the covenant of good faith and fair dealing implied in its Lease contracts with Harmons.

151. Harmons have been damaged by DTM's conduct in breach of the covenant of fair dealing implied in its Lease contracts with Harmons, and Harmons are entitled to be compensated in an amount to be determined at trial.

30

**ER_135**

Exhibit 12-30

**Count V: Negligence**

152.    Plaintiffs reallege the allegations contained in the previous paragraphs.

153.    DTI, DTM and DT&T have failed to use ordinary care and skill in the management of
their respective businesses on Harmons' property by causing, allowing, or
contributing to the release of toxic and hazardous wastes from their operations onto
the premises leased from Harmons as well as Harmons' adjacent real property in
Section 17.

154.    As a direct and proximate result of the want of ordinary care and skill by DTI, DTM
and DT&T in the management of their business operations on the premises leased
from Harmons, Harmons have suffered, and continue to suffer, damage to their real
property.  DTI, DTM and DT&T are jointly and severally liable for all such damage
and detriment proximately caused to Harmons' real property by the negligent acts and
omissions of such defendants.

**Count VI: Negligent Misrepresentation**

155.    Plaintiffs reallege the allegations contained in the previous paragraphs.

156.    By signing Lease Purchase Agreements with Plaintiffs, and the earlier Harmon/DTI
Lease, DTI, DTM and Alford made representations to Plaintiffs, express and implied
that DTI and DTM would fulfill their obligations under contract, use ordinary care
and skill, and follow Montana law in operation of their  businesses (and permitting
DT&T to operate) on the premises  leased from Harmons.

157.    DTI, DTM and Alford made the representations to the Harmons with the intent that
Harmons would rely on them.

31

**ER_136**

Exhibit 12-31

158.   Plaintiffs reasonably relied on the representations of DTI, DTM and Alford, and
allowed DTI and DTM to operate and continue to operate on the premises leased
from Harmons.

159.   The representations made by DTI, DTM and Alford were untrue in that DTI, DTM
and Alford knew or should have known they violated numerous provisions of the DTI
and DTM lease contracts and Montana law by operating and/or allowing DT&T to
operate an unlicensed SWMS on the leased property as well as causing toxic waste to
spill on and off the leased property.

160.   The representations of DTI, DTM and Alford were made with the intent that Harmons
would rely on them and allow the Dual defendants to operate and continue to operate
their commercial ventures on the premises  leased from Harmons, notwithstanding all
of DTI, DTM, DT&T and Alford knew they were violating their respective  lease and
legal obligations to Harmons' detriment.

161.   The representations of DTI, DTM and Alford were material to Harmons' agreements
to allow the Dual entities to operate and continue to operate on Harmons' property.

162.   Harmons were ignorant of the falsity of the representations made by DTI, DTM and
Alford.

163.   DTI, DTM and Alford made the representations to Harmons in spite of their falsity in
order to continue operating on Harmons' property.

164.   As a result of Harmons' reliance on the representations, Harmons have been injured
in an amount to be determined at trial.

**Count VII: Trespass**

165.   Harmons reallege the allegations contained in the previous paragraphs.

32

**ER_137**

Exhibit 12-32

166. The disposal by DTI, DTM and/or DT&T of hazardous toxic waste on, onto, off, into, under, and over the Harmons' leased and neighboring properties and intentional decisions not to contain and safely operate disposal of such wastes constitutes an unlawful trespass to the Plaintiffs' property as recognized under Montana common law. DTI, DTM and/or DT&T had and have the ability to abate such trespass, but have maliciously failed and refused to do so. Such conduct by DTI, DTM and/or DT&T was and is a continuing trespass.

167. As a direct and proximate result of the Dual defendants' continuing wrongful trespass, Plaintiffs have suffered, and continue to suffer, damage to their private property. DTI, DTM and DT&T are jointly and severally liable for all such damage and detriment proximately caused by their wrongful trespass.

### Count VIII: Nuisance

168. Plaintiffs reallege all of the allegations contained in the previous paragraphs.

169. The actions of the Dual defendants DTI, DTM and DT&T, as alleged above, violate Mont. Code Ann. § 27-30-101, et seq., and Montana common law.

170. The failure of the Dual defendants to control their business operation, toxic waste, toxic pollution, non-mitigation, to exist on and off Plaintiffs' leased and owned properties constitutes a nuisance which has damaged Plaintiffs' property.

171. As a direct and proximate result of the Dual defendants' operation and continuing nuisance, Plaintiffs have suffered, and continue to suffer, damage to their property. The Dual defendant are jointly and severally liable for all damage and detriment to Plaintiffs' property proximately caused by said defendants' continuing nuisance.

### Count IX: Restoration Damages

33

Exhibit 12-33

172.    Plaintiffs reallege all of the allegations contained in the previous paragraphs.

173.    Plaintiffs are entitled to their property being restored to the condition which existed
        prior to its contamination by the foregoing acts of the Dual defendants DTI, DTM and
        DT&T.

174.    The Dual defendants are jointly and severally liable to the Plaintiffs for the cost of
        restoring their property to its pre-contaminated condition.

### Count X: Misconduct Warranting Punitive Damages

175.    Plaintiffs reallege all of the allegations contained in the previous paragraphs.

176.    Each and all of the Dual defendants DTI, DTM and DT&T knew that they were
        illegally dumping, storing, wasting, toxic hazardous materials on Plaintiffs' leased
        and owned property. DTI, DTM and DT&T intentionally and knowingly chose to
        illegally dump, store, dispose, and not contain their toxic waste, but instead,
        knowingly and intentionally released the toxic waste on Plaintiffs' property. Such
        misconduct evidences conscious and intentional disregard for the high probability of
        injury to Plaintiffs' property. Each of DTI, DTM and DT&T deliberately proceeded
        to act in conscious or intentional disregard of the high probability of injury to the
        Plaintiffs' leased and owned property. As a result of such misconduct, each of the
        Dual defendants is jointly and severally liable for punitive damages as allowed by
        Montana law. Plaintiffs request punitive damages be awarded against DTI, DTM and
        DT&T in an amount to punish such Dual defendants and to encourage them and
        others similarly situated in Eastern Montana and the Bakken refrain from engaging in
        such misconduct in the future.

### B. CAUSES OF ACTION AGAINST WASTE PRODUCTION COMPANIES

34

**ER_139**

Exhibit 12-34

## Count I: Negligence

177.  Plaintiffs reallege the allegations contained in the previous paragraphs.

178.  Defendants Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy
(collectively "Defendants" in this Count I and subsequent Counts in this Section B
regarding the Waste Production Companies) have failed to use ordinary care and skill
in the management and disposal of their toxic waste as a result of their drilling
practices and business by causing, allowing, and contributing to the release of toxic
hazardous waste produced by their operations onto Plaintiffs' leased property as well
as Plaintiffs' adjacent private property.

179.  As a direct and proximate result of Defendants' want of ordinary care and skill in the
management of their business operations and toxic waste disposal on the Plaintiffs'
leased property, Plaintiffs have suffered, and continue to suffer, damage to their real
property. Such Defendants are liable for all such damage and detriment proximately
caused to Plaintiffs' property by Defendants' negligent acts and omissions.

## Count II: Trespass

180.  Plaintiffs reallege the allegations contained in the previous paragraphs.

181.  Defendants' disposal of hazardous toxic waste on, onto, off, into, under, and over the
Plaintiffs' leased and neighboring properties, as well as their apparently intentional
decisions not to affirmatively determine their respective wastes were being legally
and properly disposed of constitutes an unlawful trespass to the Plaintiffs' property as
recognized under Montana common law. Defendants have the ability to abate such

35

**ER_140**

Exhibit 12-35

trespass, but have maliciously failed and refused to do so.  Such conduct by

Defendants was and is a continuing trespass.

182. As a direct and proximate result of Defendants' continuing wrongful trespass,

Plaintiffs have suffered, and continue to suffer, damage to their private property.

Defendants are liable for all such damage and detriment proximately caused Harmons

by their wrongful trespass.

### Count III: Nuisance

183. Plaintiffs reallege all of the allegations contained in the previous paragraphs.

184. The Defendants' actions, as alleged above, violate Mont. Code Ann. § 27-30-101, et

seq., and Montana common law.

185. The Defendants' failure to ensure that the toxic wastes that they produce is legally

and properly, according to industry standards, disposed of in a location that is

licensed and capable to receive and dispose of Defendants' toxic wastes; and that

wastes weres subsequently spilled onto and off Plaintiffs' leased and owned

properties, constitutes a continuing nuisance which has damaged Plaintiffs' property.

186. As a direct and proximate result of Defendants' failures and continuing nuisance,

Plaintiffs have suffered, and continue to suffer, damage to their property.  The

Defendants are liable for all damage and detriment to Plaintiffs' property proximately

caused by Defendants' continuing nuisance.

### Count IV: Restoration Damages

187. Plaintiffs reallege all of the allegations contained in the previous paragraphs.

188. Plaintiffs are entitled to their property being restored to the condition which existed

prior to its contamination by the foregoing acts of Defendants.

36

**ER_141**

Exhibit 12-36

189.  Defendants are liable to the Plaintiffs for the cost of restoring their property to its pre-contaminated condition.

<u>**Count V: Misconduct Warranting Punitive Damages**</u>

190.  Plaintiffs reallege all of the allegations contained in the previous paragraphs.

191.  Defendants knew that they were sending their respective hazardous wastes to an unlicensed illegal SWDS that was illegally dumping, storing, wasting, and polluting, toxic and/or hazardous materials onto Plaintiffs' leased and owned property. Defendants intentionally and knowingly chose to allow their respective wastes to be illegally dumped, stored, and disposed of on Plaintiffs' property. Defendants' misconduct evidences conscious and intentional disregard for the high probability of injury to Plaintiffs' property. Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs' leased and owned property. As a result of this misconduct, Defendants are liable for punitive damages as allowed by Montana law. Plaintiffs request punitive damages be awarded against Defendants in an amount to punish Defendants and to encourage them and others similarly situated in Eastern Montana and the Bakken to refrain from engaging in such misconduct in the future.

<u>**Count VI: Unjust Enrichment**</u>

192.  Plaintiffs reallege all of the allegations contained in the previous paragraphs.

193.  Defendants deliberately, intentionally and knowingly chose not to have their respective toxic wastes stored at a legally licensed storage facility, and instead deliberately, intentionally, and knowingly allowed such wastes to be dumped and disposed of on Plaintiffs' property.

37

**ER_142**

Exhibit 12-37

194.    Defendants' intentional and knowing decision to use Plaintiffs' property to dispose of
        and treat their toxic wastes is wrongful and done without Plaintiffs permission or
        authorization in violation of Montana law regarding trespass and nuisance, and in
        violation of the Montana constitution.

195.    Defendants' unauthorized use of and contamination of Plaintiffs' property benefits,
        and has benefitted Defendants monetarily to Plaintiffs' detriment. Defendants are
        therefore unjustly enriched by their respective uses and contamination of Plaintiffs'
        property. In equity and pursuant to Mont. Code Ann. § 27-;1-602 and Montana
        common law, Plaintiffs are therefore entitled to damages as a result of Defendants'
        unjust enrichment.

**Count VII: Ultra Hazardous Activity, Strict Liability, and Non-Delegable Duty**

196.    Plaintiffs reallege the allegations contained in the previous paragraphs.

197.    Defendants were and are engaged in the generation of and then the disposal and
        storage of the toxic waste which the Defendants produce in the course and scope of
        their business operations. Defendants' production, transportation, and disposal of
        their respective toxic wastes is an abnormally dangerous and ultra-hazardous activity;
        and such wastes are required to be disposed of at a licensed and legally sanctioned
        SWMS disposal site. By allowing DTI, DTM and/or DT&T and/or any other third
        party transportation company's transport and dispose of such ultra-hazardous waste at
        an unlicensed illegal SWMS disposal site, Defendants' consequently allowed and
        permitted their toxic wastes to be illegally disposed of onto Plaintiffs' property.

38

**ER_143**

Exhibit 12-38

Defendants' toxic pollution and waste created, and still creates, an unreasonably

dangerous condition causing damage to Plaintiffs and Plaintiffs' property.

198.   As a direct and proximate result of this unreasonably dangerous condition created by

the Defendants, Plaintiffs have suffered, and continue to suffer, damage to their

property for which Defendants are strictly liable. Defendants are liable for all such

damage and detriment to Plaintiffs' private property.

199.   Defendants' duty to ensure that their respective ultra-hazardous toxic and hazardous

wastes and pollution are being processed and disposed of legally, proper, and within

industry standards is a non-delegable duty. The Duty to ensure such ultra-hazardous

waste is disposed of in a legally sanctioned solid waste facility as required by

Montana law is not delegable to third parties. Defendants are required to ensure the

waste is not disposed of illegally to an unlicensed SWMS facility; and are therefore

liable for all damage and detriment caused by or as a result of such disposal.

## C.  CAUSES OF ACTION AGAINST THE STATE OF MONTANA

200.   Plaintiffs reallege the allegations contained in the previous paragraphs.

201.   Defendant, State of Montana DEQ, has failed to use ordinary care and skill in the

administration and enforcement of toxic disposal in Montana. The DEQ maintains

the power and legal authority to institute and maintain enforcement proceedings,

including civil penalties and injunctions for any violation under its authority. The

DEQ is charged with ensuring that any entity found or known by DEQ to be

operating a SWMS facility receives a valid license to operate the facility. If the

facility is not properly operated and creates a risk, the DEQ is charged through

Exhibit 12-39

injunction or fines to cure the deficiencies in the operation of such facility or to stop

the operation of the unlicensed activities in order to prevent further harm.

202.   Here, the DEQ allowed the unlicensed Dual defendants DTI, DTM and/or DT&T to

dispose of ultra-hazardous waste that accumulated, stayed, and continued to be

disposed of on Plaintiffs' property for nearly two years, 643 days, before the DEQ

requested the Dual defendants cease operations.  Defendant DEQ had actual

knowledge for two years DTI, DTM and/or DT&T was operating an unlicensed

SWMS before the Dual entities voluntarily ceased operations.

203.   As a direct and proximate result of the want of ordinary care and skill by DEQ in the

administration and enforcement of toxic waste disposal, the Harmons have suffered,

and continue to suffer, damage to their real property.  Defendant DEQis liable for all

such damage and detriment proximately caused to Plaintiffs' property by DEQ's

negligent acts and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Garth Harmon and Wagner Harmon respectfully pray for the

following relief:

A.  On Section A, Count I, granting judgment in favor of Harmons and against DTI,

DTM and DT&T, jointly and severally, for damages for breach of the Harmon/DTI

and Harmon/DTM Leases in an amount to be proven at trial but believed to be not

less than $1,500,000.00;

B.  On Section A, Count II, granting judgment for Harmons and against DTI and DT&T

declaring the purported options to purchase set forth in each of the October 2012

Harmon/DTM Leases to be null, void and of no further force or effect; and declaring

Exhibit 12-40

each and all of said leases to have been terminated effective September 15, 2014 and
of no further force or effect;

C.  On Section A, Count III, granting judgment for Harmons and against each and all of
Defendants DTI, DTM, Whitney Bank and Caron quieting title to the E1/2SE1/4 of
Section 17, T28N, R58E, Roosevelt County, Montana in Harmons and declaring the
foregoing defendants' respective recorded instruments and liens to be null, void and
of no further force or effect with respect to the said Harmons' real property;

D.  On Section A, Count IV, granting judgment for Harmons and against DTM for
damages caused Harmons by said defendant's breach of the implied covenant of good
faith and fair dealing in an amount to be proven at trial;

E.  On Section A, Count V, granting judgment for Harmons and against Defendants DTI,
DTM and DT&T jointly and severally, for all damages proximately caused Harmons
by said defendants' negligence, in an amount to be proven at trial but estimated to be
not less than $2,000,000.00.

F.  On Section A, Count VI, granting judgment for Harmons and against Defendants
DTI, DTM, and Alford, jointly and severally, for all actual, compensatory and
consequential damages caused Harmons by said defendants misrepresentations on
and after August 22, 2011;

G.  On Section A, Count VII, granting judgment for Harmons and against Defendants
DTI, DTM and DT&T, jointly and severally, for all actual, compensatory and
consequential damages proximately caused Harmons by said defendants' trespass on
Harmons' real property;

41

**ER_146**

Exhibit 12-41

H.  On Section A, Count VIII, granting judgment for Harmons and against DTI, DTM
    and DT&T, jointly and severally, for all actual, compensatory and consequential
    damages proximately caused Harmons by said defendants' maintenance of a nuisance
    of the premises leased from Harmons between August 22, 2011 and September 15,
    2014;

I.   On Section A, Count IX, granting judgment for Harmons and against DTI, DTM and
     DT&T, jointly and severally, for the costs of restoring Harmons' real property in the
     E1/2SE1/4 of Section 17, T28N R58E to its condition prior to the earlier of July 26,
     2012 or the date when said defendants' operations on the premises began to
     contaminate such premises;

J.   On Section A, Count X, granting judgment for Harmons and against DTI, DTM,
     DT&T and Alford, jointly and severally, for punitive damages;

K.  On Section B, Count I, granting judgment for Harmons and against Defendants
    Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for all
    actual, compensatory and consequential damages proximately caused Harmons, in
    amounts to be determined at trial, by said defendants' negligence in the discharge and
    disposal of their respective hazardous and toxic wastes, through the Dual defendants,
    on Harmons' real property in Section 17;

L.   On Section B, Count II, granting judgment for Harmons and against Whitney,
     Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for all actual,
     compensatory and consequential damages proximately caused Harmons by said
     defendants' trespass on Harmons' real property;

42

**ER_147**

Exhibit 12-42

M. On Section B. Count III, granting judgment for Harmons and against Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for all actual, compensatory and consequential damages proximately caused Harmons by said defendants' maintenance of a continuing nuisance on Harmons' real property;

N. On Section B, Count IV, granting judgment for Harmons and against Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for all costs incurred by Harmons to restore their real property in the E1/2SE1/4 of Section 17, T28N R58 E, Roosevelt County to the condition of such property before the discharge and disposal thereon of said defendants' toxic and hazardous wastes;

O. On Section B, Count V, granting judgment for Harmons and against Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for punitive damages;

P. On Section B, Count VI, granting judgment for Harmons and against Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for all amounts unjustly received by said defendants in connection with the transport, discharge and disposal of their respective toxic and hazardous wastes through DTI, DTM and/or DT&T rather than through properly licensed and legally operated waste disposal facilities;

Q. On Section B, Count VII, granting judgment for Harmons and against Whitney, Continental, Cetco, Whiting, Hess, Petro-Hunt, Purity, Zenergy for all damages to Harmons property from the handling, discharge and/or disposal of said defendants' toxic and/or hazardous wastes on such property, in amounts to be determined at trial;

R. On Section C, Count I, granting judgment for Harmons and against the State of Montana for all actual, compensatory and consequential damages proximately caused

43

Exhibit 12-43

Harmons by the State's negligence in the administration and enforcement of state law and regulations regarding maintenance, operation, licensing and closure of solid waste management systems facilities by DTI, DTM and/or DT&T on Harmons' real property in Section 17;

S.  As against Defendants DTI, DTM and DT&T, jointly and severally, for Harmons attorneys' fees and costs in connection with this action; and

T.  On all Counts, for post-judgment interest at the highest legal rate from the date of entry of judgment until the judgment is fully satisfied, and costs; and

U.  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38, M.R.Civ.P., Plaintiffs Garth and Wagner Harmon hereby demand a trial by jury of the issues triable by right by jury.

DATED this 23rd day of June, 2015.

EDWARDS, FRICKLE & CULVER

John W. Edwards

FOR

DOAK & ASSOCIATES, P.C.

Jon E. Doak

Attorneys for Plaintiffs

44

**ER_149**

Exhibit 12-44

"*Healthy environment, healthy people*"

**Montana Department of**
# ENVIRONMENTAL QUALITY

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901 • Helena, MT 59620-0901 • (406) 444-2544 • Website: www.deq.mt.gov

March 12, 2013

Gordon E. Dove Sr.
Dual Trucking and Transport, LLC
5 Glenn Oaks Dr.
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1163**
**Return Receipt Requested**

Timothy J. Thompson
Dual Trucking and Transport, LLC
315 Barrow Street
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1170**
**Return Receipt Requested**

Anthony J. Alford
Dual Trucking and Transport, LLC
1217 Museum Dr.
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1187**
**Return Receipt Requested**

**Re:   Solid Waste and Open Burning Complaint [CVID #16354]**

Dear Mr. Dove, Mr. Thomson, and Mr. Alford:

The Enforcement Division (ENFD) of the Montana Department of Environmental Quality (DEQ) has received additional complaints regarding the improper storage and disposal of solid waste plus complaints related to open burning by Dual Trucking and Transport, LLC (Dual) on property on County Road 1009, Bainville, Montana (Site).  According to the complainants, Dual is dumping "Liquid Invert" and contaminated soil and water on the ground and burning tyvek suits and miscellaneous trash.

On September 17, 2012, I sent a Warning Letter (CVID 15855) concerning allegations Dual is operating a solid waste management facility at the above Site. DEQ has added the information concerning the solid waste aspect of this complaint into our database under CVID 15855 and the air quality component will be entered as a new complaint (CVID 16354) and is the content of this letter.

The Administrative Rules of Montana (ARM) prohibits the disposal of any material listed in ARM 17.8.604 by open burning, which includes, but is not limited to: Styrofoam and other plastics; wastes generating noxious odors; food wastes; oil or petroleum products; rubber material; treated lumber and timbers; wood and wood byproducts that have been coated, painted, stained, treated, or contaminated by a foreign material; plywood; particleboard; and any waste which is moved from the premises where it was generated.  I have provided a copy of the open burning rules for your use.

---

Enforcement Division  •  Permitting & Compliance Division  •  Planning, Prevention & Assistance Division  •  Remediation Division

MT-DEQ - 28
Exhibit 14-1

Gordon E. Dove Sr., Timothy J. Thompson, Anthony J. Alford
March 12, 2013
Page 2

If the complaint allegations are valid, in order to comply with the ARM:

1. Do not dispose of prohibited material by open burning.

2. Properly dispose of **all the solid waste,** at an appropriately licensed solid waste management system, within **10 days** from receipt of this letter.

3. Notify me, using the contact information below, within **10 days** and let me know that you have ceased open burning of prohibited materials and properly disposed of the solid waste.

Violation of the Air Quality Rules is considered a significant violation. Continued open burning of prohibited materials may result in a formal enforcement action, including the assessment of administrative or judicial penalties.

If you have any questions, please contact me at the telephone number or e-mail address listed below.

Sincerely,

Thomas P. Bovington
Environmental Enforcement Specialist
Enforcement Division
(406) 444-2711; Fax (406) 444-1923
email: tbovington@mt.gov

Enclosure

cc via email:   Dan Walsh, DEQ ARMB
                Steve Kilbreath, DEQ Eastern Montana Oil and Gas Development Coordinator
                Ron Smith, Roosevelt County Sanitarian

cc w/ encl.:    Brian Robichaux, 315 Barrow Street, Houma, LA 70360
                Lee Buffington, P.O. Box 167, Bainville, MT 59212
                Jimmy Delcambre, P.O. Box 167, Bainville, MT 59212

MT-DEQ - 29
Exhibit 14-2



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com.

OFFICIAL USE

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $

Postmark
Here

Sent To
GORDON E DOVE SR
DUAL TRUCKING AND TRANSPORT LLC
Street, Apt. No.;
or PO Box No. 5 GLENN OAKS DR
City, State, ZIP+4 HOUMA LA 70360

PS Form 3800, August 2006          See Reverse for Instructions

Sent To
TIMOTHY J THOMPSON
DUAL TRUCKING AND TRANSPORT LLC
Street, Apt. No.;
or PO Box No. 315 BARROW STREET
City, State, ZIP+4 HOUMA LA 70360

PS Form 3800, August 2006          See Reverse for Instructions

Sent To
ANTHONY J ALFORD
DUAL TRUCKING AND TRANSPORT LLC
Street, Apt. No.;
or PO Box No. 1217 MUSEUM DR
City, State, ZIP+4 HOUMA LA 70360

PS Form 3800, August 2006          See Reverse for Instructions

7011 0470 0000 1313 1163
7011 0470 0000 1313 1179
7011 0470 0000 1313 1186

ER_152

MT-DEQ - 30
Exhibit 14-3

■ Complete items 1, ...nd 3. Also complete
Item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

A. Signature

X _Ashley Adams_          ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

_Ashley Adams_            3 / 8

1. Article Addressed to:

ANTHONY J ALFORD
DUAL TRUCKING AND TRANSPORT LLC
1217 MUSEUM DR
HOUMA LA 70360

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:          ☐ No

**Signature, Printed Name, & Date
REQUIRED in A.B. & C above**

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)        ☐ Yes

2. Article Number
(Transfer from service label)

7011 0470 0003 1313 1187

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-...

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, ... and 3. Also complete
Item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

1. Article Addressed to:

TIMOTHY J THOMPSON
DUAL TRUCKING AND TRANSPORT LLC
315 BARROW STREET
HOUMA LA 70360

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Chrisley Franks_       ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

_Chrisley Franks_        3-15-13

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:          ☐ No

**Signature, Printed Name, & Date
REQUIRED in A.B. & C above**

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)        ☐ Yes

2. Article Number
(Transfer from service label)

7011 0470 0003 1313 1170

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-154C



*"Healthy environment, healthy people"*

**Montana Department of**
**ENVIRONMENTAL QUALITY**

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901  •  Helena, MT 59620-0901  •  (406) 444-2544  •  Website: www.deq.mt.gov

March 13, 2013

### VIOLATION LETTER

Gordon E. Dove Sr.
Dual Trucking and Transport, LLC
5 Glenn Oaks Dr.
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1156**
**Return Receipt Requested**

Timothy J. Thompson
Dual Trucking and Transport, LLC
315 Barrow Street
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 0135**
**Return Receipt Requested**

Anthony J. Alford
Dual Trucking and Transport, LLC
1217 Museum Dr.
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1149**
**Return Receipt Requested**

**Re:    Violations of the Solid Waste Management Act [CVID #15855]**

Dear Mr. Dove, Mr. Thomson, and Mr. Alford:

The Enforcement Division (ENFD) of the Montana Department of Environmental Quality (DEQ) is writing this letter because Dual Trucking and Transport, LLC (Dual) has not performed any of the required items listed in the September 17, 2012, Warning Letter (enclosed).  The Warning Letter pertained to the Solid Waste Management Facility (Facility) Dual is operating on County Road 1009, Bainville, Montana (Site). The Warning Letter stated that a failure to follow the listed requirements could lead to formal enforcement.

The Warning Letter was sent to Mr. Alford at a Scott, LA address.  It was also cc'd to Mr. Dove, Mr. Thompson, and Mr. Robichaux at the Houma, LA address above. Mr. Buffington from Bainville, MT was also cc'd. Although the letter to Mr. Alford was not accepted and ultimately  returned to DEQ, someone cc'd must have received the letter because Mr. Knudson, an attorney said to represent Dual, left me a message on September 19, 2012, concerning the Warning Letter.  Mr. Knudson also contacted Mary Louise Hendrickson from DEQ's Solid Waste Section (SWS) on September 20, 2012. Ms. Hendrickson emailed me the content of that phone conversation stating that Mr. Knudson said Dual would respond to DEQ within 15 days and describe, in detail, the process at the Site. DEQ-SWS would then make a permitting determination. No further contact from Dual has been received since that date and therefore DEQ-SWS cannot make a permit determination.

Enforcement Division  •  Permitting & Compliance Division  •  Planning, Prevention & Assistance Division  •  Remediation Division

**ER_154**

Dual - 20070

Exhibit 15-1

Gordon E. Dove Sr., Timothy J. Thompson, Anthony J. Alford
March 13, 2013
Page 2

The September 20, 2012, phone call documented that Dual is operating an unlicensed Facility and DEQ may use that date for calculating the number of days in violation for any penalty calculation included in an Administrative Order, should formal enforcement be pursued. The Montana Code Annotated (MCA) 75-10-228 allows for an administrative penalty of $250 per day.

The violation of the Solid Waste Management Act is considered a significant violation. It is imperative Dual complete the four requirements listed in the Warning Letter to bring the Site into compliance with state law or supply the information to DEQ SWS as promised by your attorney so the type of permit required can be determined. Contact me after receipt of this letter and state your intentions so DEQ can plan accordingly.

If you have any questions, please contact me at the telephone number or email address listed below.

Sincerely,

Thomas P. Bovington
Environmental Enforcement Specialist
Enforcement Division
(406) 444-2711; Fax (406) 444-1923
email: tbovington@mt.gov

Enclosure

cc via email:        Rick Thompson and Mary Louise Hendrickson, DEQ WUTMB-SW
                     Steve Kilbreath, DEQ Eastern Montana Oil and Gas Development Coordinator
                     Ron Smith, Roosevelt County Sanitarian
                     Austin Knudsen, Attorney at Law

cc w/ encl.:         Brian Robichaux, 315 Barrow Street, Houma, LA 70360
                     Lee Buffington, P.O. Box 167, Bainville, MT 59212
                     Jimmy Delcambre, P.O. Box 167, Bainville, MT 59212

**ER_155**

Dual - 20071

Exhibit 15-2

*"Healthy environment, healthy people"*

**Montana Department of**
# ENVIRONMENTAL QUALITY

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901   •   Helena, MT 59620-0901   •   (406) 444-2544   •   Website: www.deq.mt.gov

March 13, 2013

## VIOLATION LETTER

Gordon E. Dove Sr.
Dual Trucking and Transport, LLC
5 Glenn Oaks Dr.
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1194**
**Return Receipt Requested**

Timothy J. Thompson
Dual Trucking and Transport, LLC
315 Barrow Street
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1200**
**Return Receipt Requested**

Anthony J. Alford
Dual Trucking and Transport, LLC
1217 Museum Dr.
Houma, LA  70360

**CERTIFIED MAIL #7011 0470 0003 1313 1217**
**Return Receipt Requested**

**Re:**   **Liquid Invert Spill at CR 1009, Bainville, Roosevelt County, Montana [CVID #16391]**

Dear Mr. Dove, Mr. Thomson, and Mr. Alford:

The Enforcement Division (ENFD) of the Montana Department of Environmental Quality (DEQ) received a spill report from the National Response Center on February 26, 2013, concerning a release of 1500 barrels of liquid invert from a leaking Poseidon Tank (Tank) at the property on County Road 1009, Bainville, Montana (Site).

As of the date of this letter, ENFD has not received any written documentation that indicates the spill site has been assessed and/or that the liquid invert-impacted soils have been cleaned up and properly disposed.

DEQ's Spill Management and Reporting Policy (revised April 2012 and enclosed) requires that all releases or spills of hazardous or deleterious substances or other wastes, regardless of size, must be properly and expeditiously managed, contained, and removed to protect public health and the environment.  The Spill Policy is available online at http://deq.mt.gov/enf/spillpol.mcpx.

This letter is to inform Dual Trucking and Transport, LLC (Dual) that the spill of liquid invert at the above-referenced location is an improper disposal of a solid waste and therefore constitutes a violation of the Montana Solid Waste Management Act.

---

Enforcement Division   •   Permitting & Compliance Division   •   Planning, Prevention & Assistance Division   •   Remediation Division

MT-DEQ - 49
Exhibit 17-1

Gordon E. Dove Sr., Timothy J. Thompson, Anthony J. Alford
March 13, 2013
Page 2

Section 75-10-212, Montana Code Annotated (MCA), states in part that: "(1) No person may dispose of solid waste except as permitted under this part. (2) It shall be unlawful to dump or leave any garbage, dead animal, or other debris or refuse: (a) in or upon any highway, road, street, or alley of this state; (b) in or upon any public property, highway, street, or alley under the control of the State of Montana or any political subdivision thereof or any officer or agent or department thereof; or (c) within 200 yards of such public highway, road, street, or alley or public property." Pursuant to Section 75-10-221(1), MCA, "a person may not dispose of solid waste without a license from the department."

Section 75-10-203(3), MCA, defines disposal as the discharge, injection, deposit, dumping, spilling, leaking, or placing of any solid waste into or onto the land so that the solid waste or any constituent of it may enter the environment or be emitted into the air or discharged into any waters, including ground water. Administrative Rules of Montana 17.50.502(41) defines waste as useless, unwanted, or discarded materials in any physical form, i.e., solid, semi-solid, liquid, or gaseous.

In order to bring the site into compliance, ENFD requests that the following corrective actions be conducted and sent to me at the address below:

- <u>Within five days of receipt of this letter</u> supply a repair report, including photographic evidence of the repair of the Tank leak.

- <u>By March 29, 2013</u>, hire a qualified environmental consultant and complete assessment and remedial actions, including proper disposal of all petroleum hydrocarbon-impacted media. Guidance for hiring an environmental consultant is provided at the following internet address: http://www.deq.mt.gov/lust/downloadables/Consultlist/consultantlist.mcpx.

- <u>By May 27, 2013</u>, submit a final spill cleanup report to ENFD. ENFD's revised guidance document for spill cleanup report requirements is enclosed and is located at the following internet address: www.deq.mt.gov/enf/spillGuidance.mcpx.

ENFD is now accepting submittal of the final spill cleanup reports (Reports) as a PDF file in either electronic or digital formats. Reports that are less than 3 megabytes can be emailed to the ENFD project manager. All Reports larger than 3 megabytes should be submitted on a compact disc with the project name and project location identified on the disc or accompanying cover letter. ENFD requests that consultants notify the ENFD project manager via email or telephone of the pending disc submittal.

The issuance of this letter has been entered into ENFD's database. Failure to complete the above corrective actions may result in a formal enforcement action that may include the issuance of a cleanup order and the assessment of administrative or civil penalties.

Within five days of receipt of this letter contact me and inform me of your intentions regarding this matter.

MT-DEQ - 50
Exhibit 17-2

Gordon E. Dove Sr., Timothy J. Thompson, Anthony J. Alford
March 13, 2013
Page 3

If you disagree with the information presented in this letter or have questions related to this matter, please contact me at the telephone number listed below.

Sincerely,

Thomas P. Bovington
Environmental Enforcement Specialist
Enforcement Division
(406) 444-2711; Fax (406) 444-1923
email: tbovington@mt.gov

Enclosure

cc via email:       Rick Thompson and Mary Louise Hendrickson, DEQ WUTMB-SW
                    Steve Kilbreath, DEQ Eastern Montana Oil and Gas Development Coordinator
                    Ron Smith, Roosevelt County Sanitarian
                    Austin Knudsen, Attorney at Law

cc w/ encl.:        Brian Robichaux, 315 Barrow Street, Houma, LA 70360
                    Lee Buffington, P.O. Box 167, Bainville, MT 59212
                    Jimmy Delcambre, P.O. Box 167, Bainville, MT 59212



7011 0470 0003 1313 1217

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | 3/13/13 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To
ANTHONY J ALFORD
Street, Apt. No.; or PO Box No. DUAL TRUCKING AND TRANSPORT LLC
1217 MUSEUM DR
City, State, ZIP+4 HOUMA LA 70360

PS Form 3800, August 2006 See Reverse for Instructions

7011 0470 0003 1313 1194

Sent To
GORDON E DOVE SR
Street, Apt. No.; or PO Box No. DUAL TRUCKING AND TRANSPORT LLC
5 GLENN OAKS DR
City, State, ZIP+4 HOUMA LA 70360

PS Form 3800, August 2006 See Reverse for Instructions

7011

Sent To
TIMOTHY J THOMPSON
Street, Apt. No.; or PO Box No. DUAL TRUCKING AND TRANSPORT LLC
315 BARROW STREET
City, State, ZIP+4 HOUMA LA 70360

PS Form 3800, August 2006 See Reverse for Instructions

Case: 21-35433, 10/13/2021, ID: 12255714, DktEntry: 11, Page 160 of 262

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ANTHONY J ALFORD
DUAL TRUCKING AND TRANSPORT LLC
1217 MUSEUM DR
HOUMA LA 70360

PS Form 3811, February 2004    Domestic Return Receipt

2. Article Number
(Transfer from service label)

7011 0470 0003 1313 1217

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X Ashley Adams
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Ashley Adams
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

Signature, Printed Name, & Date
REQUIRED in A.B. & C above

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

102595-02-M-1540

**Card 2 (top right):**

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2 and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

TIMOTHY J THOMPSON
DUAL TRUCKING AND TRANSPORT LLC
315 BARROW STREET
HOUMA LA 70360

2. Article Number
(Transfer from service label)

7011 0470 0003 1313 1200

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Chesley Franks
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

Signature, Printed Name, & Date
REQUIRED in A.B. & C above

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

**Card 3 (bottom right):**

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

GORDON E DOVE SR
DUAL TRUCKING AND TRANSPORT LLC
5 GLENN OAKS DR
HOUMA LA 70360

2. Article Number
(Transfer from service label)

7011 0470 0003 1313 1194

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Jenni Voisin
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

Signature, Printed Name, & Date
REQUIRED in A.B. & C above

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

**ER_160**

Exhibit 17-5

**Bovington, Tom**

| | |
|---|---|
| **From:** | dalep@dual-tt.com |
| **Sent:** | Wednesday, March 20, 2013 3:29 PM |
| **To:** | Bovington, Tom |
| **Cc:** | Tony Alford; jimmy delcambre |
| **Subject:** | CVID # 16354 and CVID # 16391 |
| **Attachments:** | DEQ Letter 3 20 2013.docx; Burn Permit.pdf |

Mr. Bovington,

Attached is a response letter on the alleged violations referred to above.

We deny both allegations, but are unsure what is needed to clear them off of our record. We are working with our consultants and attorney to have these matters resolved, but don't want to miss any timely responses.

Our best guess is that these reports are originating from either disgruntled or ex-employee or a competitor.

Please contact me, if you have any further questions.

Sincerely,

**Dale Prosperie**

**DUAL TRUCKING** & Transport, LLC
**Treatment Facility**
**Dispatch  406-769-2176**
**Cell   406-787-7458**
**Fax   888-389-4668**

1

**ER_161**

# Dual Trucking
## and Transport, LLC

**P.O. Box 590**
**Houma, Louisiana 70361**

March 20, 2013

Thomas P. Bovington
Post Office Box 200901
Helena, MT 59620-0901

Re: CVID #16354 and CVID #16391

Mr. Bovington,

This letter is to provide a written response to the allegations of above 2 violation letters
dated March 13, 2013.

### CVID # 16354

Attached is a copy of an open burn permits issued by Roosevelt County. Onsite in a safe
location we did burn some permitted waste (i.e. pallets and boxes) . We do have some
stored containers of waste material (i.e. filter socks and tyvex suites) that will be disposed
in a proper manner. We have contacted Next Generation, a vendor that handles this sort of
waste to place a container for the safe storage and disposition of such material.

### CVID # 16391

At or around February 26, 2013, we were visited by the Roosevelt County Sheriff's Office,
deputy Cory Reum, for a report that was given to US Environmental Protection Agency for
the possibility of a leaking posiedon tank. Deputy Reum and our onsite safety person,
Carlos Aldi performed on onsite inspection, they determined that the allegations were
either false or meant for another company. In compliance with our SWPPP plan, no spills
have taken place that would have required us to contact the Montana Department of
Environmental Quality. We are in the process of obtaining the police report that clarifies
this matter.

It was our understanding that a response was provided to CVID #15855 by either our
attorney Austin Knudsen or our consultant Hydrosolutions. We have our SWPPP plan in
place and are in the final stages of submitting for our Solid Waste permit.

If you have any questions, please feel free to contact Anthony Alford 337-296-1741 or
myself 406-787-7458.

Sincerely,


Dale J. Prosperie
Dual Trucking and Transport

**ER_162**



**Montana Department of**
# ENVIRONMENTAL QUALITY

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901  •  Helena, MT 59620-0901  •  (406) 444-2544  •  Website: www.deq.mt.gov

August 2, 2013

Mr. Dale Prosperie                          *Certified Mail – Return Receipt Requested:*
DUAL TRUCKING AND TRANSPORT, LLC            **7006 2150 0001 5296 0321**
PO Box 167
Bainville, MT 59212

RE: PROPOSED DUAL TRUCKING TREATMENT FACILITY – BAINVILLE, MONTANA
    SITE INSPECTION REPORT – VIOLATION LETTER

Dear Dale:

An application for a solid waste management system license was submitted to the Department's Solid Waste Program (SWP) by you as a result of a complaint received on July 26, 2012, by the Department's Enforcement Division. The complaint alleged that oil field exploration and production wastes were being accepted and treated at an unlicensed facility on property located on County Road 1009 near Bainville. The assertions made in the complaint were subsequently verified by Department of Environmental Quality (DEQ) personnel. As a result, the application for a solid waste management system (SWMS) license was submitted to the DEQ to bring the facility into compliance with the laws and rules of the State of Montana pertaining to solid waste management.

On July 23, 2013, John Collins and I conducted a pre-licensing inspection at your facility to verify activities presented in the SWMS license application you submitted on June 10, 2013. A copy of the inspection report is attached. The purpose of this letter is to inform you that the SWP has documented the following major violation at the facility:

- The operation of a SWMS without a license from the SWP. The operation of a SWMS without a license is a violation of the Montana Solid Waste Management Act (SWMA).

As noted in previous correspondence to you from the DEQ, the Montana Code Annotated (MCA) 75-10-802(8) defines oil field exploration and production wastes as a "Special Waste". Special Waste is defined as "solid waste that has unique handling, transportation, or disposal requirements to ensure protection of the public health, safety, and welfare and the environment." MCA 75-10-203(12) defines a solid waste management system as disposal as "a system that controls the storage, treatment, recycling, recovery, or disposal of solid waste." Further, MCA 75-10-203(3) defines disposal as "the discharge , injection, deposit, dumping spilling, leaking or placing of any solid waste into or onto the land so that the solid waste or any constituent of it may enter the environment or be emitted into the air or discharged into any waters, including ground water." MCA 75-10-212(1) states that "A person may not dispose of solid waste except

Enforcement Division  •  Permitting & Compliance Division  •  Planning, Prevention & Assistance Division  •  Remediation Division

Dual - 20000

Exhibit 20-1

Mr. Dale Prosperie
Page 2
August 2, 2013

as permitted under this part." Finally, MCA 75-10- 221(1) states "Except as provided in 75-10-214, a person may not dispose of solid waste or operate a solid waste management system without a license from the department." Therefore, the on-going management of solid wastes at the subject facility without a license is a direct violation of Sections 75-10-212 and 75-10-221, MCA.

The violation of the SWMA is considered a significant violation. The SWP is preparing an Enforcement Request that may result in an administrative order that includes the assessment of penalties for each continued violation per day.

If you have any questions or comments, please contact me directly at the Permitting and Compliance Division, Waste and Underground Tank Management Bureau: phone 406-444-1808 or e-mail mhendrickson@mt.gov.   Thank you for your prompt attention to these matters.

Sincerely,

*Mary Louise Hendrickson*

Mary Louise Hendrickson
Solid Waste Section
Technical Lead - Licensing

Enclosure: Pre-licensing Inspection Report

cc w/ enc:      Steve Kilbreath, DEQ Eastern Montana Oil and Gas Development Coordinator
                Chad Anderson and Tom Bovington, DEQ Enforcement Division
                Ron Smith, Roosevelt County Sanitarian
                Austin Knudsen, Attorney at Law

Dual - 20001

Exhibit 20-2

Montana Department of Environmental Quality
Permitting & Compliance Division
Waste & Underground Tank Management Bureau
Solid Waste Section

## SOLID WASTE MANAGEMENT SYSTEM - PRE-LICENSING INSPECTION REPORT

**SITE NAME:**
Dual Trucking and Transport, LLC
Dual Trucking Treatment Facility
Bainville, Montana

**DATE & TIME OF INSPECTION:**
July 23, 2013
7:45 a.m. – 9: 05 a.m.

**CONTACTS:**
Dale Prosperie, Todd Ruark, Brian ?

**INSPECTION TEAM:**
Mary Louise Hendrickson
John Collins

**PURPOSE:**
Pre-licensing site tour/inspection.

**REPORT PREPARED BY:**
**Mary Louise Hendrickson**

**RESULTS OF INSPECTION:**
Mary and John met with Dale Prosperie, Todd Ruark, and Brian from Dual Trucking in Dale's office at the site. Discussed overall facility processes. Briefly discussed recent changes to the management structure at the facility when Dale indicated that he is now the CFO. They do currently recover crude from the waste invert and have approximately 400 bbl's on site at the present time. Mary reiterated the licensing process to Dale, Todd, and Brian and reminded Dale that the SWP will not perform any formal review of the application until the license application review fee has been paid. Dale said that they did receive my letter with the invoice, that it had been left unopened for some time, but that he was going to send the payment to the Department of Environmental Quality on Friday (7/26/13) or on Monday (7/29/13). I told Dale that the payment needed to be received on time.

A tour of the site was conducted with Todd Ruark and Brian. We followed the process through the facility from waste acceptance to treatment and removal.

During the site tour, the dirt lot at the site was being smoothed resulting in the site being very dusty. No dust suppressant was being used, nor was a water truck employed to sprinkle the dirt lot. We first observed the activities in the Spin Shack. No issues were identified. The company collects and stores

**ER_165**

Dual - 20002

Exhibit 20-3

samples of each of the incoming waste loads.  The samples are stored on site and identify the generator, well location, and results of the spin-out.

We observed the stormwater diversion ditches that had been constructed around the site perimeter. Although we had no issues with the construction itself, the ditches have been recently constructed. Todd said that he thought the ditches were designed by the consulting engineer (Hydro Solutions?), but he wasn't sure.

We observed about 20 or more 500 bbl frac tanks on the perimeter of the site.  Todd said that these frac tanks are full and the wastes are just settling out before they are treated.

We observed the dump pad where wastes are being dumped from the trucks for treatment.  It appears that these are mainly drill cuttings.  Todd said that they are being dumped into a concrete bunker-like pad structure that is below ground and angled away from the dump location.  He said that it is about 12-feet below the surface at its deepest point.  The dump bin was full.

We observed the 22,700 bbl "Poseidon" tank that is reported to be about half full of liquids that are settling out.  Once settled, the solid material will be solidified and disposed of off-site. The liquids will be treated and sent to an injection well.

We observed the treatment building where waste invert, oil mud, and frac gel is dumped for oil recovery.  These activities were being conducted inside a pole barn like structure with a dirt floor and NO liners.  We observed buried tanks (open top container) where material is dumped and then conveyed to a centrifuge and press for hydrocarbon recovery.  The liquids were sent to various storage tanks located inside and outside the building.  The tanks may be subject to regulation by the Underground Storage Tank Program.  The solids that are pressed out are put into another buried tank until enough is accumulated to move out of the building for further treatment.  The facility may also need an industrial storm water discharge permit.

We observed the area where the fly ash is staged - no issues.

We observed the recovered invert tank farm area – these tanks are not depicted on the site plan map that was submitted with the license application.

Prior to departure, Mary told Dale that there were several fixes that would be necessary in order for the facility to be successfully licensed that included:

- The use of a dust palliative on facility roads/interior dirt covered area;
- The installation of engineered liners beneath all waste management areas; and,
- The construction of additional stormwater BMP's/structures.

John and Mary departed the site at approximately 9:05 a.m.

DEQ's Underground Storage Tank Program contact: Redge Meierhenry, 406-444-5300
DEQ's Water Protection Bureau contact Industrial Storm Water: 406-444-3080

**ER_166**

Dual - 20003

Exhibit 20-4



**Montana Department of**
# ENVIRONMENTAL QUALITY

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901  •  Helena, MT 59620-0901  •  (406) 444-2544  •  Website: www.deq.mt.gov

June 26, 2014                    **VIOLATION LETTER**

Jackie Elizabeth Dove, Registered Agent          CERTIFIED MAIL #7009 1680 0002 1393 2263
Dual Trucking of Montana, LLC                    Return Receipt Requested
7605 Park Avenue
Houma, LA 70364

Anthony Alford                                   CERTIFIED MAIL #7009 1680 0002 1393 2256
Dual Trucking and Transport, LLC                 Return Receipt Requested
801 Borrow Street, Suite 305
Houma, LA 70360

Brian LeBouef, Registered Agent                  CERTIFIED MAIL #7009 1680 0002 1393 2249
Dual Trucking, Inc.                              Return Receipt Requested
110 Machine Loop
Scott, LA 70583

**RE:  Violations of the Water Quality Act [FID 2271]**

Dear Ms. Dove and Messrs. Alford and LeBouef:

On April 11, 2014, a representative from the Department of Environmental Quality (DEQ) collected two water samples from the wetland (Wetland) downstream of the Dual Trucking, LLC (Dual) facility near Bainville (Facility). Analytical results from the two water samples and other solid waste samples collected at the Facility are on the enclosed CD. Pages 24 through 32 of the lab report list the results for the Wetland Upper and Wetland Lower samples. The results show that the water samples contained Total Purgeable Hydrocarbons, Total Extractable Hydrocarbons, and C19 to C36 Aliphatic and C11 to C22 Aromatic Hydrocarbons in concentrations above what would be considered naturally-occurring.

Table 1. Details of Suspected/Known Waste/Storm Water Releases, and Figure 1. Location in the Suspected/Known Releases in the December 2013 Site Characterization and Environmental Condition Report (Report) submitted by Dual identifies three releases that discharged off site from the Facility. DEQ believes that these discharges flowed into the Wetland.

Section 75-5-103(30)(a), Montana Code Annotated (MCA), of the Montana Water Quality Act (WQA) defines "pollution" as contamination or other alteration of the physical, chemical, or biological properties of state waters that exceeds that permitted by Montana water quality standards, including but not limited to standards relating to change in temperature, taste, color, turbidity, or odor; or the discharge, seepage, drainage, infiltration, or flow of liquid, gaseous, solid, radioactive, or other substance into state water that will or is likely to create a nuisance or render the waters harmful, detrimental, or injurious to public health, recreation, safety, or welfare, to livestock, or to wild animals, birds, fish, or other wildlife.

---

Enforcement Division  •  Permitting & Compliance Division  •  Planning, Prevention & Assistance Division  •  Remediation Division

**ER_167**

#34-2

Dual - 20391

Exhibit 39-1

Jackie Elizabeth Dove, Anthony Alford, and Brian LeBouef
June 26, 2014
Page 2 of 2

Section 75-5-605(1)(a), MCA, states that it is unlawful to place or cause to be placed any wastes where they will cause pollution of any state waters.  Section 75-5-103(33)(a), MCA, defines state waters as a body of water, irrigation system, or drainage system, either surface or underground. The placement of waste in, or where it could flow into, groundwater or Shotgun Creek is a violation of the Montana Water Quality Act (WQA).

DEQ believes that discharges from Dual's Facility entered state waters and caused pollution, in violation of the WQA. If you believe the information stated above is inaccurate or if you have additional information to demonstrate that the violations did not occur as described, please contact me and I will consider any additional information.

DEQ requests that, by July 30, 2014, Dual collect additional water and soil samples to verify if the hydrocarbons remain in the Wetlands or the downstream drainage system (Shotgun Creek), and the extent of any contamination that remains in soils upstream of the Wetlands that may further discharge to state waters and cause pollution. Water and soil samples must be collected, preserved and analyzed in accordance with DEQ's Risk Based Corrective Action Guidance, which can be found at: http://deq.mt.gov/lust/rbca.mcpx. Dual must also modify or construct controls as necessary to prevent any additional discharges. Sample results must be submitted to me within 10 days of receipt from the laboratory. Include a detailed description of the discharge controls, including diagrams and photos, along with the sample results.

If you have any comments or questions, feel free to contact me at the telephone number listed below.

Sincerely,

Thomas Bovington
Enforcement Division
Montana Department of Environmental Quality
P.O Box 200901
Helena, MT 59620-0901
(406) 444-2711; Fax (406) 444-1923
tbovington@mt.gov

Enclosure

cc/enc.:     Wagner Harmon, 6368 Dill Drive, Bainville, MT 59212
             Garth Harmon, P.O. Box 2, Bainville, MT 59212

cc/enc. via email:     Paul Nicol, DEQ Legal
                       Rick Thompson, DEQ Solid Waste Program
                       Alan Joscelyn, Gough, Shanahan, Johnson & Waterman, PLLP, Helena
                       Mike Rinaldi, R.S., Roosevelt County

**ER_168**

Dual - 20392

Exhibit 39-2

.NOV. 25. 2014 11:21AM    DEQ/PCB/ARMB                          NO. 128   P. 12    2291

ROOSEVELT COUNTY
CLERK OF COURT
TIME          FILED

NOV 25 2014

JERI TOAVS

DEPUTY CLERK

1  | Paul J. Nicol
   | Norman J. Mullen
2  | Special Assistant Attorneys General
   | Department of Environmental Quality
3  | Legal Unit, Metcalf Building
   | P.O. Box 200901
4  | Helena, Montana 59620-0901
   | Telephone # (406)444-5690
5  | Attorney for Plaintiff

6

7

8

9      MONTANA FIFTEENTH JUDICIAL DISTRICT COURT, ROOSEVELT COUNTY

10  | STATE OF MONTANA DEPARTMENT OF     Case No. DV-14-67
    | ENVIRONMENTAL QUALITY,

11  |          Plaintiff,

12  |     vs.                            COMPLAINT AND APPLICATION
                                         FOR INJUNCTION
13  | DUAL TRUCKING AND TRANSPORT,
    | LLC,
14
    |          Defendant.
15

16      Plaintiff, State of Montana Department of Environmental Quality, (Department) alleges

    and complains as follows:
17

18                              I.  PARTIES

19      1. Plaintiff is a department of the executive branch of state government, duly created and

20  existing under and by virtue of the laws of the State of Montana.  § 2-15-3501, MCA.

21      2. Dual Trucking and Transport LLC (Dual), is a "person" as that term is defined by § 75-

22  10-203(7), MCA and ARM 17.50.403(33).

23

24

COMPLAINT                                                              Page 1

**ER_169**

# 42-9
Dual - 20412

Exhibit 40-1

)                                    )

## II. JURISDICTION AND VENUE

3. The Department is responsible for the administration and enforcement of the Solid Waste Management Act (Title 75, chapter 10, part 2, MCA) (the Act). The Department is specifically authorized by §§ 75-10-228 and 75-10-231, MCA, to institute and maintain enforcement proceedings, including civil actions seeking civil penalties and injunctions, for violations of the Act or rules adopted pursuant to the Act.

4. Section 75-10-221(1), MCA, provides that "a person may not dispose of solid waste or operate a solid waste management system without a license from the department."

5. Section 75-10-203(12), MCA, defines a "solid waste management system" as "a system that controls the storage, treatment, recycling, recovery, or disposal of solid waste."

6. Section 75-10-203(3), MCA, defines "dispose" or "disposal" as "discharge, injection, deposit, dumping, spilling, leaking, or placing of any solid waste into or onto the land so that the solid waste or any constituent of it may enter the environment or be emitted into the air or discharged into any waters, including ground water."

7. Under the authority of § 75-10-231, MCA,

> The department may, through the attorney general . . . initiate and maintain in district court enforcement actions as provided in this part, including actions . . . to enjoin the transportation of solid waste or the operation of a solid waste management system that is in violation of this part or a rule adopted by the department or order issued as provided in this part.

8. Because the violations of the Act described in this Complaint occurred in Roosevelt County, venue for this matter is appropriate before this Court. § 75-10-228(2), MCA.

## III. NATURE OF CLAIM

9. The Defendant has violated the Act by maintaining a solid waste management system without a license.

COMPLAINT                                              Page 2

)                              )

1      10. This violation subjects the Defendant to civil penalties of up to $1,000 per day of

2   violation under § 75-10-228(1), MCA, and injunctive relief under § 75-10-231, MCA.

3      11. The Department seeks: (1) civil penalties from the Defendant as provided in § 75-10-

4   228, MCA; (2) injunctive relief pursuant to § 75-10-231, MCA, requiring the Defendant to

5   refrain from maintaining a solid waste management system without a license; and (3) an Order

6   from this Court requiring the Defendant to complete a Department approved environmental site

7   assessment and cleanup.

8                              **IV. GENERAL ALLEGATIONS**

9      12. Garth Harmon and Wagner Harmon (Owners) own the property described as Geocode

10   17-4051-17-4-01-01-0000 on County Road 1009 near Bainville, Roosevelt County, Montana

11   (Property).

12      13. The Defendant leases a portion of the Property from the Owners where the Defendant

13   has owned and operated the Dual Trucking Treatment Facility (Facility).  The Facility's address

14   is, 5702 Road 1009, P.O. Box 167, Bainville, Montana 59212.

15      14. Neither the Property nor any activity described in the Complaint is within the

16   jurisdiction of the Montana Oil and Gas Conservation Board pursuant to Title 82, Chapter 11,

17   MCA.

18      15. Beginning on or before July 26, 2012, the Defendant used the Facility to treat, recover,

19   store, or dispose of wastes generated by the drilling and hydraulic fracturing (fracking) of oil and

20   gas wells outside the Property.

21      16. The Defendant violated § 75-10-221(1), MCA, by operating a solid waste management

22   system (SWMS) without a license from on or before July 26, 2012, through April 30, 2014.

23

24

COMPLAINT                                                          Page 3

**ER_171**

)                                    )

## V. CLAIM FOR RELIEF

**Operating a solid waste management system without a license**

17. Section 75-10-221(1), MCA, states that a person may not operate a SWMS without a license from the department.

18. On July 26, 2012, the Department received a complaint alleging the Defendant was operating a SWMS on the Property without a license.

19. On September 17, 2012, the Department sent the Defendant a Warning Letter concerning the operation of its unlicensed SWMS. The Warning Letter requested that the Defendant:

   a.    Immediately discontinue operating the Facility until it was licensed by Department's Solid Waste Program.

   b.    Hire an environmental consultant and develop a corrective action plan for cleaning up the solid waste on the Property within 15 days.

   c.    Remove and properly dispose of the solid waste at either a licensed landfill or recycling facility within 30 days.

   d.    Provide a cleanup report, including before and after photographs of the site, and landfill receipts indicating that the solid waste has been removed from the Property and disposed at a properly-licensed solid waste management facility within 60 days.

20. The Defendant did not respond to the Department's Warning Letter or conduct the requested corrective actions.

21. On September 26, 2012, Department personnel inspected the Facility and observed that the Defendant was treating, recovering, storing, and disposing of solid waste on the

COMPLAINT                                                    Page 4

**ER_172**

)                                    )

1 | Property.

2 |    22. On March 13, 2013, the Department sent the Defendant a Violation Letter that stated

3 | the Defendant did not respond to the Warning Letter or undertake the corrective actions

4 | requested in the Warning Letter. The Violation Letter requested that the Defendant complete the

5 | corrective actions listed in the Warning Letter.

6 |    23. Department staff met with the Defendant on April 15, 2013, and determined that a

7 | SWMS license was required for the operation of the Facility. The Department sent a follow-up

8 | letter to the Defendant on April 17, 2013, reiterating that a SWMS license was required for the

9 | Facility and requesting submission of a license application by June 10, 2013.

10 |    24. On June 10, 2013, the Department received a SWMS license application from

11 | the Defendant for the Facility.

12 |    25. On August 22, 2013, the Department sent a letter to the Defendant that identified

13 | deficiencies in the license application.

14 |    26. On September 24, 2013, the Department received the Defendant's response to the

15 | August 22, 2013, deficiency letter. The Department determined that the Defendant's response

16 | did not sufficiently address the deficiencies in the license application.

17 |    27. On November 1, 2013, the Department sent the Defendant a letter requesting additional

18 | information concerning soils and a hydrogeologic characterization.

19 |    28. On November 18, 2013, the Department received the Defendant's response to the

20 | information request letter and determined that the information provided was still insufficient to

21 | address the deficiencies in the Defendant's license application.

22 |    29. On November 27, 2013, the Department sent a second deficiency letter to the

23 | Defendant that identified the deficiencies in the application. The November 27, 2013, letter

24 |

COMPLAINT                                                        Page 5

**ER_173**                                    Dual - 20416

Exhibit 40-5

)                              )

1  described deficiencies with the proposed ground water monitoring plan and deficiencies in the

2  proposed method for screening wastes to ensure wastes containing radionuclide concentrations

3  greater than 30 pCi/gm were not managed at the Facility.

4       30. On December 4, 2013, a consultant for the Defendant sent the Department  a revised

5  schedule for the installation of wells and test pits at the Facility. The revised schedule stated a

6  Hydrogeologic and Soils Characterization Draft Report would be sent to the Department on

7  January 31, 2014.

8       31. While the Facility was in use, the Defendant used the Facility to process waste derived

9  from oil and gas development.  The Defendant processed and stored drill cuttings, invert (drilling

10 mud), frac gel and produced water at the Facility.

11      32. The Defendant characterized its business as one of continual off-loading and re-loading

12 products, materials, and oil field wastes.  The Defendant stated that it utilized drying pads,

13 storage tanks, mixing tanks, and tanker trucks in its solid waste management system.

14      33. As part of the Defendant's solid waste management system, chemicals were used and

15 stored at the Facility. The chemicals included sodium hypochlorite, CrudeSorb X-Dry,

16 ammonium persulfate, RM-10, muriatic acid, Cetfloc F985C, caustic soda, flocculent,

17 demulsifier and water clarifier.

18      34. Diesel fuel, engine oil, coolant and other chemicals for truck operation and

19 maintenance were also used and stored at the Facility.

20      35. The Defendant identified 21 on-site materials that it characterized as "pollutants

21 of concern."  These materials were used, processed and stored at the Facility.

22      36. The majority of the facility was not lined, with the exception of a cement pad that

23 covered the floor of half of one of the structures at the Facility, and cement slabs at the base of

24

COMPLAINT                                                      Page 6

**ER_174**                                          Dual - 20417

Exhibit 40-6

1  some of the separation bins.

2      37. On April 11, 2014, Department personnel inspected the Facility and again observed

3  that the Defendant was treating, recovering, storing, and disposing of solid waste on the

4  Property.

5      38. During the site visit on April 11, 2014, Department personnel took soil samples.  The

6  soil samples contained quantities of invert, revealing that invert had been spilled or released onto

7  the ground.

8      39. Department personnel also took water samples from a wetland adjacent to the Facility.

9  The water samples contained hydrocarbons in concentrations above what would be considered

10  naturally occurring.

11      40. The Defendant acknowledged that storm water runoff had previously been allowed to

12  discharge off-site from the Facility.

13      41. In April of 2014, the Defendant informed the Department that it no longer intended to

14  address the deficiencies identified in its SWMS license application.

15      42. On April 22, 2014, the Department sent the Defendant a letter requesting that the

16  Defendant cease all solid waste management activities at the Facility.

17      43. On April 30, 2014, the Defendant sent the Department a letter representing that it had

18  ceased operations at the Facility.

19      44. After operations ceased, the Defendant estimated that 1400 tons of drill cuttings mixed

20  with fly ash and sawdust remained on the property.  This material remains at the Facility.

21      45. The Defendant never satisfied the deficiencies in its license application.

22      46. The Defendant never obtained a license from the Department for its operation of a solid

23  waste management facility.

24

COMPLAINT                                                                 Page 7

**ER_175**

)                              )

1     47. The Defendant has not provided the soil characterization requested by the Department.

2  The Defendant has also failed to provide an accounting of spills that occurred at the site.

3     48. The Defendant violated § 75-10-221(1), MCA, by operating a SWMS without a license

4  for at least 643 days, from July, 26, 2012 through April 30, 2014.

5     49. Pursuant to § 75-10-228, MCA, a person who violates § 75-10-221(1), MCA, is subject

6  to a civil penalty not to exceed $1,000.  Each day of violation constitutes a separate violation.

7                          **VI. PRAYER FOR RELIEF**

8        The Department requests that this Court grant the following relief:

9     **A.  PENALTIES**- That, pursuant to §§ 75-10-221(1) and 75-10-228, MCA, this Court

10  enter judgment against the Defendant in favor of the Department for penalties of $1,000 for each

11  day of the violations referred to in the claim for relief committed during the period that began

12  two years before the filing of this complaint.

13     **B.  INJUNCTION**- That this Court issue a permanent injunction pursuant to § 75-10-231,

14  MCA, to enjoin acceptance or processing of wastes without a solid waste management license.

15     **C.  ENVIRONMENTAL SITE ASSESSMENT**- That this Court Order the Defendant to

16  complete Phase I and Phase II environmental site assessments, in accordance with the American

17  Society for Testing and Materials (ASTM) standards, that are necessary to supply the

18  Department with the information necessary to review and approve a clean-up plan.

19     **D.  CLEAN-UP ORDER**- That this Court Order the Defendant to submit a clean-up plan to

20  the Department for approval, and modify that plan if the Department finds it necessary, and to

21  clean-up the property in accordance with the Department approved clean-up plan.

22     **E.** For such other relief as this Court deems necessary and proper.

23

24

COMPLAINT                                                    Page 8

**ER_176**

Dual - 20419

Exhibit 40-8

)                                    )

1   DATED this 25th day of November, 2014.

2                           STATE OF MONTANA
                            DEPARTMENT OF ENVIRONMENTAL QUALITY
3

4                   By    _____
                          Paul J. Nicol,
5                         Special Assistant Attorney General
                          Attorney for Plaintiff
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT                                              Page 9

**ER_177**

1 | KD Feeback
TOOLE & FEEBACK, PLLC
2 | 720 Main Street
PO Box 907
3 | Lincoln, Montana 59639
(406) 262-4025
4 | kdfeeback@gmail.com

5 | Attorneys for Plaintiff

ROOSEVELT COUNTY
CLERK OF COURT
TIME          FILED

JAN 0 4 2017

JERI TOAVS
_____
DEPUTY CLERK

6

7

8 | MONTANA FIFTEENTH JUDICIAL DISTRICT COURT
ROOSEVELT COUNTY

9

10 | Dual Trucking of Montana, LLC,

11 |            Plaintiff,

12

13 |       -vs-

14 | Garth and Wagner Harmon,

15 |            Defendants.

Cause No.   DV-2015-17

**Third Amended
Complaint**

16 |                         * * * *

17 |       Plaintiff Dual Trucking of Montana, LLC ("Dual"), appears and respectfully

18 | requests an Order finding the Defendants in breach of contract and ordering Defendants

19 | to perform their obligations under those  certain agreements attached as Exhibits 1 - 3 to

20 | this Third Amended Complaint.  Dual alleges as follows in support of its action against

21 | the Defendants Garth and Wagner Harmon ("Harmons").

22 | The Parties

23 |       1.     Plaintiff is a Montana corporation in good standing with the Montana

24 | Secretary of State with its principal place of business in Bainville, Roosevelt County,

25 | Montana.

26 |       2.     On information and belief, Defendants are individual citizens residing in

27 | Roosevelt County, Montana.

28 | *3d Amended Complaint*                                   Page 1 of 7

24

Exhibit 41-1

**Jurisdiction & Venue**

3.     The subject Lease Purchase Agreements ("Agreements") between the parties, marked as Exhibits 1 - 3, and by this reference incorporated herein, was executed by the Defendants in Roosevelt County, Montana, addresses real property located in Roosevelt County, Montana, and requires performance in Roosevelt County, Montana.

4.     Jurisdiction over the subject matter of this action is accordingly proper in this Court pursuant to Montana Code Annotated § 3-5-302 and venue is proper in this Court pursuant to Montana Code Annotated §§ 25-2-118, 25-2-121, and 25-2-123.

**Fact Allegations**

5.     Harmons originally owned an unsubdivided parcel of property near Bainville, Montana, which the Parties jointly desired to lease to Dual for commercial purpose.

6.     The Parties accordingly entered into three separate lease option agreements on three separate parcels of property that were anticipated as represented by Harmons as being created via subdivision review while Dual was occupying and conducting business on the properties.

7.     The subject Agreements were executed in October 2012, wherein Dual acquired the right of use of certain of Harmon's property, referred to as "Lots 1, 2, and 3" of the Shotgun Creek Commercial Park located near Bainville, Montana. *Id..* Dual proceeded to develop the properties, building a large truck shop and ancillary facilities not only on Lot 1, but on the other leased properties as well. Dual has consistently operated a trucking business on Lot 1 up to this date and is in business there at this time via an authorized sublease to a third-party business concern.

8.     At the time of entering into the Agreement, the subject properties were not yet an approved subdivision. However, by separate agreement, Dual paid Harmons

*3d Amended Complaint*                                                              Page 2 of 7

Exhibit 41-2

1   $75,000 as an advance pursuant to the Lot 2 Agreement, for the purpose of completing
2   subdivision review, making the individual Lots available for purchase.

3        9.    Harmons received the agreed upon $75,000 but failed to cause the
4   subdivision of the property in a timely manner.  In fact, at one point in the subdivision
5   review process, Harmons intentionally caused the review process to cease without notice
6   to Dual of doing so.

7        10.    Dual routinely contacted Harmon's attorney of record requesting
8   information on the status of the subdivision review process.  Dual contacted Harmon's
9   attorney in September through November 2012, based upon Harmon's representations
10  that subdivision review was nearly complete.  In late November 2012, the subdivision
11  review process finally culminated and although Harmons neglected to advise Dual as
12  requested, Dual learned of the completion independently and in early December 2014,
13  advised that Dual was exercising the option to purchase Lot 1.  Harmons have never
14  responded in good faith and did not respond to Dual's request after completion of the
15  subdivision review process.

16       11.    The Parties agreed in October 2012, that Dual "shall have the irrevocable
17  option to purchase [Lot 1] for **Twenty Five Thousand and 00/100 per acre**
18  **($25,000/acre, that is the total sum of $99,500.00,** during the primary term and
19  once Lessor has subdivided the property making it available for purchase." Exhibit 1 at ¶
20  4 (emphasis supplied).

21       12.    Dual arranged for closing on the option with Roosevelt County Abstract
22  Company; Dual ordered a title insurance commitment; and Dual forwarded $99,500 in
23  cash to be held in escrow for purpose of closing the option.  Dual has continued in its
24  attempts to schedule a closing date with Harmons to no avail albeit the purchase price
25  remains in escrow at this time.

26       13.    Since filing the complaint in this matter, Dual issued notice to Defendants
27  of its intent to exercise the option to purchase and paid off Lots 2 and 3 as well.

28  *3d Amended Complaint*                                                    Page 3 of 7

**ER_180**

Exhibit 41-3

1   14.   As in the instance of Lot 1 Defendants refuse to acknowledge Dual's
2   request as set forth in either the Lot 2 Agreement or Lot 3 Agreement.

3   15.   Despite Dual's repeated requests, Harmons have never responded to
4   Dual's request to exercise the option to purchase Lots 1, 2 or 3 and are in breach of the
5   Parties' Agreements in both instances.

6   16.   Dual has paid the entire purchase price on Lots 2 and 3 and placed the
7   funds for Lot 1 in escrow. Dual has paid the Harmons a total sum of $729,000 in
8   addition to substantial amounts in attorney's fees and costs to date to no avail.

9   17.   Dual is without recourse other than seeking the assistance of this Court to
10   enforce the agreements made by parties.

11   <u>Count I - Breach of Contract</u>

12   18.   Dual incorporates the preceding allegations in paragraphs 1-17 as if set
13   forth in full hereafter.

14   19.   Harmons and Dual entered into the three lease option agreements for a
15   specific business purpose - to build and operate a trucking company on the respective
16   properties.

17   20.   Dual has conducted its business operations on the respective properties
18   continuously through the term of the leases.

19   21.   Dual performed its obligations under the three lease agreements in full,
20   having paid Harmons a total of $729,000.

21   22.   Harmons have not performed their obligations under the leases and are in
22   breach of the same.

23   23.   Specifically, Harmons have refused to convey title to the three leases as
24   promised in the lease agreements.

25   24.   Harmons have breached all three leases and are liable for damages
26   accordingly.

27

28   *3d Amended Complaint*                                    Page 4 of 7

**ER_181**

Exhibit 41-4

<center>Count II - Breach of the Implied Covenant</center>

25. Dual incorporates the preceding allegations in paragraphs 1-24 as if set forth in full hereafter.

26. Every contract executed in Montana contains an implied covenant of good faith and fair dealing.

27. Harmons' conduct in stalling subdivision review, refusing to deal openly with Dual regarding completion of subdivision review, and finally refusing to convey title breaches the implied covenant and Harmons are accordingly liable thereunder.

<center>Count III - Tortious Interference with Contract</center>

28. Dual incorporates the preceding allegations in paragraphs 1-27 as if set forth in full hereafter.

29. Dual and Harmons voluntarily entered into the three lease option contracts which Dual expected to provide it an economic benefit.

29. Dual paid Harmons $75,000 up front to conduct and complete subdivision review on the subject parcel, thereby enabling Dual to purchase the individual parcels.

30. Harmons were aware of Dual's economic expectancy and accordingly started the process of subdivision review but instructed its agents to cease operations during the review and thereby forestalled Dual's ability to purchase the properties.

31. Harmons' ultimately restarted review but refused to inform Dual when the process was complete which completion allowed Dual to start the process of purchasing the individual lots.

32. Dual nonetheless determined independently when subdivision review was completed and began the process of purchasing the properties; however, Harmons once again intentionally frustrated Dual's efforts to acquire the properties under the plain language of the lease option contracts.

33. Harmons have intentionally interfered with completion of the lease option contracts and Dual economic expectancy thereunder.

*3d Amended Complaint*                                                              Page 5 of 7

<center>ER_182</center>

Exhibit 41-5

1    34.    Harmons interference with completion of the lease option contracts is
2  improper as well as intentional.

3    35.    Dual has been and is currently damaged by Harmons' intentional
4  interference with the lease option contracts and Harmons are accordingly liable in an
5  amount to be proven at trial.

6       WHEREFORE, Plaintiff prays Judgment against Defendant as follows:

7    1.    Finding the Defendants are in breach of the Agreement and requiring
8  Defendants to execute a warranty deed passing ownership of Lots 1, 2, and Lot 3 to Dual;

9    2.    Finding Defendant liable to Dual for intentional interference with contract
10  and awarding damages as proven at trial;

11    3.    Requiring Defendants to pay Plaintiff's costs and attorneys fees incurred in
12  having to bring this action and pursuant to the terms of the lease option agreements;
13  and

14    4.    Requiring Defendants to perform such other actions and awarding Dual
15  additional damages which the District Court deems just under the premises.

16       Dated this 28th day of December 2016.

                        TOOLE & FEEBACK, PLLC

                        KD Feeback
                        Attorneys for Dual Trucking of Montana, LLC

                               ///

28  *3d Amended Complaint*                                    Page 6 of 7

**ER_183**

Exhibit 41-6

1    CERTIFICATE OF SERVICE

2         I hereby certify that a true and correct copy of the foregoing Third Amended

3    Complaint was mailed, postage pre-paid, via U.S. Mail on this _____ day of December

4    2016, directed to the attention of the Court and the following:

5
         A. Clifford Edwards
6        Triel Culver
         A. Christopher Edwards
7        John W. Edwards
         EDWARDS, FRICKLE & CULVER
8        1648 Poly Drive, Suite 206
         Billings, Montana 59102
9
         Jon E. Doak.
10       DOAK & ASSOCIATES, P.C.
         100 North 27th Street; Suite 200
11       P. Oo. Box 1875
         Billings, Montana 59103
12

13

14                    _____
                              KD Feeback
15

16

17

18

19

20

21

22

23

24

25

26

27

28   *3d Amended Complaint*                                        Page 7 of 7

Exhibit 41-7

# Limited Site Investigation Report

### Approximate 30-Acre Truck Yard

### 5702 Road 1009

### Bainville, Roosevelt County, Montana

**October 21, 2016**

**Terracon Project No. 26167095**



**Prepared for:**

**Dual Trucking and Transport LLC**

**Houma, Louisiana**

**Prepared by:**

**Terracon Consultants, Inc.**

**Billings, Montana**



Offices Nationwide   Established in 1965
Employee-Owned   terracon.com

**Terracon**

Geotechnical   ■   Environmental   ■   Construction Materials   ■   Facilities

Admiral - 1423

Exhibit 42-1



October 21, 2016

Dual Trucking and Transport LLC
P.O. Box 2967
Houma, Louisiana 70361
Attn:   Kelly DeCoursey

Telephone: (985) 858-6231
Email:        kelly@badlandsfracresources.com

Re:     Limited Site Investigation Report
        Approximate 30-Acre Truck Yard
        5702 Road 1009
        Bainville, Roosevelt County, Montana
        Terracon Project No. 26167095

Dear Ms. DeCoursey:

Terracon Consultants, Inc. (Terracon) is pleased to submit this Limited Site Investigation (LSI) report for the above-referenced site.  This investigation was performed in accordance with the initial Terracon Proposal No. E2615023 dated January 29, 2015, revised April 14, 2015, and the *Revisions to Proposed Limited Site Investigation Scope,* dated August 5, 2016.

We appreciate the opportunity to perform these services for Dual Trucking and Transport LLC. Please contact either of the undersigned at (406) 656-3072 if you have questions regarding the information provided in the report.

Sincerely,
**Terracon Consultants, Inc.**

Prepared By:                          Reviewed By:                          Reviewed By:

Paul G. Townsend               Robyn R. Sargent, CHMM          Derek A. Brown, P.E.
Project Manager                   Environmental Dept. Manager    Senior Env. Engineer
Enclosure

cc:     Mr. Tom Bovington, MDEQ
        Ms. Mary Louise Hendrickson, MDEQ
        Mr. Brad Jones, MDEQ
        Mr. KD Feeback, Attorney



Terracon Consultants, Inc.   2110 Overland Ave., Suite 124 Billings, Montana 95102
P  [406] 656 3072    F  [406] 656 3578    terracon.com

Geotechnical  ■  Environmental  ■  Construction Materials  ■  Facilities

1Terracon

## TABLE OF CONTENTS

Page No.

| | | |
|---|---|---|
| **1.0** | **INTRODUCTION** | **1** |
| **1.1** | Site Description | 1 |
| **1.2** | Scope of Work | 1 |
| **1.3** | Standard of Care | 2 |
| **1.4** | Additional Scope Limitations | 2 |
| **1.5** | Reliance | 2 |
| **2.0** | **FIELD ACTIVITIES** | **3** |
| **2.1** | Borings and Monitoring Wells | 3 |
| **2.2** | Soil, Sediment, Surface Water, and Groundwater Sampling | 4 |
| **3.0** | **QUALITY ASSURANCE OBJECTIVES FOR MEASUREMENT DATA** | **5** |
| **3.1** | Accuracy | 6 |
| **3.2** | Completeness | 6 |
| **3.3** | Representativeness | 6 |
| **3.4** | Comparability | 6 |
| **3.5** | Sampling Frequency | 6 |
| **3.6** | Decontamination Procedures | 7 |
| **3.7** | Sample Labeling | 7 |
| **3.8** | Containers, Preservation, and Holding Times | 8 |
| **3.9** | Field Quality Control | 9 |
| **3.10** | Laboratory Quality Control | 9 |
| **4.0** | **LABORATORY ANALYTICAL METHODS** | **9** |
| **5.0** | **DATA EVALUATION** | **9** |
| **5.1** | Soil and Sediment Samples | 10 |
| **5.2** | Groundwater and Surface Water Samples | 13 |
| **6.0** | **EQUIPMENT INVENTORY** | **14** |
| **7.0** | **FINDINGS AND RECOMMENDATIONS** | **14** |

**LIST OF APPENDICES**

Appendix A:   Exhibit 1 – Topographic Map
                    Exhibit 2 – Exploration Diagram
                    Exhibit 3 – Groundwater Contour Map

Appendix B:   Boring Logs

Responsive ■ Resourceful ■ Reliable                                                     i

Admiral - 1425

Exhibit 42-3

**Terracon**

Appendix C:   Table 1 – Soil Analytical Summary (VPH, EPH Screen/Fractionation, Chemical Characteristics and Radionuclides)
Table 2 – Soil Analytical Summary (VOCs and PAHs)
Table 3 – Soil Analytical Summary (RCRA 8 Metals)
Table 4 – Groundwater Analytical Summary (VPH, EPH Screen/Fractionation, VOCs, Chlorides and PAHs)
Table 5 – Groundwater Analytical Summary (RCRA 8 Metals)

Appendix D:   Site Photos of Equipment Inventory

Appendix E:   Laboratory Data Sheets



**LIMITED SITE INVESTIGATION REPORT**

**APPROXIMATE 30-ACRE TRUCK YARD**
**SITE ADDRESS:  5702 ROAD 1009**
**BAINVILLE, MONTANA**

**Terracon Project No.  26167095**
**October 21, 2016**

## 1.0   INTRODUCTION

### 1.1   Site Description

| | |
|---|---|
| **Site Name** | Approximate 30-Acre Truck Yard |
| **Site Location/Address** | 5702 Road 1009, Bainville, Montana |
| **General Site Description** | The site consists of an earthen yard with an office / vehicle maintenance shop building and a former treatment building. |

A topographic map depicting the approximate location of the site is included as Exhibit 1 (Appendix A), and an exploration diagram depicting the site boundaries, pertinent site features, and sampling locations is included as Exhibit 2 (Appendix A).

### 1.2   Scope of Work

Terracon Consultants, Inc. (Terracon) conducted a Limited Site Investigation (LSI) at the approximate 30-acre truck yard located 5702 Road 1009 in Bainville, Montana (site).  At your request, Terracon's LSI was undertaken in response to the results of Terracon's Environmental Site Assessment (ESA Report No. 26147106), dated December 11, 2014, which identified the following recognized environmental conditions (RECs):

- Impacted surface and subsurface soils identified through previous investigations completed at the site by Hydro Solutions Inc.; and
- Stained soils located in several areas of the facility, including but not limited to the earthen floor within the former treatment building, stockpiled soil north of the former treatment building, stockpiled soil on the northeastern portion of the site, and various areas in the yard including former oilfield waste handling and processing areas; and
- Former oilfield waste handling and processing activities that may have further impacted soils, and the potential that the site may have impacted groundwater.

The objective of the proposed LSI was to evaluate the presence of chemicals of concerns (COCs) including volatile petroleum hydrocarbons (VPH), extractable petroleum hydrocarbons (EPH), volatile organic compounds (VOCs), polycyclic aromatic hydrocarbons (PAHs), RCRA 8 metals, pH,

Admiral - 1427
Exhibit 42-5

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



conductance, radioisotopes and chlorides at concentrations above relevant laboratory reporting limits in the on-site soils and groundwater as a result of potential releases from the above-mentioned RECs.  Terracon's LSI was conducted in accordance with Terracon Proposal No. E2615023 dated January 29, 2015, revised April 14, 2015, and the *Revisions to Proposed Limited Site Investigation Scope,* dated August 5, 2016, as authorized by Mr. Todd Hutchinson of Dual Trucking and Transport LLC on June 14, 2016 and August 7, 2016, respectively.

## 1.3    Standard of Care

Terracon's services were performed in a manner consistent with generally-accepted practices of the profession undertaken in similar studies in the same geographical area during the same time period. Terracon makes no warranties, either express or implied, regarding the findings, conclusions or recommendations.  Please note that Terracon does not warrant the work of laboratories, regulatory agencies or other third parties supplying information used in the preparation of the report. These services were performed in accordance with the scope of work agreed with you, our client, as set forth in our proposal and were not intended to be in strict conformance with ASTM E1903-11.

## 1.4    Additional Scope Limitations

Findings, conclusions and recommendations resulting from these services are based upon information derived from the on-site activities and other services performed under this scope of work; such information is subject to change over time.  Certain indicators of the presence of hazardous substances, petroleum products, or other constituents may have been latent, inaccessible, unobservable, nondetectable or not present during these services, and we cannot represent that the site contains no hazardous substances, toxic materials, petroleum products, or other latent conditions beyond those identified during this LSI.  Subsurface conditions may vary from those encountered at specific borings or wells or during other surveys, tests, assessments, investigations or exploratory services; the data, interpretations, findings, and our recommendations are based solely upon data obtained at the time and within the scope of these services.

## 1.5    Reliance

This report has been prepared for the exclusive use of Dual Trucking and Transport LLC, and any authorization for use or reliance by any other party (except a governmental entity having jurisdiction over the site) is prohibited without the express written authorization of Dual Trucking and Transport LLC and Terracon.   Any unauthorized distribution or reuse is at the client's sole risk. Notwithstanding the foregoing, reliance by authorized parties will be subject to the terms, conditions and limitations stated in the proposal, LSI report, and Terracon's Terms and Conditions.  The limitation of liability defined in the Terms and Conditions is the aggregate limit of Terracon's liability to the client and all relying parties unless otherwise agreed in writing.

Admiral - 1428
Exhibit 42-6

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



## 2.0   FIELD ACTIVITIES

### 2.1   Borings and Monitoring Wells

Terracon's field activities were conducted during the period of August 15, 2016 through August 26, 2016 by Mr. Paul Townsend, a Terracon Project Manager, and Mr. Cameron Sapp, a Terracon Field Scientist.  As part of the approved scope of services, 15 hand auger soil borings (HA-1 through HA-15) were advanced off-site on the surrounding properties, five permanent groundwater monitoring wells (TERR-MW-1 through TERR-MW-5) and 61 soil borings (BA-1 through BN-2 and SB-1 through SB-9) were advanced on the site.  Exhibit 2 (Appendix A) is an exploration plan that indicates the approximate locations of the soil borings and monitoring wells in relation to the pertinent structures and general site boundaries.

Drilling services were performed by a State of Montana licensed monitoring well driller using a truck-mounted hollow stem auger (HSA) drilling rig and a track-mounted direct-push drilling rig under the supervision of a Terracon Project Manager.  Soil samples were collected using core barrel samplers and four- to five-foot direct-push sample tubes lined with dedicated, acetate liners.  Hand auger soil borings HA-1 through HA-15 were advanced using hand auger equipment.  Drilling augers and core-barrel samplers were cleaned using a high-pressure washer prior to beginning the project and before beginning each soil boring.  Non-dedicated sampling equipment were cleaned using an Alconox® wash and potable water rinse prior to the beginning of the project and before collecting each soil sample.

Soil samples were collected continuously and observed to document soil lithology, color, moisture content and sensory evidence of impairment.  The soil samples were field-screened using a photoionization detector (PID – Ion Science PhoCheck® Tiger) to indicate the presence of VOCs.

The general soil lithology encountered during sample collection generally consisted of clayey sand with intermittent layers of sandy clay to a depth of approximately 30 feet below grade surface (bgs). Detailed lithologic descriptions are presented on the soil boring logs included in Appendix B.

Groundwater was only encountered during the advancement of soil borings Terr-MW-1 through Terr-MW-5 at approximate depths ranging from 24 feet bgs to 25 feet bgs.  Depth to groundwater measurements collected during groundwater sample collection ranged from 24.39 to 25.34 feet bgs. The general direction of groundwater flow appears to be toward the southeast.  The groundwater gradient is estimated at 0.0007 feet per foot.  Exhibit 3 (Appendix A) provides contours of the static water level across the site.  It should be noted that local geohydrologic characteristics such as flow direction and gradient may change due to variations in precipitation and recharge or other conditions that were not evident at the time of field exploration.

Odors and/or staining were detected in the soil samples collected from soil borings BF1, BG3, BL1, SB-6, SB-7, and TERR-MW-2.  PID readings ranging from 0.1 parts per million (ppm) to 198.1 ppm

Admiral - 1429
Exhibit 42-7

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



were detected in the soil samples collected from the soil borings.  The PID readings are included on the soil boring logs presented in Appendix B.

Following sample collection, soil borings BA-1 through BN-2, SB-1 through SB-9 and HA-1 through HA-15 were backfilled with bentonite pellets and then hydrated and grouted to surface grade.

Subsequent to advancement, soil borings TERR-MW-1 through TERR-MW-5 were converted to flush-mounted groundwater monitoring wells.  The monitoring wells were completed using the following methodology:

- Installation of 15 feet of 2-inch diameter, 0.010-inch machine-slotted PVC well screen with a threaded bottom cap;
- Installation of 15 feet of 2-inch diameter, threaded, flush-joint PVC riser pipe to the surface;
- Addition of a pre-sieved 20/40-grade annular silica sand pack from the bottom of the boring to approximately 2 feet above the top of the well screen;
- Addition of at least 2 feet of hydrated bentonite seal from above the sand pack filter zone to the near surface; and,
- Installation of an 8-inch diameter, circular, bolt-down, steel, monitoring well cover with locking well cap inset in a flush-mount, concrete well pad.

The monitoring well construction details are presented on the soil boring logs for these monitoring wells, which are included in Appendix B.

The five existing and new monitoring wells were developed by surging and removing groundwater with a submersible pump that was cleaned with an Alconox® wash and potable water rinse between sample locations until the groundwater was relatively free of fine-grained sediment.  Approximately 20 to 50 gallons of groundwater were removed from each monitoring well during development activities.

Groundwater and equipment cleaning water generated during the field activities were placed in Department of Transportation (DOT) approved, 55-gallon steel drums, and were closed and appropriately labeled with project-specific information and initial accumulation date.  A total of five 55-gallon drums containing groundwater and two 55-gallon drums containing equipment cleaning water were generated.  Two stockpiles of soil cuttings were generated during the field services and were placed on visqueen sheeting and covered with visqueen sheeting.  The investigation derived waste (IDW) generated during these field services was left on the site for subsequent characterization and disposal, which is not included in the scope of services.

## 2.2    Soil, Sediment, Surface Water, and Groundwater Sampling

Terracon's soil sampling program consisted of the collection of one soil sample from the first two feet bgs in each soil boring advanced within Grids A through N(soil borings BA-1 through BN-2).

Admiral - 1430

Exhibit 42-8

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



Each shallow soil sample collected within the designated grid was composited with the other soil samples collected within that specific grid for analysis. Soil samples collected below the first two feet bgs within the designated grid were not composited. The remaining soil sampling program involved submitting at least one soil sample from each soil boring HA-1 through HA-15, SB-1 through SB-9 and TERR-MW-1 through TERR-MW-5 for laboratory analysis. The soil samples were collected from the interval exhibiting the highest PID reading and/or highest likelihood of environmental impact based on the field professional's judgment in each soil boring was selected for laboratory analysis. This sampling rationale was applied for soils in the unsaturated or vadose zone since applicable regulations consider soils beneath the water table part of the groundwater bearing unit. Additional soil samples were collected from each soil boring from the capillary fringe zone, intervals exhibiting a change in lithology, and/or the bottom of the boring. These additional soil samples were submitted to the laboratory and placed on hold for potential contingent analyses if deemed warranted based on the initial analytical results. Soil sample intervals for each boring are presented with the soil sample analytical results (Tables 1 through 3, Appendix C), and are provided on the lithologic boring logs included in Appendix B.

One groundwater sample was collected from each new groundwater monitoring well, and from each of the five existing groundwater monitoring wells for laboratory analysis. Prior to sample collection, each monitoring well was purged until consistent values were obtained for select geochemical parameters. Subsequent to parameter stabilization, one groundwater sample was collected from each monitoring well utilizing low-flow sampling equipment.

To evaluate the impacts to the adjacent wetlands located northwest of the site, two surface water samples and two sediment samples were collected from the area. The sediment samples were collected from the edge of the wetland from the upper one foot of soil. One sediment sample was collected from the northeast portion of the wetland and one sediment sample was collected from the southwest portion. The surface water samples were collected by wading into the wetland and submersing containers. One surface water sample was collected from the northeast portion of the wetland and one from the southwest portion.

Soil, sediment, surface water and groundwater samples were collected and placed into laboratory-prepared glassware containing the appropriate preservative, labeled, and placed on ice in sample coolers. The sample coolers were either released via chain-of-custody directly from the sampler to a representative of the analytical laboratory or were secured with a custody seal and shipped to the selected analytical laboratory. The sample coolers and completed chain-of-custody forms were relinquished to Pace Analytical Services, Inc. in Billings, Montana for analysis on normal turnaround.

## 3.0   QUALITY ASSURANCE OBJECTIVES FOR MEASUREMENT DATA

The overall Quality Assurance (QA) objective for this project was to develop and implement for field sampling, laboratory analysis, chain-of-custody, and reporting that provided accurate results.

Admiral - 1431
Exhibit 42-9

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



## 3.1 Accuracy

Accuracy is the degree of agreement between an observed value and an accepted reference or true value. Accuracy in the field is assessed through the use of field blanks and through adherence to sample handling, preservation, and holding time requirements.

Two groundwater field blanks were collected during the groundwater sampling event and were analyzed for VOCs. Sample handling, preservation, and holding time requirements discussed within work plan and *Quality Assurance and Control Plan*, dated August 9, 2016 were followed.

## 3.2 Completeness

Completeness is the measure of the amount of valid data obtained from a measurement system to the amount that was expected to be obtained under normal conditions. Field completeness is a measure of the amount of valid measurements obtained from the measurements taken in the project. Although the total number of samples collected for this project was dynamic based upon conditions encountered, the field completeness objective for this project was greater than 95%.

## 3.3 Representativeness

Representativeness expresses the degree to which data accurately and precisely represents a characteristics of a population, parameter variations at a sampling point, a process condition, or an environmental condition within a defined spatial and/or temporal boundary.

Representativeness was dependent upon the proper design of the sampling program and was satisfied by assuring that proper sampling techniques were used. Established procedures were used in the field and by the analytical laboratory. Field and laboratory blanks were also used.

## 3.4 Comparability

Comparability is an expression of the confidence with which one data set can be compared to another.

Comparability was dependent upon the proper design of the sampling program and was satisfied by assuring proper sampling and analytical techniques was used. Planned analytical data was comparable when similar sampling and analytical methods were used and documented. Comparability is also dependent on similar QA objectives.

## 3.5 Sampling Frequency

As previously discussed, a minimum of one soil sample was collected from each boring. Additional samples were collected in order to better define the vertical extent of impacts. Samples of

Admiral - 1432
Exhibit 42-10

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



potentially-impacted soils were collected for characterization purposes from intervals where field screening or other indications suggest the presence of petroleum hydrocarbons.

One groundwater sample was collected from each new monitoring well and each existing monitoring well during LSI.

## 3.6    Decontamination Procedures

Dedicated sampling equipment and materials were used wherever possible to minimize the potential for cross contamination.  Non-dedicated, reusable sampling tools, equipment, and instruments were cleaned between samples to minimize the potential for cross contamination.  Following sampling activities, the sampling equipment was washed in a laboratory-grade, biodegradable phosphate-free, detergent solution and rinsed with potable water.  A final rinse with distilled water removed detergent residue from the sampling equipment.  Clean, unused nitrile gloves were used to handle each sample.  Teflon-lined tubing used during development and sampling of the groundwater monitoring wells were disposed of after the samples were collected.  The Teflon-lined tubing was dedicated to each well during sampling activities.

## 3.7    Sample Labeling

Terracon used laboratory provided labels, affixed to each sampling container utilized.  Each sample was labeled with the sample name and additional sample information.  The containers were cleaned and dried to ensure that sample labels are securely attached to the containers.  Labeling was performed using an indelible felt-tip marker.

### 3.7.1  Soil Samples

Soil samples were identified from the boring which they are collected.  The sample identification included the boring or well number and the depth from which it was collected.  For example, the soil sample collected from the boring identified as TERR-MW-1 at a depth of 9 to 10 feet was labeled "TERR-MW-1@9-10".  The composite soil samples collected from the designated Grid A were labeled "BA@0-2".  A discrete soil sample collected from the individual soil boring BA1 within the designated grid, below the first two feet bgs, was labeled "BA1@2-4".  Sediment samples, collected from the wetland located northwest of the site, were labeled "SED-1" and "SED-2".

### 3.7.2  Groundwater Samples

Groundwater samples were identified with the well number.  For example, the groundwater sample collected from monitoring well MW-1 was labeled "MW-1".  The surface water samples collected from the northwest wetland were labeled "SW-1" and "SW-2".

Two field blanks were collected during the groundwater sampling event.  The field blanks were labeled "Field Blank #1" and "Field Blank #2".

Admiral - 1433

Exhibit 42-11

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



### 3.8    Containers, Preservation, and Holding Times

The following table presents the containers, analytical laboratory methods, and preservation information utilized for each media sampled:

| Matrix | Analyte | Container | Preservation | Holding Time |
|--------|---------|-----------|--------------|--------------|
| Soil | Extractable Petroleum Hydrocarbons (EPH) Screen by MDEP 98 EPH | Two 4-oz glass jars | Cool to 4° C | 7 days |
| Soil | EPH Fractionation by MDEP 98 EPH | | | |
| Soil | Volatile Petroleum Hydrocarbons (VPH) by MDEP 98 VPH | | | |
| Soil | RCRA 8 Metals by SW-846 Method 6010 | One 4-oz glass jar | Cool to 4° C | 6 months |
| Soil | Polycyclic Aromatic Hydrocarbons (PAHs) by EPA 8270D | One 4-oz ambler glass jar | Cool to 4° C | 14 days |
| Soil | Volatile Organic Compounds (VOCs) by SW-846 Method 8260B | One 4-oz glass jar | Cool to 4° C | 14 days |
| Soil | Chloride by EPA 300.0 | One 4-oz glass jar | Cool to 4° C | 28 days |
| Soil | pH by ASA 10-3,2 | One 4-oz glass jar | Cool to 4° C | None |
| Soil | Conductance by ASA Mono. #9, Part 2, Method 10-3.3 | Two 4-oz glass jars | Cool to 4° C | 28 days |
| Soil | Radionuclides:  Rad 226 by EPA 901.1, Rad 228 by EPA 901.1, Lead 210 by EPA 901.1, Thorium 232 by HSL-300 and Polonium 210 by HSL-300 | 1 gallon Bag | None | 6 months |
| Water | EPH Screen by MDEP 98 EPH | Two 1L Amber glass bottles | HCl and Cool to 4° C | 14 days |
| Water | EPH Fractionation by MDEP 98 EPH | | | |
| Water | VPH by MDEP 98 VPH | Three 40 mL vials | HCl and Cool to 4° C | 14 days |
| Water | VOC by SW-846 Method 8260B | Three 40 mL vials | HCl and Cool to 4° C | 14 days |
| Water | RCRA 8 Metals by SW-846 Method 6020 | One 250 mL poly container | Nitric Acid and Cool to 4° C | 6 months |
| Water | PAHs by SW-846 Method 8270 | Two 1L Amber glass bottles | None | 7 days |
| Water | Chloride by EPA 300.0 | One 250 mL poly container | None | 28 days |

All samples were submitted for normal turn around.

Admiral - 1434

Exhibit 42-12

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



**3.9    Field Quality Control**

Established procedures for sample collection and handling were followed, and field activities were documented.

As previously discussed, field blanks were used to evaluate field quality control.  Two field blanks were collected during the groundwater sampling and analyzed.

**3.10    Laboratory Quality Control**

This project used Pace Analytical Services, Inc. of Billings, Montana to analyze the samples collected.  Pace Analytical Services, Inc. is accredited by the State of Montana to perform the specified analytical methods.  Laboratory quality control included adherence to established analytical protocols and analysis of a method blank, a matrix spike/matrix spike duplicate report, and a blank spike.

# 4.0    LABORATORY ANALYTICAL METHODS

The shallow soil samples collected from each soil boring within the grid locations and composited were analyzed for VPH and EPH Screen using Montana-modified Massachusetts Method, VOCs using SW-846 Method 8260B, PAHs using SW-846 Method 8270D, RCRA metals using SW-846 Method 6010, pH using ASA 10-3,2, conductance using ASA Mono. #9, Part 2, Method 10-3.3, chlorides using EPA 300.0, Rad 226 using EPA 901.1, Rad 228 using EPA 901.1, Lead 210 using EPA 901.1, Thorium 232 using HSL-300, and Polonium 210 using HSL-300.  Additional soil samples were analyzed for VPH, EPH Screen, VOCs, PAHs, RCRA metals, pH, conductance, chlorides and radioisotopes as needed.   The shallow soil samples collected from the agricultural property northwest of the site were analyzed for VPH, EPH Screen, PAHs, RCRA metals, and chlorides. The shallow soil samples collected from the agricultural property located east, southeast, and south of the site were analyzed for EPH Screen, PAHs, and RCRA metals.  The surface water and sediment samples were analyzed for VPH, EPH Screen, PAHs, RCRA metals, and chlorides.   The groundwater samples collected from the monitoring wells were analyzed for VPH, EPH Screen, VOCs, PAHs, RCRA metals, and chlorides.  If deemed warranted based on the initial analytical results, select soil and/or groundwater samples were analyzed for Extractable Hydrocarbon Fractionation using Montana-modified Massachusetts Method.  In addition, two field blank samples were prepared and analyzed for VOCs for QC purposes.

Laboratory results are summarized in the tables included in Appendix C and the executed chain-of-custody forms and laboratory data packages are provided in Appendix D.

# 5.0    DATA EVALUATION

Terracon initially compared the detected VPH, EPH Screen, VOCs, and PAHs chemical of concern (COC) concentrations to the Montana Tier 1 Risk-Based Screening Levels (RBSLs) for residential

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



surface soil (<2 feet), less than 10 feet to groundwater from the sample depth as defined in the *Montana Tier 1 Risk-Based Corrective Action Guidance for Petroleum Releases,* by the Montana Department of Environmental Quality (MDEQ), dated September 2009.  If the surface soil samples exceeded the initial screening level, the soil samples were compared to the Montana Tier 1 RBSLs for surface soil, (<2 feet), greater than 10 feet to groundwater from the sample depth.  If the sample was collected at a depth deeper than two feet bgs and exceeded the initial screening level, the soil samples were compared to the Montana Tier 1 RBSLs for subsurface soil (>2 feet), 10 to 20 feet to groundwater from the sample depth.

VOC and PAH COCs were also compared to modified Environmental Protection Agency (EPA) Regional Screening Levels (RSLs) obtained using MDEQ parts 1 and 2 of Attachment C – Soil Screening Process and the EPA RSLs, dated May 2016 and the MDEQ Standardized Cleanup Report for Spills or Releases that Impact Soil, dated June 2015. Chlorides, pH, conductivity, and radionuclides do not have a State of Montana screening level.

In addition to a comparison to the MDEQ RBSLs, the detected metals concentrations in soils were also compared to their Montana Background Study Investigation (MBSI) levels, dated September 2013.  In cases where the MBSI is greater than the RBSL, the action level is the MBSI.

Terracon compared the detected COCs from the groundwater samples to the MDEQ Tier 1 RBSLs for Groundwater, dated September 2009, and the MDEQ Groundwater Human Health Standard, Circular DEQ-7, Montana Numeric Water Quality Standards, dated October 2012.  The surface water samples, collected from the northwest wetland, followed the MDEQ Groundwater Human Health Standard, Circular DEQ-7, Montana Numeric Water Quality Standards for RCRA 8 metals with the exception of mercury, which has a lower screening level for surface water.

As previously discussed, the composite sample labeling for the composite soil samples collected from the designated Grid C were labeled "BC@0-2", which were a composited result from soil borings BC1 through BC5.  A discrete soil sample collected from the individual soil boring BC1 within the designated grid, below the first two feet bgs, was labeled "BC1@2-4".

## 5.1   Soil and Sediment Samples

**VPH Analysis**

VPH compounds were detected in two soil samples at concentrations exceeding their respective Tier 1 RBSLs for surface soil, greater than 10 feet to groundwater.  Sample SB-6 (0-3 feet) exhibited concentrations of naphthalene (38.3 mg/kg), $C_9$ to $C_{10}$ Aromatics (991 mg/kg) and $C_9$ to $C_{12}$ Aliphatics (427 mg/kg) above the Tier 1 RBSL of 4 mg/kg, 100 mg/kg, and 100 mg/kg, respectively.  Sample SB-7 (0-3 feet) exhibited concentrations of $C_9$ to $C_{10}$ Aromatics (324 mg/kg) and $C_9$ to $C_{12}$ Aliphatics (554 mg/kg) above the Tier 1 RBSL of 100 mg/kg for both.  Soil borings SB-6 and SB-7 were further delineated vertically with soil samples SB-6 (6-9 feet) and SB-7 (6-9 feet), which did not exhibit

Admiral - 1436

Exhibit 42-14

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



concentrations of VPH compounds above the laboratory reporting limit.  The results of the VPH soils analysis are summarized in Table 1 of Appendix C.

**EPH Screen Analysis**

Soils samples TERR-MW-4 (0-2 feet), BC (0-2 feet), BF1 (2-4 feet), BK (0-2 feet), BL (0-2 feet), BM (0-2 feet), BN (0-2 feet), SB-6 (0-3 feet), and SB-7 (0-3 feet) exceeded the EPH Screening level of 200 mg/kg and were fractionated.

EPH fractionation compounds were detected in seven of the soil samples at concentrations exceeding their respective Tier 1 RBSL for surface soil, greater than 10 feet to groundwater.

Soil samples TERR-MW-4 at 0 to 2 feet (838 mg/kg), BK at 0 to 2 feet (785 mg/kg), BL at 0 to 2 feet (256 mg/kg), BM at 0 to 2 feet (543 mg/kg), BN at 0 to 2 feet (270 mg/kg), SB-6 at 0 to 3 feet (1,130 mg/kg) and SB-7 at 0 to 3 feet (771 mg/kg) exhibited concentrations of $C_9$ to $C_{18}$ Aliphatics above the Tier 1 RBSL of 200 mg/kg.  Soil borings TERR-MW-4, SB-6 and SB-7 were further delineated vertically with soil samples TERR-MW-4 (4-6 feet), SB-6 (6-9 feet) and SB-7 (6-9 feet), which exhibited concentrations of total extractable hydrocarbons below the fractionation threshold of 200 mg/kg.  The results of the EPH soils analysis are summarized in Table 1 of Appendix C.

**VOCs Analysis**

Various VOC compounds including n-butylbenzene, sec-butylbenzene, p-isopropyltoluene, naphthalene, n-propylbenzene, 1,2,4-trimethylbenzene, 1,3,5-trimethylbenzene and total xylenes were detected at concentrations above laboratory reporting limits in several of the soil samples collected across the site.

The naphthalene concentration of 7,120 mg/kg detected in the soil sample collected at 0 to 3 feet bgs from soil boring SB-6 exceeds the Tier 1 RBSL of 4,000 mg/kg.  In addition, the 1,2,4-trimethylbenzene concentration of 12,000 mg/kg detected in the soil sample collected at 0 to 3 feet bgs from soil boring SB-6 exceeds the modified EPA RSL of 5,800 mg/kg.  Soil boring SB-6 was further delineated vertically with soil sample SB-6 (6-9 feet), which did not exhibit concentrations of VOC compounds above the laboratory screening levels.  The remaining VOCs detected in the on-site soil samples do not exceed the applicable Tier 1 RBSLs or modified EPA RSLs.  Refer to Table 2 (Appendix C) for a complete summary of the soil VOCs results.

**PAHs Analysis**

Various PAHs, including acenaphthene, acenaphthylene, anthracene, fluoranthene, fluorene, naphthalene, phenanthrene and pyrene, were detected at concentrations above laboratory reporting limits in the soil samples collected from soil borings TERR-MW-4, BF1, BK, BL, BM, BN, SB-6 and SB-7.

Admiral - 1437
Exhibit 42-15

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



Terracon compared the detected PAH concentrations in soil samples collected from soil borings TERR-MW-4, BF1, BK, BL, BM, BN, SB-6 and SB-7 to their respective MDEQ RBSLs.  The PAH concentrations did not exceed applicable MDEQ RBSLs, with the exception of the naphthalene concentration of 23,400 mg/kg detected in soil boring SB-6 at 0 to 3 feet bgs above the Tier 1 RBSL of 4,000 mg/kg.  Soil boring SB-6 was further delineated vertically with soil sample SB-6 (6-9 feet), which did not exhibit a concentration of naphthalene above the laboratory screening level.  The PAH concentrations are summarized in Table 2 (Appendix C).

**Metals Analysis**

Various RCRA 8 metals including arsenic, barium, cadmium, chromium, lead, mercury and selenium were detected at concentrations above their laboratory reporting limits in the soil samples collected at the site.    Refer to Table 3 in Appendix C for a complete summary of the metals soil analytical results.

Terracon compared the metals concentrations detected in the soil samples to their applicable action level.  The metals concentrations did not exceed applicable action level, with the exception of the barium concentrations detected in select soil samples. Samples TERR-MW-4 (0-2 feet), BF1 (2-4 feet), SB-6 (0-3 feet), and SB-7 (0-3 feet) exhibited concentrations of barium reported at 2,080 mg/kg, 3,320 mg/kg, 2,720 mg/kg, and 1,270 mg/kg, respectively, that exceeded the MDEQ Screening Level of 820 mg/kg.  Soil borings TERR-MW-4 and SB-6 were further delineated vertically with soil samples TERR-MW-4 (4-6 feet) and SB-6 (6-9 feet), which did not exhibit concentrations of barium above the MDEQ Screening Level.

**Chemical Characteristics**

Chlorides, pH and conductivity were analyzed in select soil samples from the site.  Chloride concentrations ranged from less than the laboratory detection limits to 12,100 mg/kg in the soil sample collected from soil boring SB-6 at 0 to 3 feet.  The pH concentrations ranged from 7.8 to 8.6 standard units.   The conductivity concentrations ranged from 0.33 millimhos per centimeter (mmhos/cm) in soil boring SB-6 at 6 to 9 feet to 97.4 mmhos/cm in SB-6 at 0 to 3 feet.

**Radionuclides**

Radionuclides including radium 226, radium 228, lead 210, thorium 232 and polonium 210 were analyzed in select samples from the on-site borings.  Radium 226 concentrations ranged from 1.661 picocuries per gram (pCi/g) in the soil sample collected from soil boring BF at 0 to 2 feet to 3.802 (pCi/g) in soil sample BK at 0 to 2 feet.  Radium 228 concentrations ranged from 0.785 (pCi/g) in the soil sample collected from soil boring BG at 0 to 2 feet to 1.297 (pCi/g) in SB-6 at 6 to 9 feet.  Lead 210 concentrations ranged from 0.639 pCi/g in the soil sample TERR-MW-2 at 0 to 2 feet to 3.096 pCi/g in SB-8 at 0 to 3 feet.  Thorium 232 concentrations ranged from 0.288 pCi/g in SB-5 at 0 to 3 feet to 0.736 pCi/g in SB-4 at 0 to 3 feet.  Polonium 210 concentrations ranged from 0.388 pCi/g in BE at 0 to 2 feet to 1.094 pCi/g in BK at 0 to 2 feet.

Admiral - 1438

Exhibit 42-16

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



## 5.2    Groundwater and Surface Water Samples

**VPH Analysis**

VPH compounds were not detected in any of the ten groundwater samples collected at the site or in the surface water samples collected from the northwest wetland at concentrations exceeding their respective Tier 1 Groundwater RBSLs and Standards, as summarized in Table 4 of Appendix C.

**EPH Screen Analysis**

None of the EPH screen concentrations exceeded the Tier 1 Groundwater RBSL of 1,000 µg/L; therefore, were not submitted for Fractionated EPH as summarized in Table 4 of Appendix C.

**VOCs Analysis**

VOC compounds were not detected in any of the ten groundwater samples, field blanks collected at the site or in the surface water samples collected from the northwest wetland at concentrations exceeding their respective Tier 1 Groundwater RBSLs and Standards, as summarized in Table 4 of Appendix C.

**PAHs Analysis**

PAHs compounds were not detected in any of the ten groundwater samples collected at the site or in the surface water samples collected from the northwest wetland at concentrations exceeding their respective Tier 1 Groundwater RBSLs and Standards, as summarized in Table 4 of Appendix C.

**Metals Analysis**

RCRA 8 metals were not detected in any of the ten groundwater samples at concentrations exceeding their respective Tier 1 Groundwater RBSLs and Standards, as summarized in Table 5 of Appendix C.

The RCRA 8 metal arsenic was detected at concentrations above the MDEQ Screening Level in the surface water samples SW-1 (26.2 micrograms/liter) and SW-2 (26.2 micrograms/liter) above the screening level of 10 micrograms/liter.  Refer to Table 5 in Appendix C for a complete summary of the metals in groundwater analytical results.

**Chlorides**

Chlorides were analyzed in the ten groundwater samples collected at the site and in the surface water samples collected from the northwest wetland.  Chloride concentrations ranged from 2.8 milligrams per liter (mg/L) in the groundwater sample collected from TERR-MW-4 to 907 mg/L in the

Admiral - 1439

Exhibit 42-17

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



groundwater sample collected from TERR-MW-3. Refer to Table 4 in Appendix C for a complete summary of the chlorides in groundwater analytical results.

## 6.0   EQUIPMENT INVENTORY

It is Terracon's understanding that the MDEQ previously observed various pieces of equipment on the west side of the former waste treatment building that appear to be associated with the former on-site operations. As part of the *Revisions to Proposed Limited Site Investigation Scope,* dated August 5, 2016, the MDEQ had requested that Terracon complete an inventory of the equipment present during the LSI. The equipment inventory included the following:

- One yellow Peterbilt semi-truck with attached tanks and gauges with Louisiana license plates;
- One white tractor trailer (locked) with no license plates;
- Four black side-dump trailers partially filled with yellow hazmat suits and no license plates. Soil staining was observed below the side-dumps;
- One semi-truck oil tanker with Montana license plates;
- One white Chevrolet 2500 heavy duty truck extended cab with an attached white trailer (locked). The truck had North Dakota license plates and the trailer had Louisiana license plates;
- One white Chevrolet 2500 heavy duty truck with North Dakota license plates;
- One white Chevrolet Silverado truck with North Dakota license plates;
- One blue 400-barrel above-ground storage tank (AST) in poor condition and empty;
- Two 1,500-gallon plastic ASTs, severely damaged and empty; and
  One 550-gallon plastic AST in fair condition and empty.

A site photo log of the equipment inventory is provided in Appendix D.

## 7.0   FINDINGS AND RECOMMENDATIONS

The findings and recommendations of this limited site investigation are as follows:

- VPH compounds were detected in the on-site soils in the soil samples collected from soil borings SB-6 and SB-7 at concentrations exceeding their respective Tier 1 RBSL for surface soil, greater than 10 feet to groundwater.

- EPH fractionation compounds were detected in the on-site soils in the soil samples collected from soil borings TERR-MW-4, BK, BL, BM, BN, SB-6 and SB-7 at concentrations exceeding their respective Tier 1 RBSLs for surface soil, greater than 10 feet to groundwater.

Admiral - 1440

Exhibit 42-18

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



■ Naphthalene and 1,2,4-trimethylbenzene were detected in the on-site soils in the soil samples collected from soil boring SB-6 at concentrations exceeding their applicable action levels.

■ The PAH compound naphthalene was detected in the soil sample collected from the soil boring SB-6 at 0 to 3 feet bgs at a concentration exceeding the Tier 1 RBSL of 4,000 mg/kg.

■ The RCRA 8 metal barium was detected in the soil samples collected from soil borings TERR-MW-4, BF1, SB-6 and SB-7 at concentrations exceeding the applicable action levels.

■ Based on the analytical results, the groundwater samples collected from the on-site monitoring wells appears to be unaffected by the previous site operations. The groundwater flow direction and the depth to shallow groundwater will likely vary depending upon seasonal variations in rainfall and site-specific geologic and hydrogeologic conditions.

■ The RCRA 8 metal arsenic was detected at concentrations above the MDEQ Screening Level in the surface water samples SW-1 (26.2 micrograms/liter) and SW-2 (26.2 micrograms/liter) above the screening level of 10 micrograms/liter. No other COCs were detected in the surface water above the applicable action levels. These surface water samples were collected from the offsite pond located northwest of the site. The arsenic concentrations detected in the offsite pond does not appear to correlate with the on-site soil or groundwater analytical results from the site and may be due to agricultural processes such as the application of herbicides and/or pesticides to the surrounding fields.

■ Based on the analytical results, the soil samples collected offsite from the hand-auger soil borings appear to be unaffected by the previous site operations.

■ Based on the analytical results, the investigation-derived waste (IDW) purged groundwater may be dispersed on the site as unaffected material. Alternatively, these IDW materials may be disposed at an approved off-site receiving facility in accordance with applicable regulations. The IDW equipment cleaning water and soils need to be disposed at an approved off-site receiving facility in accordance with applicable regulations.

■ The objective of the LSI was to evaluate the presence of COCs in the on-site soils and groundwater above relevant laboratory reporting limits. While the groundwater samples collected from the on-site groundwater monitoring wells are not impacted by previous site activities, the on-site soils located in the northeast portion of the site and the approximate area of the former treatment building have been impacted by

Responsive ■ Resourceful ■ Reliable

Admiral - 1441

Exhibit 42-19

Limited Site Investigation Report
Approximate 30-Acre Truck Yard ■ Bainville, Montana
October 21, 2016 ■ Terracon Project No. 26167095



previous site activities.  The impacts to the soil appear to be from the surface down to a depth of approximately six feet bgs.  Additional site investigation in the northeast portion of the site is recommended to further evaluate the extent and magnitude of the documented release.

■ If soils located on the site are to be disturbed during future excavations or construction activities, proper procedures should be followed with respect to worker health and safety; and any affected soil encountered should be properly characterized, treated and/or disposed in accordance with applicable local, state or federal regulations.

Admiral - 1442

Exhibit 42-20



<div style="text-align:right">

## Common Policy Declarations

</div>

| Admiral Insurance Company |
|---|

**Policy Number:** FEI-ECC-10294-00
Renewal Of: Not Applicable

| **Named Insured** | **Program Administrator** |
|---|---|
| Dual Trucking & Transport LLC | Freberg Environmental, Inc. |
| 801 Barrow Street | 2000 S. Colorado Blvd., Tower II Suite 800 |
| Houma, LA  70360 | Denver, Colorado 80222 |

**Policy Period**

> **From:**   10/1/2012          **To:**   10/1/2013
>
> At 12:01 am Standard Time at your mailing address shown above

In return for the payment of premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

| This policy consists of the following Coverage Parts as indicated: | **Premium** |
|---|---|
| **Contractors Pollution Liability Coverage** | **Included** |
| **Total Coverage Part Premium** | ▉ |
| **Total Premium** | ▉ |

**FORMS APPLICABLE TO ALL COVERAGE PARTS:** See Schedule of Forms and Endorsements and attached State specific Surplus Lines Warning where applicable.

These declarations together with the common policy conditions, coverage part declarations, coverage part coverage forms(s) and forms and endorsements, if any, issued to form a part thereof, complete the above numbered policy.

*Barry Brown*
By: Authorized Representative

Issue Date:  10/5/2012

Certified Copy
This will certify that this is a true
and exact copy of the original
policy and that it contains all
forms, endorsements and riders
attached thereto:

By: _David Burt_     Date: _9/26/2019_

ECC-309-0712

Exhibit Miller-E -1



# Common Policy Declarations

| Admiral Insurance Company |
|---|

**Policy Number:** FEI-ECC-10294-00
**Renewal Of:** Not Applicable

| **Named Insured** | **Program Administrator** |
|---|---|
| Dual Trucking & Transport LLC | Freberg Environmental, Inc. |
| 801 Barrow Street | 2000 S. Colorado Blvd., Tower II Suite 800 |
| Houma, LA  70360 | Denver, Colorado 80222 |

**Policy Period**

**From:**   10/1/2012          **To:**   10/1/2013

At 12:01 am Standard Time at your mailing address shown above

In return for the payment of premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

| This policy consists of the following Coverage Parts as indicated: | **Premium** |
|---|---|
| **Contractors Pollution Liability Coverage** | **Included** |
| **Total Coverage Part Premium** | ■■■■ |
| *Total Premium* | ■■■■ |

**FORMS APPLICABLE TO ALL COVERAGE PARTS:** See Schedule of Forms and Endorsements and attached State specific Surplus Lines Warning where applicable.

These declarations together with the common policy conditions, coverage part declarations, coverage part coverage forms(s) and forms and endorsements, if any, issued to form a part thereof, complete the above numbered policy.

|  | _Sang Brown_ | Issue Date:  10/5/2012 |
|---|---|---|
|  | By: Authorized Representative |  |

**ER_206**

ECC-309-0712

Exhibit Miller-E -2



**ADMIRAL** INSURANCE COMPANY

## Coverage Part Declarations

**Policy Number:** FEI-ECC-10294-00

**Coverage Parts Attached** (indicated with "X"):

| | Coverage Part | Policy Type |
|---|---|---|
| **X** | Contractors Pollution Liability | Occurrence Form |

**Limits of Insurance:**

Regardless of the number of Coverage Parts written under this policy or applicable to any one *Occurrence, Claim, Wrongful Act or Pollution Condition*, the Limits of Insurance shown below apply once for the entire policy, and not separately for each Coverage Part.

| Applicable to Contractors Pollution Liability Coverage Part: | |
|---|---|
| $1,000,000 | Damages Limit for Each Occurrence, Claim or Pollution Condition |
| $2,000,000 | General Aggregate Limit |
| $1,000,000 | *Claims Expense* Limit for Each Claim |
| $2,000,000 | *Claims Expense* Aggregate Limit |

**Deductible:**

| Coverage | Amount | Type |
|---|---|---|
| Contractors Pollution Liability | $10,000 | per pollution condition |

**Premium Schedule:**

| Estimated Annual Gross Receipts: | ███ | Rate: | Flat |
|---|---|---|---|
| Policy Period Minimum Earned Premium: | ███ | Minimum & Deposit Premium: | ███ |

**Form of Business:**

| Corporation | Joint Venture | Individual | Partnership | X LLC | Other |
|---|---|---|---|---|---|

**ER_207**

Exhibit Miller-E -3



# Schedule of Forms and Endorsements

| **Policy Number:** | FEI-ECC-10294-00 |
|---|---|

**SCHEDULE**

The following forms and endorsements are made part of this policy:

| | |
|---|---|
| JA10011 0712 | ECC Signature Page |
| ECC-311-0712 | Contractors Pollution Liability Form Occurrence |
| ECC-315-0712 | Common Policy Conditions |
| ECC-316-0712 | Nuclear Energy Liability Exclusion |
| ECC-319-0712 | Automatic Additional Insured Owners, Lessees, or Contractors |
| ECC-320-0712 | Automatic Waiver of Subrogation |
| ECC-322-0712 | Claims Notice Document |
| ECC-327-0712 | Minimum Earned Premium Endorsement |
| PN-0001 00107 | OFAC |
| ECC-510-0712 | Mold and Mildew Exclusion |
| ECC-548-0712 | Blanket Primary and Non-Contributory Endorsement |
| ECC-401-0712 | Transportation of Cargo Pollution Endorsement |
| EXL 1201 0712 | Exclusion of Certified Acts of Terrorism and Other Acts of Terrorism |
| EXL 1205 0712 | Exclusion of Certified Acts of Terrorism |
| EXL 1311 0712 | TRIA Rejection of Offer |
| ECC-326-0712 | Service of Suit |
| Louisiana Notice | Louisiana State Surplus Lines Notice Attachment |

ECC-451-0712

Exhibit Miller-E -4

 Dual Trucking & Transport LLC

**ADMIRAL** INSURANCE COMPANY®

# Signature Page

---

**Policy Number:**    FEI-ECC-10294-00

IN WITNESS WHEREOF, we have caused this Policy to be executed and
attested, and, if required by state law, this policy shall not be valid unless
countersigned by our authorized representative.

_____          _____
         Secretary                                        President and CEO

**ER_209**

Exhibit Miller-E -5

# Contractors Pollution Liability Policy

The insurance company shown in the Declarations (hereinafter "the Company") in consideration of the payment of the premium and the undertaking of the *named insured* to pay the Deductible described hereunder, in reliance upon all representations and warranties contained in the application attached hereto and made a part of this Policy, including any addendum or addenda thereto, and subject to all provisions of this Policy subsequently set forth, agrees with the *named insured* as follows:

## I.   INSURING AGREEMENTS

### A.  COVERAGE AND DEFENSE

The Company shall pay on behalf of the *insured* those *damages* for *bodily injury* or *property damage* in excess of the Deductible that the *insured* becomes legally obligated to pay:

1. If the *damages* result from a *pollution condition* at any site where any *insured* or any independent contractor working on behalf of any *insured*, is performing, or has performed, any contracting or remediation operations anywhere in the world; and

2. If the *pollution condition* is first incurred during the *policy period* of this Policy.

3. If on or prior to the effective date of this Policy, no *insured* had any knowledge of any circumstances which could reasonably be expected to give rise to a *claim*; and

4. If the *pollution condition* was unexpected and unintended from the standpoint of the *insured*.

The Company will pay all *claims expenses* in excess of the Deductible for all *claims* covered under the terms of this Policy.

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -6

**Contractors Pollution Liability Policy**

The Company shall have both the right and duty to provide for the defense of the *insured* with respect to a *claim* made against the *insured* in the United States of America, its territories or possessions, or Canada, falling under the purview of all of the foregoing requirements.  The Company shall also have the exclusive right to investigate such *claim*, to designate and appoint all legal counsel to defend the *insured* and to otherwise control the defense thereof.

If a *claim* is made against any *insured* such as is described in the immediate foregoing, other than in the United States of America, its territories or possessions, or Canada, the Company shall have the right, but not the duty, to provide for the defense of such *claim*. If the Company elects not to provide for the defense of such *claim*, the *named insured*, under the supervision of the Company, shall have the duty to make or cause to be made such investigation and defense as are necessary and, subject to prior authorization by the Company, effectuate settlement. In such eventuality, the Company shall indemnify the *named insured* for *claims expenses* incurred and *damages* and supplementary payments paid in excess of the Deductible.

The Company shall have the exclusive right hereunder to negotiate and effectuate the settlement of all *claims*, as it deems expedient, whether under or in excess of the Deductible, but it shall not commit the *named insured* to any settlement without the *named insured's* consent.  If, however, the *named insured* refuses to consent to a settlement recommended by the Company and elects to contest such *claim* or continue legal proceedings in connection therewith, the Company's liability shall be limited to the sum of the amount for which the *claim* could have been settled and all *claims expense* incurred up to the time of such refusal, which is in excess of the Deductible.

The Company's duty to provide for the defense of any *insured*, to pay *damages* on behalf of any *insured*, or to make any payment pursuant to Section I.B., Supplementary Coverages and Payments, shall immediately terminate

5.  If the Limits of Insurance of this Policy become exhausted by payment of *damages* or *claims expenses*; or

6.  If the *named insured* fails to fulfill its Deductible obligation as imposed by Section IV. Deductible; or

7.  If the application attached hereto and made a part of this Policy, including any addendum or addenda thereto, contains any material misrepresentation of fact.

**ER 211**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -7

**Contractors Pollution Liability Policy**

## B. SUPPLEMENTARY COVERAGES AND PAYMENTS

With respect to such insurance as is afforded by this Policy, the Company shall pay, in addition to the applicable limit of liability, all of the following:

1. All premiums on bonds to release attachments and appeal bonds, limited to that portion of such bond that does not exceed the limit of liability of this Policy but without any obligation of any kind upon the Company to apply for, secure, or furnish any such bonds.

2. Pre-judgment interest and post judgment interest on the full amount of any judgment that accrues after entry of the judgment and before the Company has paid, offered to pay, or deposited in court the part of the judgment that is covered and within the applicable Per *Claim* or Aggregate Limit of Liability. However, the maximum amount of pre-judgment or post judgment interest the Company will pay under this Policy will be the portion of pre-judgment or post judgment interest accrued on *damages* covered by this Policy.

3. All reasonable expenses incurred by any *insured* at the Company's request in assisting the Company in the investigation and defense of any *claim*, other than loss of earnings, salaries or other compensation paid to the *named insured's* officers or employees, except as provided in Paragraph 5., below.

4. All costs assessed against any *insured* in any suit covered under this Policy.

5. Defendant's Reimbursement - The Company will pay an amount of $500 to each *insured* for each day or part of a day that any *insured* attends as a witness at any trial, deposition, or interrogatory at which the Company has requested the *insured's* attendance, or when such attendance is required by the court.  This payment shall only apply to appearances involving *claims* against an *insured*.  The maximum amount payable for all such appearances made during the *policy period*, shall not exceed $5,000 as a total aggregate, regardless of how many appearances are actually made during the *policy period*, or how many different *insureds* make appearances, and regardless of any other fact, circumstance, or situation.

6. Coverage for fines or penalties - The Company will reimburse the *named insured* for the amount of any fine or penalty which is levied against any *insured*, and is paid by the *insured* during the *policy period*, by the Environmental Protection Agency, any state or local environmental regulatory agency, or any other governmental official or regulatory agency, or any court.  The maximum total amount the Company will pay for reimbursement for all fines or penalties combined which are levied and paid during the *policy period* will be $50,000, regardless of the actual number of fines or penalties levied or paid, or the actual amount of any fine, and

**ER  212**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -8

**Contractors Pollution Liability Policy**

---

regardless of any other fact or circumstance.  Reimbursement shall not be available whenever the applicable law provides that a particular fine or penalty is uninsurable as a matter of law.

For Supplementary Coverages numbers 7., 8., 9., and 10., below, it is agreed that any and all payments made for any of these shall be included within, and shall not be in addition to, the applicable limit of liability.

7.  Automatic coverage for newly formed or acquired entities - The coverage provided under this Policy shall apply on behalf of any entity which is newly formed or newly acquired by the *named insured* subsequent to the inception date of the *policy period*.  Coverage shall be provided only to those newly formed or newly acquired entities for which, as of the date of formation or acquisition, the *named insured* directly owns fifty percent (50%) or more of the outstanding stock or other equity or ownership interest.

It is agreed that there shall only be coverage for those *claims* that arise from *pollution conditions* which arise subsequent to the date of formation or acquisition.  The *named insured* agrees to advise the Company of any newly formed or acquired entity within ninety (90) days of the date of formation or acquisition.  The *named insured* agrees to accept any coverage terms or reasonable additional premium which the Company may require, relative to the newly formed or acquired entity.

8.  Coverage for indemnification of clients- Whenever any written contract or written job specifications provide that the *named insured* shall indemnify the client for, or hold the client harmless or free from, any *damages* or *claims expense*  which are due to a *pollution condition* which arises out of the *named insured's* operations, the Company will pay on behalf of the *named insured* those *damages* or *claims expense*  that must be paid to indemnify the client.

9.  Vicarious liability coverage - The coverage provided under this Policy shall apply on behalf of all *insureds* for *pollution conditions* arising out of operations performed by any entity or individual for whom any *insured* is legally liable, as long as the operations were performed on or after the effective date shown on the Policy Declarations Page or on an endorsement to the Policy, but prior to the end of the *policy period.*

---

**ER  213**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

**Contractors Pollution Liability Policy**

10. Response costs coverage - In accordance with, and in support of, the duties of the *named insured* to mitigate *damages*, as described in Section VI., Conditions, Paragraph G., Mitigation, the Company will reimburse the *named insured* for all costs expended by the *named insured* in fulfilling the *named insured's* duties of mitigation, subject to the following limitations:

a. The only costs that will be reimbursed by the Company are those costs that are expended by the *named insured* in efforts to abate, stop, prevent, or reduce the *damages* emanating from a *pollution condition* caused directly or indirectly by any *insured*.

b. The only costs that will be reimbursed by the Company are those costs that are expended by the *named insured* on or after the date that the *named insured* first becomes aware of the *pollution condition* until that date that the *named insured* first has a reasonable opportunity to report the incident, circumstances, or *claim* to the Company.

c. Nothing in this provision shall in any way alter, modify, or change the duty of the *named insured* to give notice of *claims* to the Company pursuant to Section VI., Conditions, Paragraph A., Notice of *Claim*."

## II.   DEFINITIONS

Words and phrases in italics in this Policy have the following special meaning.

**Bodily Injury**

The term *Bodily injury* means, sickness, disease, mental anguish or shock sustained by any person, including death resulting therefrom caused by a *pollution condition* arising out of the performance by any in*sured* of operations covered by this policy.

**Claim**

The term *claim* means an oral or written notice to the *named insured* from any party intending to hold any *insured* responsible for *damages* arising out of a *pollution condition*.

**Claim Expenses**

The term *claim expenses* shall mean all costs, charges and expenses resulting from the adjustment, appraisal, investigation, defense, settlement, arbitration or appeal of any *claim* covered by the terms and conditions of this Policy if such costs, charges and expenses are incurred by the Company, an attorney designated by the Company, or by any *insured* with the written consent of the Company; except that it shall not include the costs of investigating or administering any *claim* by employees of the Company or loss of earnings incurred by any *insured* in investigating, defending, settling, arbitrating or appealing any *claim* at the Company's direction, except as provided in Section I.B., Supplementary Coverages and Payments, Paragraph 5., Defendant's Reimbursement.

**Damages**

The term *damages* shall mean a judgment, award or settlement monetarily compensating a claimant for a *claim* covered by the terms and conditions of this policy, and shall include *damages* based upon emotional distress.  *Damages* also

**ER  214**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -10

**Contractors Pollution Liability Policy**

includes any loss due to diminuation in value or loss of use of land, property, or buildings. *Damages* does not include any of the following:

1. Any administrative, civil or criminal fines, sanctions, taxes, or penalties, whether pursuant to law or statute, except to the extent coverage for reimbursement for fines or penalties is provided under Section I.B., Supplementary Coverages and Payments, Paragraph 6, Coverage for fines or penalties;

2. Restitution, reduction, disgorgement, set off, return, or payment of any form of any consulting fees or payments, or any other costs, expenses or charges;

3. Any loss of income or revenue to the *named insured*, regardless of the cause or reason for the loss of income or revenue, except as provided in Section I.B., Supplementary Coverages and Payments, Paragraph 5., Defendant's reimbursement;

4. Any form of non-monetary judgments or relief, including, but not limited to, specific performance or any injunctive relief of any kind;

5. Any amount of any civil judgment which is, or represents, any multiple of any kind of damage award, including, but not limited to, the two-thirds portion of any award of treble *damages*.

**Insured**

The term *Insured* means:

1. The *named insured*; and

2. A director or officer of the *named insured*, but only while acting in their respective capacity as such; and

3. An employee of the *named insured*, but only with respect to services performed or failed to have been performed on behalf of the *named insured* in the employee's capacity as such; and

4. A former director, officer or employee of the *named insured*, but only with respect to services performed or failed to have been performed on behalf of the *named insured* prior to the termination of that respective capacity; and

5. The current spouse of any current owner, director or officer of the *named insured*; and

6. The heirs, executors, administrators, and legal representatives of each *insured* in the event of death, incapacity or bankruptcy, but solely with respect to the liability of each *insured* as otherwise covered by this Policy; and

**ER  215**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -11

**Contractors Pollution Liability Policy**

---

7. A limited liability company, if the *named insured* or any other *insured* exists as such, along with all past and present members of any such limited liability company, but only with respect to *professional services* performed or failed to have been performed on behalf of the *named insured*.

No person or organization is an *insured* with respect to the conduct of any current or past partnership or joint venture that is not shown as a *named insured* in the Declarations.

**Named Insured**    The term *named insured* shall mean the proprietor, partners or organization specified in the Declarations.

**Policy Period**    The term *policy period* means the period set forth in the Declarations, or any shorter period arising as a result of cancellation.

**Policy Year**    The term *policy year* means the separate annual year period whenever the *policy period* set forth in the Declarations is either for a two or three year time period.

**Pollution Condition**    The term *pollution condition* means the discharge, dispersal, release or escape of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids or gases, *waste* materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water which results in bodily injury or *property damage*. A continuous, related, repeated, or similar series of discharges, dispersals, releases, or escapes of pollutants at or from a site shall constitute a single *pollution condition*.

Related *pollution conditions* are those *pollution conditions* that arise out of , are based on, relate to or are in consequence of, the same facts, circumstances or situations.

**Property Damage**    The Term *property damage* means:

1. Physical injury to or destruction of tangible property including the resulting loss of use thereof; and

2. Costs expended by the *named insured* to evaluate, investigate, clean up, remediate or monitor any environmentally contaminated site.

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -12

3. Loss of use of tangible property that has not been physically injured or destroyed; provided that such physical injury or destruction, clean up costs and/or loss of use are caused by a *pollution condition* arising out of the performance by the *named insured* of operations insured by this policy.

Waste          The term *waste* means any discarded materials of any kind, including those materials to be recycled, reconditioned, reclaimed, or disposed of.

## III.  LIMITS OF INSURANCE

### A.  MAXIMUM LIMITS OF LIABILITY

The Company's maximum Limit of Liability hereunder shall not exceed the separate limits of liability for *damages* and *claims expenses* specified in the Declarations, irrespective of the following:

1. The number of *claims* made; or

2. The number of persons or organizations making *claims*; or

3. The number of persons covered hereunder; or

4. The number of *pollution condition*s which arise; or

5. The types of *damages* awarded.

### B.  SEPARATE AND SPECIFIC LIMITS OF LIABILITY

As specified in the Declarations:

1. The *"Damages* Limit for Each *Claim"* amount shown in the Declarations is the maximum amount the Company will pay under all Coverage Parts combined that form a part of this Policy for *damages* that arise out of any one *claim*;

2. The "General Aggregate Limit for *Damages* (Other than Products-Completed Operations)" amount shown in the Declarations is the maximum amount the Company will pay under all Coverage Parts combined that form a part of this Policy, for all *damages* arising from covered *claims* (other than those included in the products-completed operations hazard);

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -13

Contractors Pollution Liability Policy

3. The "*Claims* Expense Limit for Each *Claim*" amount shown in the Declarations is the maximum amount the Company will pay for all *claims expenses* that arise out of any one *claim* that is covered under either or both of the Contractors Pollution Liability and/or the Professional Liability Coverage Parts;

4. The "*Claims* Expense Aggregate Limit" amount shown in the Declarations is the maximum amount the Company will pay for all *claims expenses* that arise from covered *claims* that are covered under either or both of the Contractors Pollution Liability and/or the Professional Liability Coverage Parts.

The Limits of Insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the *policy period* shown in the Declarations, unless the *policy period* is extended after issuance for an additional period of less than 12 months.  In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

If this Policy and any other Policy providing coverage by the Company or any affiliate company apply to the same *pollution condition* or series of related *pollution conditions*, the aggregate maximum Limit of Liability payable under all of the policies combined shall be limited to the amount of the highest applicable Limit of Liability payable under any one of the policies.  Related *pollution conditions* are those *pollution conditions* that arise out of, are based on, relate to or are in consequence of, the same facts, circumstances or situations.

The Limits of Insurance shown in the Declarations shall apply in excess of the Deductible amount shown in the Declarations.

## IV.   DEDUCTIBLE

As respects each *claim* first made against the *insured*, the *named insured* shall be responsible for payment for that amount of *damages* or *claims expenses* indicated in the Declarations as the Deductible amount.  The Company shall not be responsible to make any payments for either *damages* or *claims expenses*, or any coverage or payment provided pursuant to Section I.B., Supplementary Coverages and Payments, unless and until the full amount of the Deductible has been paid by the *named insured*.

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -14

**Contractors Pollution Liability Policy**

Should the Company, for any reason, pay the entire amount of *damages*, *claims expenses*  or supplementary payments without regard to the Deductible amount, the *insured* will reimburse the Company, within 30 days of the Company's request for such reimbursement, for that part of the Deductible Amount which has been paid.

## V.   EXCLUSIONS

The Company shall have no obligation whatsoever under this Policy to make any payment of any kind for either *damages*, *claims expenses*, or any coverage or payment provided pursuant to Section I.B., Supplementary Coverages and Payments, or to arrange for, provide, or pay, for any defense, for:

A. Any *claim* by any past or present *insured* against any *insured*; however, this exclusion does not apply to additional insureds under this policy; or

B. Any *claim* made by or on behalf of any business enterprise not shown on the Declarations:

   1.   Which is, was, or will be owned in whole or in part by any past or present insured; or

   2.   Which owned in whole or in part at any time the *named insured*; or

C. Any *claim* arising from any *insured's* intentional, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint or notice of violation, notice letter, executive order, or instruction of a governmental agency or body; or

D. Any *claim* arising from an illegal, dishonest, fraudulent, criminal, or malicious act by any *insured*; or

E. Any *claim* which arises from, or is related to, any collision or accident involving an automobile, truck, boat, watercraft, airplane, helicopter, or other aircraft or vehicle of any kind or type; or

F. Any *claim* arising from any of the following relative to a contract any *insured* has entered into with a client:

   1.   Any assumption of the client's sole negligence or legal liability by; or

   2.   Any failure by any *insured* to perform or provide a good or service by a date stipulated in a contract with a client; or

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -15

**Contractors Pollution Liability Policy**

---

3. Any liquidated or stipulated *damages* under a contract with a client of any *insured*, unless the same type of *damages* would attach without the existence of the contract; or

G. Any obligation of any *insured* under workers compensation, disability benefits, unemployment compensation, employee benefits, pension sharing, ERISA law or any similar law; or

H. Any *claim* for wrongful termination, discrimination or any unfair employment practices; or

I. Any *claim* arising out of any *waste* or other kind of products or materials transported, shipped or delivered via any automobile, aircraft, watercraft, or rolling stock to any location located beyond the boundaries of a site at which any *insured* has performed any contracting or site remediation services.

J. Any *claim* for any *property damage* to any real or personal property that was owned in whole or in part, or was rented, occupied or in the care, custody or control of any *insured* at any time.

## VI.   CONDITIONS

### A. NOTICE OF *CLAIM*

In the event of a *claim*, or any *insured's* knowledge of circumstances which could reasonably be expected to give rise to a *claim*, the *named insured* shall have the duty to provide written notice to the Company as soon as practicable.

This written notice shall be given whether or not the *named insured* believes that the *claim*, or incident giving rise to the *insured's* knowledge, will result in a demand that falls under, or in excess of, the Deductible.

**ER  220**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -16

**Contractors Pollution Liability Policy**

Written notice shall be given to the insurance company shown in the Declarations, in care of:

Written notice shall be given to the insurance company shown in the Declarations, in care of:

<div align="center">

Claims

Berkley Custom Insurance Managers

3 Stamford Plaza

301 Tresser Blvd., 6th Floor

Stamford, CT 06901

Toll Free:  855-597-7616


claims@berkleycustom.com

</div>

Such written notice must contain complete details, including, but not limited to, the exact date the *claim* was made, location, circumstances giving rise to such *claim*, the name of all claimants and a full description of the nature and scope of the allegations.  These duties of the *insured* hereunder shall be non-delegable.

## B. COOPERATION AND ASSISTANCE OF THE *INSURED*

Each *insured* shall have the duty to fully cooperate with and assist the Company, with respect to the investigation, defense, settlement, arbitration or appeal of any *claim*.  No insured shall be indemnified hereunder for loss of earnings incurred in such cooperation or assistance, except as provided in Section I.B., Supplementary Coverages and Payments, Paragraph 5., Defendant's Reimbursement, nor shall such loss of earnings apply towards the satisfaction of the Deductible.

## C. ACTIONS PREJUDICIAL TO THE COMPANY

In the event of a *claim*, no *insured* shall undertake any of the following actions, without the Company's prior, written consent:

1. Engage counsel to provide legal representation; or

2. Assume any obligation, other than the reasonable efforts required to satisfy the duty to mitigate *damages* as provided in Section VI., Conditions, Paragraph G., Mitigation; or

3. Forgive, reduce in amount or otherwise compromise any compensation owed or allegedly owed the *named insured*; or

4. Admit, or in any manner acknowledge liability; or

<div align="center">

**ER  221**

</div>

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -17

**Contractors Pollution Liability Policy**

5. Effectuate or attempt to effectuate settlement, including, but not limited to, entering into a consent decree involving the assignment of the *insured's* interest under this Policy.

Any of the foregoing actions by the *insured* shall be deemed to materially prejudice the Company's rights.

## D. SUBROGATION

If the Company pays an amount hereunder as *damages*, *claims expense*, or as any payment under Section I.B., Supplementary Coverages and Payments, or any combination thereof, it shall be subrogated to all of each *insured's* rights of recovery against any person, firm or organization.  All *insureds* shall execute and deliver instruments and papers and do whatever else is necessary  to secure such rights.  No *insured* shall waive or prejudice such rights either prior or subsequent to any *claim*.

## E. ACCEPTANCE

By acceptance of this Policy, the *named insured* hereby confirms that all provisions hereof, including all endorsements and the application attached hereto and made a part of this Policy, embody all agreements existing between the *named insured* and the Company and supersede any prior agreements, whether expressed or implied.

## F. MITIGATION

The *named insured* shall make all reasonable efforts to abate, stop, prevent, or reduce the *damages* emanating from any *pollution condition* resulting directly or indirectly from any operations performed by any *insured*.  It is agreed that these efforts shall commence immediately upon discovery or notice of the *pollution condition* by any *insured*.  These efforts must include mitigating, alleviating or otherwise limiting the *damages* which could result from the *pollution condition*.  Such efforts must be undertaken even in the absence of a *claim*.

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -18

**Contractors Pollution Liability Policy**

## G. NO ACTION AGAINST COMPANY

No action shall lie against the Company unless, as a condition precedent thereto, each *insured* has fully complied with all the provisions of the Policy, or until the amount of the *named insured's* obligation to pay has been finally determined either by written agreement of the *named insured*, the claimant and the Company or by final judgment against the *named insured* after the actual trial of the issues and the period of time to appeal has elapsed without an appeal having been taken or, if an appeal has been taken, then until after such appeal has been determined.

## H. AUDIT

The Company shall have the right to examine or audit all financial records of the *named insured*, for the purpose of ascertaining the accuracy of the income or revenue stated in the application.

## I. NONRENEWAL

The Company may non-renew this policy by mailing or delivering to the *named insured* at the address stated on the Declarations Page written notice of nonrenewal at least thirty (30) days before the expiration date of this policy.  The Company shall have the right to offer renewal policy terms, conditions, or premium amounts different than those in effect prior to renewal, this does not constitute non-renewal.

## J. APPLICATION IS INCORPORATED INTO, AND IS PART OF POLICY

The *named insured* acknowledges and agrees that:

1. The warranties and representations contained in the Application for this Policy are true, correct and complete; and

2. The Company issued this Policy in specific reliance upon the representations contained in the Application; and

3. The Application is incorporated into, and is part of, this Policy.

**ER  223**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

ECC-311-0712

Exhibit Miller-E -19

**Contractors Pollution Liability Policy**

## K. OTHER INSURANCE

If any part of either *damages* or *claims expenses* is insured under this Policy and any other current, prior or subsequent Policy, this Policy shall provide coverage for such *damages* or *claims expenses* on a pro rata basis with such other Policy according to the applicable Limits of Liability of this Policy and such other Policy.

## L. SEPARATION OF INSUREDS

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first *Named Insured,* this insurance applies:

1.    As if each *Named Insured* were the only *Named Insured*; and

2.    Separately to each *insured* against whom *claim* is made or *suit* is brought.

**ER  224**

Copyright © 2000 Freberg Environmental, Inc.
All rights reserved.

Dual Trucking & Transport LLC
Endorsement Number: 1

**ADMIRAL** *INSURANCE COMPANY*

# Common Policy Conditions Endorsement

---

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

---

In consideration of the premium charged, and notwithstanding anything
contained in this policy to the contrary, it is hereby agreed that all coverage parts
included in this policy are subject to the following conditions:

**A.**   **CANCELLATION**

The *named insured* may cancel this policy by mailing to the Company
written notice stating when thereafter such cancellation shall become
effective. The Company may cancel this policy by mailing to the *named
insured*, at the mailing address specified the Declarations, written
notice stating when not less than thirty  (30) days thereafter such cancellation
shall become effective, except in the event of the *named insured's*
nonpayment of premium, not less than ten (10) days advance notice of
cancellation shall be given. The mailing of notice as aforesaid, shall be
sufficient proof of either party's intent to cancel. The effective date of
cancellation specified in such notice shall terminate this *policy period*.
Delivery of such notice shall be equivalent to mailing.

If the *named insured* cancels, the earned premium shall be computed in
accordance with the customary short rate table. If the Company cancels,
the earned premium shall be computed pro rata. The Company will
tender any return premium subject to retaining a minimum earned
premium equal to 25% of the amount specified in the Declarations.
Premium adjustment may be made either at the time cancellation is
effective or as soon as practicable thereafter, but tender of the unearned
premium or return of this policy, shall not be conditions precedent to
cancellation hereunder.

**B.**   **CHANGES**

No provision of this policy may be amended, waived or otherwise
changed, except by endorsement hereto.

**ER_225**

ECC-315-0712

Exhibit Miller-E -21



Dual Trucking & Transport LLC
Endorsement Number: 1

**C.    EXAMINATION OF YOUR BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three (3) years afterward.

**D.    INSPECTIONS AND SURVEYS**

We have the right, but are not obliged to:

**1.**    Make inspections and surveys at any time; and

**2.**    Give you reports on the conditions we find; and

**3.**    Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged.  We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

**1.**    Are safe or healthful; or

**2.**    Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service, engineering firm or similar organization which makes insurance inspections, surveys, reports or recommendations.

**E.    NAMED INSURED AS AGENT**

The *named insured* specified in the Declarations shall be deemed agent of each *insured* with respect to all matters involving this policy, however, the Company shall have the right to seek indemnification from any *insured* or any other person who may be legally liable for the debts of the *named insured*.

ECC-315-0712

**ER_226**



Dual Trucking & Transport LLC
Endorsement Number: 1

**F.    PREMIUMS**

The first *Named Insured* shown in the Declarations:

**1.**    Is responsible for the payment of all premiums; and

**2.**    Will be the payee for any return premiums we pay; and

**3.**    Is responsible for the payment of all deductibles and self-insured retention amounts under this policy.

**G.    ADDITIONAL PREMIUMS**

If, during this *policy period*, an increase in the risk or hazards covered hereunder occurs, the Company shall have the right to charge the appropriate additional premium.

**H.    TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual *Named Insured*.  If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative.  Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**I.    BANKRUPTCY**

Bankruptcy or insolvency of the *insured* or of the *insured's* estate will not relieve us of our obligations under this Coverage Part.



Dual Trucking & Transport LLC
Endorsement Number: 2

# Nuclear Energy Liability Exclusion

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

I.   **The insurance does not apply:**

A.   Under any Liability Coverage, to *bodily injury* or *property damage*:

1.   With respect to which an *insured* under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of insurance; or

2.   Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the *insured* is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.   Under any Medical Payments coverage to expenses incurred with respect to *bodily injury* resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C.   Under any Liability Coverage to *bodily injury or property damage* resulting from "hazardous properties" of "nuclear material," if:

1.   The "nuclear material" is (a) at any "nuclear facility" owned by or operated by or on behalf of an *insured* or (b) has been discharged or dispersed therefrom;

2.   The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an *insured*; or

3.   The *bodily injury* or *property damage* arises out of the furnishing by an *insured* of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility" but if such facility is located within the Unites States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such "nuclear facility" and any property thereat.

**ER p.228**

ECC-316-0712

Exhibit Miller-E -24



Dual Trucking & Transport LLC
Endorsement Number: 2

II.  **As used in this endorsement**:

"Hazardous properties" include radioactive, toxic or explosive properties.

"Nuclear material" means "source material," "special nuclear material" or "by-product material."

"Source material," "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

"Waste" means any waste material (a) containing "by-product material" other than the tailings or waste produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**a.**  Any "nuclear reactor";

**b.**  Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste";

**c.**  Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any of the combination thereof, or more than 250 grams of uranium 235; or

**d.**  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste"; and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

ECC-316-0712

Exhibit Miller-E -25



Dual Trucking & Transport LLC
Endorsement Number: 3

# Automatic Additional Insured – Owners, Lessees or Contractors

---

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

---

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**CONTRACTORS POLLUTION LIABILITY COVERAGE PART**

<u>SCHEDULE</u>

Name of Person or Organization:

Any person(s) or organization(s) whom the *Named Insured* agrees, in a
written contract, to name as an additional insured.  However, this status
exists only for the project specified in that contract.

The person or organization shown in this Schedule is included as an insured, but
only with respect to that person's or organization's vicarious liability arising out
of your ongoing operations performed for that insured.

**ER_230**

ECC-319-0712

Exhibit Miller-E -26

Dual Trucking & Transport LLC
Endorsement Number: 4

**ADMIRAL** *INSURANCE COMPANY*

# Automatic Waiver of Subrogation Endorsement

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**CONTRACTORS POLLUTION LIABILITY COVERAGE PART**

<u>SCHEDULE</u>

Name of Person or Organization:

Any person(s) or organization(s) to whom the *Named Insured* agrees, in a
written contract, to provide a waiver of subrogation.  However, this status
exists only for the project specified in that contract.

The Company waives any right of recovery it may have against the person or
organization shown in the above Schedule because of payments the Company
makes for injury or damage arising out of the *insured's* work done under a contract
with that person or organization.  The waiver applies only to the person or
organization in the above Schedule.

Under no circumstances shall this endorsement act to extend the policy period,
change the scope of coverage or increase the Aggregate Limits of Insurance shown
in the Declarations.

**ER_231**

ECC-320-0712

Exhibit Miller-E -27



Dual Trucking & Transport LLC
Endorsement Number: 5

# CLAIM NOTICE

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.**

In the event of claim to which this policy may apply, please give notice as soon as practicable in any of the following ways, to:

Claims

Berkley Custom Insurance Managers

3 Stamford Plaza

301 Tresser Blvd., 6th Floor

Stamford, CT 06901

Toll Free:  855-597-7616


claims@berkleycustom.com

E-mail is the preferred method of receiving claim notice information, but any of the above methods of notification will generate an acknowledgement of receipt of claim with a claim number and all of the claim adjusters' contact information.

ECC-322-0712

**ER_232**

Exhibit Miller-E -28



Dual Trucking & Transport LLC
Endorsement Number: 6

# Minimum Earned Premium Endorsement

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

This endorsement modifies insurance provided under the following:

   X        **CONTRACTORS POLLUTION LIABILITY COVERAGE PART**

If this policy is cancelled at the request of the *Insured*, the total retained by the Company shall not be less than  <u>25%</u> of the premium shown in the Declarations.

**ER_233**



Dual Trucking & Transport LLC
Endorsement Number: 7

# U. S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC.  **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous:

- Foreign agents;

- Front organizations;

- Terrorists;

- Terrorist organizations; and

- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons".  This list can be located on the United States Treasury's website – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC.  When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

Admiral Insurance Company                          PN-0001 00107

Copyright, Insurance Services, Inc., 2004

**ER_234**



Dual Trucking & Transport LLC
Endorsement Number: 8

# Mold and Mildew Exclusion

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

In consideration of the premium charged, and not withstanding anything contained
in this policy to the contrary, it is hereby agreed that this insurance does not apply to
any loss or expense arising directly or indirectly out of, or in concurrence with
actual, alleged or threatened existence, growth, spread, proliferation, discharge,
dispersal, seepage, release cross-contamination or escape of any form of fungus,
including mold or mildew, and any mycotoxins, spores, scents or byproducts
produced or released by fungi regardless of whether or not any such loss or expense
arises out of *professional services*, or any air testing, air monitoring, air sampling,
physical testing, sample collection, evaluation, assessment, remediation, abatement,
investigation, clean-up, analytical testing, and/or containment activities performed
or rendered by the *Named Insured* or by anyone acting on behalf or at the request or
under the direct or indirect supervision of the *Named Insured*.  The Company will
have no duty to defend any legal proceeding or to pay for any claim excluded by
this endorsement.

**ER_235**

ECC-510-0712

Exhibit Miller-E -31



Dual Trucking & Transport LLC
Endorsement Number: 9

# Automatic Primary and Non-Contributory
# Insurance Endorsement
### Designated Work Or Project(s)

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

<u>SCHEDULE</u>

| |
|---|
| Name of Person or Organization:<br><br><br>Any person(s) or organization(s) whom the *Named Insured* agrees, in a written contract, to provide Primary and/or Non-contributory status of this insurance. However, this status exists only for the project specified in that contract. |

In consideration of an additional premium of <u>$Applied</u> and notwithstanding anything contained in this policy to the contrary, it is hereby agreed that this policy shall be considered primary to any similar insurance held by third parties in respect to work performed by you under any written contractual agreement with such third party.  It is further agreed that any other insurance which the person(s) or organization(s) named in the schedule may have is excess and non-contributory to this insurance.

**ER_236**

ECC-548-0712

Exhibit Miller-E -32



Dual Trucking & Transport LLC
Endorsement Number: 10

# Transportation Of Cargo -- Pollution Endorsement

---

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

---

This endorsement modifies insurance provided under the following:

**CONTRACTORS POLLUTION LIABILITY COVERAGE PART**

In consideration of an additional premium in the amount of <u>$Applied</u>, it is hereby
agreed that Exclusion E. is deleted and replaced with the following:

> any *claim* which arises from, or is in any way related to, any collision or
> accident involving an automobile, truck, boat, watercraft, airplane,
> helicopter, or other aircraft or vehicle of any kind or type;

> This exclusion does not apply to *damages* which are the result of a
> *pollution condition* resulting from the upset or overturn of a *covered auto*
> and emanating from the *transported cargo*.   This insurance does not apply
> to any *claim* for *damages* caused by a *pollution condition* arising out of
> *wrongful delivery.*

> This exclusion also does not apply within the boundaries of the job site
> where the *insured* is performing any contracting or remediation operations.

The following definitions are added to the policy:

## II.  DEFINITIONS

A.   *Auto*  means a land motor vehicle, trailer, or semi-trailer designed
for travel on public roads, including any attached machinery or
equipment.

B.   *Covered Auto*  means the following provided they are indicated
with an "X".

**ER_237**

ECC-401-0712

Exhibit Miller-E -33



Dual Trucking & Transport LLC
Endorsement Number: 10

_____    Specifically described Autos listed below in the Schedule of Autos

X    Owned *Autos*. Those *autos* the *insured* owns (and any trailers the *insured* does not
own while connected to a power unit the *insured* owns.) This includes those *autos*
the *insured* acquires ownership of after the policy begins.

X    Hired *Autos*. Those *autos* the *insured* leases, hires, rents or borrows. This does not
include any private passenger type *auto* the *insured* leases, hires, rents or borrows
form the *insured*, any of its employees, partners or agents.

X    Non-owned *Autos*. Those *autos* the *insured* does not own, lease, hire, rent or borrow
that are used in connection with the *insured's* business. This includes *autos* owned by
employees or partners or members of their households but only while used in the
*insured's* business.

C.    *Cargo* means goods, products or *wastes* carried for delivery on or
within a *Covered Auto* that is properly licensed to transport such
goods, products or *wastes*.

D.    *Transported cargo* means *cargo* after it is moved from the place
where it is accepted for movement into or on to the *covered auto*,
until the *cargo* is moved from the *covered auto* to the place where
it is finally delivered. *Transported cargo* also includes *cargo*
during the loading and unloading to or from a *covered auto*,
provided that the loading or unloading is performed by the *insured*.
*Transported cargo* does not include *cargo* at rest for a period of
longer than seventy-two (72) hours, after it has been accepted for
movement into or onto a *covered auto* but before it reaches the
place of final delivery.

E.    *Wrongful delivery* means the delivery of any *cargo* into the wrong
receptacle or to the wrong address, or the delivery of one type of
*cargo* in error for another.

**ER_238**

ECC-401-0712

Exhibit Miller-E -34



Dual Trucking & Transport LLC
Endorsement Number: 11

# Exclusion of Certified Acts of Terrorism and Exclusion of Other Acts of Terrorism Committed Outside the United States

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

This endorsement modifies insurance provided under this policy.

**A.**  This insurance does not apply to:

Terrorism

"Any injury or damage" arising directly or indirectly, out of a "certified act of terrorism" or out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act.

**1.**  The total of insured damage to all types of property exceeds $25,000,000 (valued in US dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.**  Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.**  physical injury that involves a substantial risk of death; or

**b.**  protracted and obvious physical disfigurement; or

**c.**  protracted loss of or impairment of the function of a bodily member or organ; or

**ER_239**

EXL 1201 0712

Exhibit Miller-E -35



Dual Trucking & Transport LLC
Endorsement Number: 11

**3.** The terrorism involves the use or release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.
With respect to this exclusion, Paragraph 1. and 2. describe the thresholds used to measure the magnitude of an Incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under this policy, or "underlying insurance" to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "loss", "injury" or "environmental damage" as may be defined in any applicable policy, or "underlying insurance".

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

EXL 1201 0712

**ER_240**

Exhibit Miller-E -36



Dual Trucking & Transport LLC
Endorsement Number: 11

**b.** The act resulted in damage:

    **(1)** Within the United States (including its territories and possessions and Puerto Rico); or

    **(2)** Outside of the United States in the case of:

        **(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

        **(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism". Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**4.** "Coverage territory" means anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanctions or embargo by the United States of America.

EXL 1201 0712

**ER_241**

Exhibit Miller-E -37



Dual Trucking & Transport LLC
Endorsement Number: 11

**C.** In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this policy.

This endorsement does not change any other provision of the policy.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

EXL 1201 0712

**ER_242**

Exhibit Miller-E -38



Dual Trucking & Transport LLC
Endorsement Number: 12

# Exclusion of Certified Acts of Terrorism

---

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

---

This endorsement modifies insurance provided under this policy.

**A.**  The following exclusion is added:

This insurance does not apply to:

**TERRORISM**
"Any injury or damage" arising, directly or indirectly, out of a "certified act
of terrorism".

**B.**  The following definitions are added:

**1.**  For the purposes of this endorsement, "any injury or damage" means any
injury or damage covered under any Policy or "underlying insurance" to
which this endorsement is applicable, and includes but is not limited to
"bodily injury", "property damage", "personal and advertising injury",
"injury" or "environmental damage" as may be defined in any applicable
Policy or "underlying insurance".

**2.**  "Certified act of terrorism" means an act that is certified by the Secretary
of the Treasury, in concurrence with the Secretary of State and the
Attorney General of the United States, to be an act of terrorism pursuant
to the federal Terrorism Risk Insurance Act. The criteria contained in the
Terrorism Risk Insurance Act for a "certified act of terrorism" include
the following:

**a.**  The act resulted in insured losses in excess of $5 million in the

**ER_243**

Exhibit Miller-E -39



Dual Trucking & Transport LLC
Endorsement Number: 12

aggregate, attributable to all types of insurance subject to the

Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life,

property or infrastructure and is committed by an individual or

individuals as part of an effort to coerce the civilian population of the

United States or to influence the policy or affect the conduct of the

United States Government by coercion.

Exhibit Miller-E -40



Dual Trucking & Transport LLC
Endorsement Number: 13

# This Endorsement is Attached to and Made Part of Your Policy in Response to The Disclosure Requirements of The Terrorism Risk Insurance Act. This Endorsement Does Not Grant Any Coverage or Change the Terms and Conditions of Any Coverage Under The Policy.

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT – REJECTION OF OFFER

**A. Rejection of Offer**

You have rejected the offer of terrorism coverage for Acts of Terrorism that are certified under the Terrorism Risk Insurance Act as reauthorized and amended in 2007, as an Act of Terrorism. An exclusion of terrorism losses has been made a part of this policy.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.   **You have rejected this offer of coverage.**

Includes copyrighted material of Insurance Services Office, Inc. with its permission

EXL 1311 0712

**ER_245**

Exhibit Miller-E -41

Dual Trucking & Transport LLC
Endorsement Number: 14

**ADMIRAL** INSURANCE COMPANY

# Service of Suit

---

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

---

The *Named Insured* and the *Company* agree to the following:

In the event of the failure by the *Company* to pay any amount claimed to be due under this policy, the
*Company* will, at the *Named Insured's* request, submit to the jurisdiction of any court of competent
jurisdiction within the United States of America and will comply with all requirements necessary to give
the Court jurisdiction.  Nothing in this endorsement constitutes or should be understood to constitute a
waiver of the *Company's* rights to commence an action in any court of competent jurisdiction in the
United States, to remove an action to a United States District Court or to seek a transfer of a case to
another court as permitted by the laws of the United States or of any state in the United States.  In a suit
instituted against the *Company* under this contract, the *Company* agrees to abide by the final decision of
the court or of any appellate court in the event of an appeal.

Pursuant to any statute of any state, territory or district of the United States of America which makes a
provision therefore, the *Company* will designate the Superintendent, Commissioner or Director of
Insurance or other officer specified for that purpose in the statute, or his successor or successors in office,
as the *Company's* true and lawful attorney upon whom may be served any lawful process in any action,
suit or proceeding instituted by or on behalf of the *Named Insured* or the *Named Insured's* beneficiary
arising out of this contract of insurance.

The officer named below is authorized and directed to accept service of process on the *Company's* behalf:

Mr. Stacy D. Brown

Freberg Environmental Insurance, Inc.

2000 South Colorado Boulevard, Tower II, Suite 800

Denver, CO 80222

Having accepted service of process on the *Company's* behalf, the officer is authorized to mail the process
or a true copy to:

Claims

Berkley Custom Insurance Managers

3 Stamford Plaza

301 Tresser Blvd., 6th Floor

Stamford, CT 06901

**ER_246**



Dual Trucking & Transport LLC
Endorsement Number: 15

# NOTICE

This insurance policy is delivered as a surplus line coverage under the insurance code of the State of Louisiana.

In the event of insolvency of the company issuing this contract, the policyholder or claimant is not covered by the Louisiana Insurance Guaranty Association which guarantees only specific policies issued by an insurance company authorized as an admitted carrier to do business in Louisiana.

**ER_247**

Louisiana Notice

Exhibit Miller-E -43



Dual Trucking & Transport LLC
Endorsement Number: 16

# Added Named Insured Endorsement

---

This endorsement, effective 10/1/2012 attaches to and forms a part of Policy Number
FEI-ECC-10294-00. This endorsement changes the Policy.  Please read it carefully.

---

In consideration of an additional premium of $0, it is hereby understood and agreed
that the following entity is to be added as a *Named Insured* to this policy:

Dual Trucking of Montana LLC

ECC-563-0712

Exhibit Miller-E -44

Linda M. Deola
MORRISON, SHERWOOD, WILSON & DEOLA, PLLP
PO Box 557
Helena, Montana 59624-0557
(406) 442-3261
ldeola@mswdlaw.com

KD Feeback
TOOLE & FEEBACK, PLLC
PO Box 907
Lincoln, Montana 59639
(406) 362-4025
kdfeeback@gmail.com

*Attorneys for Defendants Dual Trucking, Inc., Dual Trucking of Montana, LLC,
Dual Trucking and Transport, LLC and Anthony Alford*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| ADMIRAL INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DUAL TRUCKING, INC. a Louisiana Corporation, DUAL TRUCKING OF MONTANA, L.L.C., a Louisiana limited liability company, DUAL TRUCKING AND TRANSPORT, L.L.C., a Louisiana Limited liability company, ANTHONY J. ALFORD, a Louisiana resident.<br><br>Defendants. | Case No. CV-20-53-GF-BMM<br><br><br>**NOTICE OF APPEAL** |

Notice is hereby given that Defendants Dual Trucking, Inc., Dual Trucking of Montana, LLC, Dual Trucking and Transport, LLC and Anthony Alford hereby appeal in the above-captioned action to the United States Court of Appeals for the Ninth Circuit from the District Court's Order (Doc. 76) and Judgment (Doc. 77) entered on May 5, 2021.

RESPECTFULLY SUBMITTED this 4th day of June 2021.

MORRISON SHERWOOD WILSON DEOLA PLLP

/s/ Linda M. Deola
Linda M. Deola
*Attorney for Defendants*

APPEAL,CLOSED

# U.S. District Court
## District of Montana (Great Falls)
## CIVIL DOCKET FOR CASE #: 4:20-cv-00053-BMM

Admiral Insurance Co v. Dual Trucking, Inc. et al
Assigned to: Judge Brian Morris
Case in other court:  9th Circuit, 21-35433
Cause: 28:1332 Diversity-Insurance Contract

Date Filed: 05/18/2020
Date Terminated: 05/18/2021
Jury Demand: Plaintiff
Nature of Suit: 110 Insurance
Jurisdiction: Diversity

**Plaintiff**

**Admiral Insurance Company**

represented by **Emma L. Mediak**
GARLINGTON LOHN & ROBINSON,
PLLP
350 Ryman Street
PO Box 7909
Missoula, MT 59807-7909
406-523-2500
Fax: 406-523-2595
Email: elmediak@garlington.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sidney W. Degan , III**
Degan, Blanchard & Nash (New Orleans)
Texaco Center
400 Poydras St.
Suite 2600
New Orleans, LA 70130
504-529-3333
Email: sdegan@degan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles E. McNeil**
GARLINGTON, LOHN & ROBINSON,
PLLP
PO Box 7909
199 W Pine
Missoula, MT 59807-7909
406-523-2500
Fax: 523-2595
Email: cemcneil@garlington.com
*TERMINATED: 04/07/2021*

**ER_251**

**Emma Dedman**

Degan, Blanchard & Nash
LA
400 Poydras Street
Ste 2600
New Orleans, LA 70130
504-529-3333
Fax: 504-529-3337
Email: ededman@degan.com
*ATTORNEY TO BE NOTICED*

**John M. Futrell**
Degan, Blanchard & Nash (New Orleans)
Texaco Center
400 Poydras St.
Suite 2600
New Orleans, LA 70130
504-529-3333
Fax: 504-569-1726
Email: jfutrell@degan.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Dual Trucking, Inc.**
*a Louisiana corporation*

represented by **Frederic C. Fondren**
Mayhall Fondren Blaize
628 Wood St.
Houma, LA 70360
985-223-4725
Email: ffondren@mfbfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin D. Feeback**
TOOLE & FEEBACK, PLLC
702 Main Street
P.O. Box 907
Lincoln, MT 59639
406-362-4025
Fax: 406-362-4090
Email: kdfeeback@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda M. Deola**
MORRISON, SHERWOOD, WILSON &
DEOLA, PLLP
401 N Last Chance Gulch
PO Box 557

**ER_252**

Helena, MT 59624
406-442-3261
Fax: 443-7294
Email: ldeola@mswdlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dual Trucking of Montana, LLC**
*a Louisiana limited liability company*

represented by **Frederic C. Fondren**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin D. Feeback**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda M. Deola**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dual Trucking and Transport, LLC**
*a Louisiana limited liability company*

represented by **Frederic C. Fondren**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin D. Feeback**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda M. Deola**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anthony J. Alford**
*a Louisiana Resident*

represented by **Frederic C. Fondren**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin D. Feeback**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ER_253**

**Linda M. Deola**
(See above for address)

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/04/2020 | 1 | COMPLAINT against All Defendants (Filing fee $ 400 receipt number ALAEDC-8127372) filed by Admiral Insurance Co. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z, # 28 Exhibit AA, # 29 Exhibit BB, # 30 Summons, # 31 Summons, # 32 Summons, # 33 Summons)Attorney John M. Futrell added to party Admiral Insurance Co(pty:pla).(Futrell, John) Modified text on 2/5/2020 (dw). [Transferred from laed on 5/18/2020.] (Entered: 02/04/2020) |
| 02/04/2020 | 2 | Initial Case Assignment to Judge Eldon E. Fallon and Magistrate Judge Karen Wells Roby. (cc) [Transferred from laed on 5/18/2020.] (Entered: 02/04/2020) |
| 02/05/2020 | 3 | Summons Issued as to Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Attachments: # 1 Summons Dual Trucking of Montana, LLC, # 2 Summons Dual Trucking and Transport, LLC, # 3 Summons Anthony J. Alford)(dw) [Transferred from laed on 5/18/2020.] (Entered: 02/05/2020) |
| 02/13/2020 | 4 | SUMMONS Returned Executed; Anthony J. Alford served on 2/7/2020, answer due 2/28/2020; Dual Trucking and Transport, LLC served on 2/7/2020, answer due 2/28/2020; Dual Trucking of Montana, LLC served on 2/7/2020, answer due 2/28/2020; Dual Trucking, Inc. served on 2/7/2020, answer due 2/28/2020. (Attachments: # 1 Summons return, # 2 Summons return, # 3 Summons return)(Futrell, John) Modified text on 2/14/2020 (jeg). [Transferred from laed on 5/18/2020.] (Entered: 02/13/2020) |
| 02/27/2020 | 6 | **DEFICIENT** EXPARTE/CONSENT MOTION to Appear Pro Hac Vice (Filing fee $ 100 receipt number ALAEDC-8178498) by Admiral Insurance Co. (Attachments: # 1 Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Futrell, John) Modified on 2/28/2020 (jeg). [Transferred from laed on 5/18/2020.] (Entered: 02/27/2020) |
| 02/28/2020 | 7 | EXPARTE/CONSENT MOTION for Extension of Time to Answer 1 Complaint by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. (Attachments: # 1 Proposed Order, # 2 Memorandum in Support)Attorney Frederic C. Fondren added to party Anthony J. Alford(pty:dft), Attorney Frederic C. Fondren added to party Dual Trucking and Transport, LLC(pty:dft), Attorney Frederic C. Fondren added to party Dual Trucking of Montana, LLC(pty:dft), Attorney Frederic C. Fondren added to party Dual Trucking, Inc.(pty:dft). (Fondren, Frederic) Modified text/linkage on 3/2/2020 (jeg). [Transferred from laed on 5/18/2020.] (Entered: 02/28/2020) |
| 02/28/2020 | 8 | EXPARTE/CONSENT MOTION to Appear Pro Hac Vice *Emma L. Mediak* (Filing fee $ 100 receipt number ALAEDC-8180201) by Admiral Insurance Co. (Attachments: # 1 Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Futrell, John) Modified text on 3/2/2020 (jeg). [Transferred from laed on 5/18/2020.] (Entered: 02/28/2020) |

ER_254

| 03/02/2020 | 9 | Correction of Docket Entry by Clerk re 7 MOTION for Extension of Time to Answer. **Document should have been linked to another document by checking the box 'Should the document you are filing link to another document' or by selecting a related document on other appropriate screen. Clerk took corrective action by linking document to document 1. No further action necessary.** (jeg) [Transferred from laed on 5/18/2020.] (Entered: 03/02/2020) |
|---|---|---|
| 03/03/2020 | 10 | ORDER granting 7 Motion for Extension of Time to Answer re 1 Complaint; as to Anthony J. Alford answer due 3/13/2020; Dual Trucking and Transport, LLC answer due 3/13/2020; Dual Trucking of Montana, LLC answer due 3/13/2020; Dual Trucking, Inc. answer due 3/13/2020. Signed by Judge Eldon E. Fallon on 3/2/2020. (mmm) [Transferred from laed on 5/18/2020.] (Entered: 03/03/2020) |
| 03/03/2020 | 11 | ORDER granting 8 Motion to Appear Pro Hac Vice as to Emma Laughlin Mediak. Signed by Judge Eldon E. Fallon on 3/2/2020. (Attachments: # 1 PHV Notice) (cwa) [Transferred from laed on 5/18/2020.] (Entered: 03/05/2020) |
| 03/13/2020 | 12 | MOTION to Dismiss for Lack of Jurisdiction by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. Motion(s) will be submitted on 4/15/2020. (Attachments: # 1 Notice of Submission, # 2 Memorandum in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4)(Fondren, Frederic) [Transferred from laed on 5/18/2020.] (Entered: 03/13/2020) |
| 04/01/2020 | 13 | RESPONSE/MEMORANDUM in Opposition filed by Admiral Insurance Co re 12 MOTION to Dismiss for Lack of Jurisdiction . (Futrell, John) Modified text/event on 4/2/2020 (jeg). [Transferred from laed on 5/18/2020.] (Entered: 04/01/2020) |
| 04/02/2020 | 14 | Correction of Docket Entry by Clerk re 13 Response to Motion. **Filing attorney selected incorrect event. Correct event is RESPONSE/MEMORANDUM in Opposition to Motion. Clerk took corrective action by changing the event. No further action necessary.** (jeg) [Transferred from laed on 5/18/2020.] (Entered: 04/02/2020) |
| 04/06/2020 | 15 | ORDER TRANSFERRING CASE. Case transferred to Judge Susie Morgan and Magistrate Judge Dana Douglas. Judge Eldon E. Fallon, Magistrate Judge Karen Wells Roby no longer assigned to case. Signed by Judge Eldon E. Fallon on 4/6/2020.(jeg) (NEF: Sections E and L; Magistrates 3 and 4) [Transferred from laed on 5/18/2020.] (Entered: 04/06/2020) |
| 04/07/2020 | 16 | EXPARTE/CONSENT MOTION to Continue *Hearing/Submission Date on Motion to Dismiss* by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Attachments: # 1 Proposed Order, # 2 Memorandum in Support)(Fondren, Frederic) [Transferred from laed on 5/18/2020.] (Entered: 04/07/2020) |
| 04/08/2020 | 17 | ORDER GRANTING IN PART 16 MOTION to Continue *Hearing/Submission Date on Motion to Dismiss*. The pending 12 motion to dismiss is set for submission on May 13, 2020. Signed by Judge Susie Morgan.(bwn) [Transferred from laed on 5/18/2020.] (Entered: 04/08/2020) |
| 04/27/2020 | 18 | Application for Refund of Electronic Fees filed by Admiral Insurance Co for the following reason: Duplicate payment; receipt number ALAEDC-8178498 re 8 Motion to Appear Pro Hac Vice,. (Attachments: # 1 Proposed Order, # 2 Exhibit)(Futrell, John) (NEF: Financial) Modified text on 4/28/2020 (sbs). [Transferred from laed on |

| | | 5/18/2020.] (Entered: 04/27/2020) |
|---|---|---|
| 05/04/2020 | 19 | **DEFICIENT** RESPONSE/MEMORANDUM in Opposition filed by All Defendants re 12 MOTION to Dismiss for Lack of Jurisdiction. (Fondren, Frederic) Modified text on 5/4/2020 (sbs). [Transferred from laed on 5/18/2020.] (Entered: 05/04/2020) |
| 05/04/2020 | 20 | EXPARTE/CONSENT MOTION for Leave to File Reply to Plaintiff's Memorandum in Opposition re 12 MOTION to Dismiss for Lack of Jurisdiction by All Defendants. (Attachments: # 1 Proposed Order, # 2 Proposed Pleading)(Fondren, Frederic) Modified text, added link on 5/5/2020 (sbs). [Transferred from laed on 5/18/2020.] (Entered: 05/04/2020) |
| 05/06/2020 | 21 | ORDER granting 20 Motion for Leave to File Reply. Signed by Judge Susie Morgan on 5/6/2020. (sbs) [Transferred from laed on 5/18/2020.] (Entered: 05/06/2020) |
| 05/06/2020 | 22 | REPLY to Response to Motion filed by All Defendants re 12 MOTION to Dismiss for Lack of Jurisdiction. (sbs) [Transferred from laed on 5/18/2020.] (Entered: 05/06/2020) |
| 05/18/2020 | 23 | ORDER AND REASONS - For the reasons herein, Defendants' motion to dismiss on abstention grounds is DENIED. Defendants' motion in the alternative to dismiss on forum non conveniens grounds is construed as a motion to transfer venue pursuant to 28 U.S.C. 1404(a) and GRANTED. The Court orders that this case is TRANSFERRED TO THE DISTRICT OF MONTANA, BILLINGS DIVISION. Signed by Judge Susie Morgan on 5/18/2020.(sbs) [Transferred from laed on 5/18/2020.] (Entered: 05/18/2020) |
| 05/18/2020 | 24 | Case transferred in from District of Louisiana Eastern; Case Number 2:20-cv-00383. Original file certified copy of transfer order and docket sheet received. (JDR, ) (Entered: 05/18/2020) |
| 06/11/2020 | 25 | NOTICE of Appearance by Linda M. Deola on behalf of Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. (Deola, Linda) (Entered: 06/11/2020) |
| 06/16/2020 | 26 | NOTICE of Appearance by Kevin D. Feeback on behalf of All Defendants (Feeback, Kevin) (Entered: 06/16/2020) |
| 06/16/2020 | 27 | AMENDED DOCUMENT by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. Amendment to 25 Notice of Appearance *AMENDED NOTICE OF APPEARANCE*. (Deola, Linda) (Entered: 06/16/2020) |
| 06/19/2020 | 28 | Unopposed MOTION to Change Venue Linda M. Deola appearing for Defendants Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. Motions referred to Timothy J. Cavan. (Deola, Linda) (Entered: 06/19/2020) |
| 06/19/2020 | 29 | Brief/Memorandum in Support re 28 Unopposed MOTION to Change Venue filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Deola, Linda) (Entered: 06/19/2020) |
| 06/19/2020 | 30 | MOTION to Dismiss *Opposed Motion to Dismiss Anthony J. Alford* Linda M. Deola appearing for Defendants Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. (Deola, Linda) Modified on 4/5/2021 |

| | | to remove docket text that motion is referred to TJC. (MMS). (Entered: 06/19/2020) |
|---|---|---|
| 06/19/2020 | 31 | Brief/Memorandum in Support re 30 MOTION to Dismiss *Opposed Motion to Dismiss Anthony J. Alford* filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Deola, Linda) (Entered: 06/19/2020) |
| 06/19/2020 | 32 | AFFIDAVIT/DECLARATION re 31 Brief/Memorandum in Support *Declaration of Anthony J. Alford* by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Deola, Linda) (Entered: 06/19/2020) |
| 06/22/2020 | 33 | ORDERED: Motion (Doc. 28) is GRANTED and this case shall be transferred to the Great Falls Division pursuant to L.R. 1.2(c)(3). granting 28 Motion to Change Venue. G.F. Clerk's notified. Signed by Magistrate Judge Timothy J. Cavan on 6/22/2020. (HEG) (Entered: 06/22/2020) |
| 06/22/2020 | | Case transferred to Great Falls Division from Billings Division on 06/22/2020 Billings Case Number 1:20-cv-67. (TLO) (Entered: 06/22/2020) |
| 06/23/2020 | 34 | NOTICE of Appearance by Emma L. Mediak on behalf of Admiral Insurance Co (Mediak, Emma) (Entered: 06/23/2020) |
| 06/23/2020 | 35 | NOTICE of Appearance by Charles E. McNeil on behalf of Admiral Insurance Co (McNeil, Charles) (Entered: 06/23/2020) |
| 07/10/2020 | 36 | RESPONSE to Motion re 30 MOTION to Dismiss *Opposed Motion to Dismiss Anthony J. Alford* filed by Admiral Insurance Co. (Mediak, Emma) (Entered: 07/10/2020) |
| 07/24/2020 | 37 | REPLY to Response to Motion re 30 MOTION to Dismiss *Opposed Motion to Dismiss Anthony J. Alford* filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Deola, Linda) (Entered: 07/24/2020) |
| 07/24/2020 | 38 | ANSWER to Complaint by Dual Trucking and Transport, LLC. (Deola, Linda) (Entered: 07/24/2020) |
| 07/24/2020 | 39 | ANSWER to Complaint by Dual Trucking, Inc.. (Deola, Linda) (Entered: 07/24/2020) |
| 07/27/2020 | 40 | PRELIMINARY PRETRIAL CONFERENCE ORDER: Preliminary Pretrial Statement due by 8/26/2020. Joint Discovery Plan due by 8/26/2020. Statement of Stipulated Facts due by 8/26/2020. Telephonic Pretrial Conference set for 9/2/2020 at 01:30 PM before Judge Brian Morris. PLEASE SEE ORDER FOR FULL DETAILS. Signed by Judge Brian Morris on 7/27/2020. (MMS) (Entered: 07/27/2020) |
| 08/11/2020 | 41 | ANSWER to Complaint by Dual Trucking of Montana, LLC. (Deola, Linda) (Entered: 08/11/2020) |
| 08/26/2020 | 42 | PRELIMINARY PRETRIAL STATEMENT by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Deola, Linda) (Entered: 08/26/2020) |
| 08/26/2020 | 43 | JOINT DISCOVERY PLAN by Admiral Insurance Co. (Mediak, Emma) (Entered: 08/26/2020) |
| 08/26/2020 | 44 | STATEMENT OF STIPULATED FACTS by Admiral Insurance Co. (Mediak, Emma) (Entered: 08/26/2020) |

**ER_257**

| | | |
|---|---|---|
| 08/26/2020 | 45 | PRELIMINARY PRETRIAL STATEMENT by Admiral Insurance Co. (Mediak, Emma) (Entered: 08/26/2020) |
| 09/02/2020 | 46 | MINUTE ENTRY for proceedings held before Judge Brian Morris: Telephonic Pretrial Conference held on 9/2/2020. (Law Clerk: S. Carmack), (SLL) (Entered: 09/02/2020) |
| 09/02/2020 | 47 | SCHEDULING ORDER: Final Pretrial Conference set for 8/11/2021 at 01:30 PM in Great Falls, MT before Judge Brian Morris. Jury Trial set for 9/7/2021 at 09:00 AM in Great Falls, MT before Judge Brian Morris. Amended Pleadings due by 11/6/2020. Discovery due by 3/12/2021. Joinder of Parties due by 11/6/2020. Motions due by 5/11/2021. Proposed Pretrial Order due by 7/12/2021. PLEASE SEE ORDER FOR FULL DETAILS. Signed by Judge Brian Morris on 9/2/2020. (MMS) (Entered: 09/02/2020) |
| 11/06/2020 | 48 | AMENDED COMPLAINT against All Defendants, filed by Admiral Insurance Co. (Attachments: # 1 Exhibit BB Notice of Occurrence) (Mediak, Emma) (Entered: 11/06/2020) |
| 11/25/2020 | 49 | ANSWER to 48 Amended Complaint by Dual Trucking of Montana, LLC. (Deola, Linda) (Entered: 11/25/2020) |
| 11/25/2020 | 50 | ANSWER to 48 Amended Complaint by Dual Trucking and Transport, LLC. (Deola, Linda) (Entered: 11/25/2020) |
| 11/25/2020 | 51 | ANSWER to 48 Amended Complaint by Dual Trucking, Inc.. (Deola, Linda) (Entered: 11/25/2020) |
| 01/19/2021 | 52 | MOTION to Stay Linda M. Deola appearing for Defendants Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. (Deola, Linda) (Entered: 01/19/2021) |
| 01/19/2021 | 53 | Brief/Memorandum in Support re 52 MOTION to Stay filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Deola, Linda) (Entered: 01/19/2021) |
| 01/20/2021 | 54 | PLEASE DISREGARD MINUTE ENTRY AS IT WAS DOCKETED INT HE WRONG CASE for Telephonic Pretrial Conference held on 1/20/2021. (Law Clerk: S. Carmack), (SLL) Modified on 1/20/2021 (MMS). (Entered: 01/20/2021) |
| 02/02/2021 | 55 | MOTION for Summary Judgment Emma L. Mediak appearing for Plaintiff Admiral Insurance Company (Mediak, Emma) (Entered: 02/02/2021) |
| 02/02/2021 | 56 | Brief/Memorandum in Support re 55 MOTION for Summary Judgment filed by Admiral Insurance Company. (Mediak, Emma) (Entered: 02/02/2021) |
| 02/02/2021 | 57 | Statement of Undisputed Fact re: 55 MOTION for Summary Judgment , 56 Brief/Memorandum in Support by Admiral Insurance Company filed by Admiral Insurance Company. (Mediak, Emma) (Entered: 02/02/2021) |
| 02/02/2021 | 58 | AFFIDAVIT in Support re 55 MOTION for Summary Judgment *Foundational Declaration of Emma L. Mediak* filed by Admiral Insurance Company. (Attachments: # 1 Exhibit DTT Responses to Discovery, # 2 Exhibit Admiral 400, # 3 Exhibit DTM Responses to Discovery, # 4 Exhibit DTI Responses to Discovery, # 5 Exhibit 2011 Harmon-DTI Lease, # 6 Exhibit 2011 Harmon-DTI Lease, # 7 Exhibit Lot 1 Harmon- |

**ER 258**

| | | |
|---|---|---|
| | | DTM Lease, # [8](#) Exhibit Lot 2 Harmon-DTM Lease, # [9](#) Exhibit Lot 3 Harmon-DTM Lease, # [10](#) Exhibit Admiral 3976, # [11](#) Exhibit 2012-09-12 Warning Letter Dual 20068, # [12](#) Exhibit Harmon Second Amended Complaint, # [13](#) Exhibit DT&T, DTM answer & Counterclaim, # [14](#) Exhibit 2013-03-12 First Violation Letter w Receipt MT-DEQ, # [15](#) Exhibit 2013-03-13 Second Violation Letter Dual 20070, # [16](#) Exhibit 2013-03-13 Second Violation Letter Return Receipt MT-DEQ, # [17](#) Exhibit 2013-03-13 Third Violation Letter w receipt MT-DEQ, # [18](#) Exhibit DTT Response to 3 Violation Letters MT-DEQ, # [19](#) Exhibit 2013-06-10 SWMS Permit App MT-DEQ, # [20](#) Exhibit 2013-08-02 Fourth Violation Letter Dual 20000, # [21](#) Exhibit 2013-08-02 Fourth Violation Letter w Receipt MT-DEQ, # [22](#) Exhibit 2013-09-25 Wilson Elzer Breach Letter Dual, # [23](#) Exhibit 2013-12-04 DEQ proposed AOC Dual, # [24](#) Exhibit 2013-12-13 Site Characterization Report MT-DEQ, # [25](#) Exhibit 2014 Revised Site Characterization Report, # [26](#) Exhibit 2014-01-09 DTT negotiating AOC w DEQ MT-DEQ, # [27](#) Exhibit 2014-03-07 DEQ re AOC Dual, # [28](#) Exhibit Proposed AOC to Dove FW FWD FW Dual AOC, # [29](#) Exhibit Fifth Violation Letter Dual, # [30](#) Exhibit DTI Response 5th violation letter MT-DEQ, # [31](#) Exhibit 2014-05-30 DTT response to 5th violation letter MT-DEQ, # [32](#) Exhibit email re Laris knowledge re Harmons FW Dual article, # [33](#) Exhibit Notice of Hydrocarbons in surface water MT DEQ & DTT Meeting, # [34](#) Exhibit 2014-05-20 DTT letter re Phase I and II enviro review MT-DEQ, # [35](#) Exhibit 2014-05-21 Harmon Dual Settlement Emails Admiral, # [36](#) Exhibit sent to Alfrod email address FW Dual Trucking Settlement, # [37](#) Exhibit w Tony Alford Email Address-DEQ orders Bakken company to stop, # [38](#) Exhibit DTM's Combined Reply ISO MSJ & Resp to MPSJ, # [39](#) Exhibit Sixth Violation Letter Dual, # [40](#) Exhibit DEQ Complaint Injunction Dual, # [41](#) Exhibit DTM v Harmon 3rd Amend Compl, # [42](#) Exhibit 2016-10-21 Terracon Limited Site Investigation Report Admiral) (Mediak, Emma) (Entered: 02/02/2021) |
| 02/02/2021 | [59](#) | AFFIDAVIT/DECLARATION re [56](#) Brief/Memorandum in Support, [55](#) MOTION for Summary Judgment *Declaration of Renee Miller* by Admiral Insurance Company. (Attachments: # [1](#) Exhibit DT&T EIL app 2012 (2)_Redacted, # [2](#) Exhibit Dual Trucking & Transport LLC FEI-EIL-10415-00 cert_Redacted, # [3](#) Exhibit DT&T CPL app 2012_Redacted, # [4](#) Exhibit DTI CPL App 2012_Redacted, # [5](#) Exhibit Dual Trucking & Transport LLC FEI-ECC-10294-00 cert_Redacted, # [6](#) Exhibit Dual Trucking Inc FEI-ECC-10295-00 cert_Redacted, # [7](#) Exhibit DT&T EIL app 2013_Redacted, # [8](#) Exhibit Dual Trucking & Transport LLC FEI-EIL-10415-01 cert_Redacted, # [9](#) Exhibit DT&T CPL app 2013_Redacted, # [10](#) Exhibit DTI CPL app 2013_Redacted, # [11](#) Exhibit Dual Trucking & Transport LLC FEI-ECC-10294-01 cert_Redacted, # [12](#) Exhibit Dual Trucking Inc FEI-ECC-10295-01 cert_Redacted) (Mediak, Emma) (Entered: 02/02/2021) |
| 02/02/2021 | [60](#) | AFFIDAVIT/DECLARATION re [55](#) MOTION for Summary Judgment , [56](#) Brief/Memorandum in Support *Declaration of Ronald Ronzello* by Admiral Insurance Company. (Attachments: # [1](#) Exhibit DTT First Notice of Claim Admrial 396, # [2](#) Exhibit DTI First Notice of Claim Admiral 401) (Mediak, Emma) (Entered: 02/02/2021) |
| 02/02/2021 | [61](#) | RESPONSE to Motion re [52](#) MOTION to Stay filed by Admiral Insurance Company. (Mediak, Emma) (Entered: 02/02/2021) |
| 02/12/2021 | [62](#) | REPLY to Response to Motion re [52](#) MOTION to Stay filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. |

Case: 21-35433, 10/13/2021, ID: 12255714, DktEntry: 11, Page 260 of 262

|  |  | (Deola, Linda) (Entered: 02/12/2021) |
|---|---|---|
| 02/20/2021 | 63 | MOTION for Extension of Time to File Response/Reply Kevin D. Feeback appearing for Defendant Dual Trucking and Transport, LLC (Attachments: # 1 Text of Proposed Order) (Feeback, Kevin) (Entered: 02/20/2021) |
| 02/22/2021 | 64 | ORDER: Defendants have moved for an extension of time to respond to Plaintiffs 55 Motion for Partial Summary Judgment. The current deadline for Defendants to respond is February 23, 2021. Defendants request this deadline be extended to March 15, 2021. Plaintiffs do not object. With good cause shown, Defendants Motion is granted. Defendants shall have until March 15, 2021, to respond to Plaintiffs Motion for Partial Summary Judgment. Signed by Judge Brian Morris on 2/22/2021. (SLR) (Entered: 02/22/2021) |
| 03/11/2021 | 65 | Second MOTION for Extension of Time to File Response/Reply Kevin D. Feeback appearing for Defendant Dual Trucking and Transport, LLC (Attachments: # 1 Text of Proposed Order Proposed Order) (Feeback, Kevin) (Entered: 03/11/2021) |
| 03/11/2021 | 66 | ORDER: Defendants have moved for an extension of time to respond to Plaintiffs 55 Motion for Partial Summary Judgment. The current deadline for Defendants to respond is March 15, 2021. Defendants request this deadline be extended to March 25, 2021. Plaintiffs do not object. With good cause shown, Defendants Motion is granted. Defendants shall have until March 25, 2021, to respond to Plaintiffs Motion for Partial Summary Judgment. Signed by Judge Brian Morris on 3/11/2021. (SLR) (Entered: 03/11/2021) |
| 03/25/2021 | 67 | RESPONSE to Motion re 55 MOTION for Summary Judgment filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Feeback, Kevin) (Entered: 03/25/2021) |
| 03/25/2021 | 68 | Statement of Disputed Facts re: 67 Response to Motion, filed by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. (Attachments: # 1 Exhibit H, # 2 Exhibit I) (Feeback, Kevin) (Entered: 03/25/2021) |
| 04/07/2021 | 69 | ORDER; The United States District Court for the Eastern District of Louisiana already considered Defendants arguments in the context of a Motion to Dismiss. (Doc. 23 ). The district courts application of the Brillman factors remains applicable to Defendants Motion to Stay (Doc. 52 ). This Court determines that the issues raised in Admirals Amended Complaint (Doc. 48 ) can be resolved without offending principles of comity, fairness, and judicial economy. Accordingly, IT IS ORDERED that Defendants Motion to Stay (Doc. 52 ) is DENIED. Signed by Judge Brian Morris on 4/7/2021. (TLO) (Entered: 04/07/2021) |
| 04/07/2021 | 70 | TEXT ORDER Setting Hearing on Motion 55 MOTION for Summary Judgment : IT IS HEREBY ORDERED that a Motion Hearing is set for 4/20/2021 at 01:30 PM in Great Falls, MT before Judge Brian Morris. Signed by Judge Brian Morris on 4/7/2021. (SLL) (Entered: 04/07/2021) |
| 04/07/2021 | 71 | NOTICE of Withdrawal of Counsel: Charles E. McNeil withdrawing from the case, filed by Admiral Insurance Company (McNeil, Charles) (Entered: 04/07/2021) |

| 04/08/2021 | 72 | REPLY to Response to Motion re 55 MOTION for Summary Judgment filed by Admiral Insurance Company. (Mediak, Emma) (Entered: 04/08/2021) |
| 04/08/2021 | 73 | AFFIDAVIT in Support re 55 MOTION for Summary Judgment *Second Declaration of Ronald Ronzello* filed by Admiral Insurance Company. (Mediak, Emma) (Entered: 04/08/2021) |
| 04/20/2021 | 74 | IT IS ORDERED that Defendant Anthony Alfords Motion to Dismiss for Lack of Personal Jurisdiction Doc. 30 is DENIED. Signed by Judge Brian Morris on 4/20/2021. (SLL) (Entered: 04/20/2021) |
| 04/20/2021 | 75 | MINUTE ENTRY for proceedings held before Judge Brian Morris: MOTION HEARING held 4/20/2021: Counsel Emma Mediak appearing on behalf of the Plaintiff; and, Counsel Kevin Feeback appearing on behalf of Defendants. This hearing is with regard to Plaintiffs 55 Motion for Summary Judgment. Parties w/argument. Matter is submitted. Hearing commenced at 1:36 p.m. and concluded at 2:46 p.m. (Court Reporter Y. Heinze.) (Law Clerk: S. Carmack), (Hearing held in Charles Pray Courtroom, Great Falls, MT) (SLR) (Entered: 04/20/2021) |
| 05/05/2021 | 76 | ORDER granting 55 Motion for Partial Summary Judgment. Signed by Judge Brian Morris on 5/5/2021. (MMS) (Entered: 05/05/2021) |
| 05/18/2021 | 77 | CLERK'S JUDGMENT (MMS) (Entered: 05/18/2021) |
| 06/04/2021 | 78 | NOTICE OF APPEAL by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc.. Filing fee $ 505, receipt number 0977-2677501. (Deola, Linda) (Entered: 06/04/2021) |
| 06/07/2021 | 79 | USCA Case Number 21-35433 and Time Scheduling Order for 78 Notice of Appeal filed by Anthony J. Alford, Dual Trucking of Montana, LLC, Dual Trucking, Inc., Dual Trucking and Transport, LLC. (ACC) (Entered: 06/07/2021) |
| 06/17/2021 | 80 | TRANSCRIPT DESIGNATION ORDER FORM by Anthony J. Alford, Dual Trucking and Transport, LLC, Dual Trucking of Montana, LLC, Dual Trucking, Inc. for proceedings held on April 20, 2021 before Judge Brian Morris. Court reporter Yvette Heinze. Type of transcript: 30-Day. Transcript due by 7/16/2021. (Feeback, Kevin) (Entered: 06/17/2021) |
| 07/07/2021 | 81 | TRANSCRIPT of Motion Hearing held on 04-20-2021 before Judge Morris. Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER, the clerks office, or the court reporter. NOTICE: A NOTICE OF INTENT TO REQUEST REDACTION MUST BE FILED WITHIN 7 DAYS OF THIS FILING. Contact court reporter Yvette Heinze, 406-422-8619, yvettecsrrpr@gmail.com. For further information, please see the Transcript Redaction Procedure and Schedule on the Court Reporters page of our website.. Redaction Request due 7/28/2021. Redacted Transcript Deadline set for 8/9/2021. Release of Transcript Restriction set for 10/5/2021. (YMH) (Entered: 07/07/2021) |

**PACER Service Center**

ER 261

**Transaction Receipt**

| 10/04/2021 09:58:53 | | | |
|---|---|---|---|
| **PACER Login:** | lindeola | **Client Code:** | Dual Trucking |
| **Description:** | Docket Report | **Search Criteria:** | 4:20-cv-00053-BMM |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**ER_262**